# Appendix 4E
## Preliminary final report



**ABN 42 004 080 264**

| **Financial year ended** | **Previous financial year ended** |
|---|---|
| (current period) | (previous corresponding period) |
| **30 September 2025** | 30 September 2024 |

**Results for announcement to the market**

| Extracts of the Dyno Nobel Limited results for the financial year ended 30 September 2025 | | | | **$A mill** |
|---|---|---|---|---|
| Revenues from ordinary activities | down | $A mill 19.7 (0.4%) | to | 5,345.2 |
| Net profit for the financial year attributable to members of Dyno Nobel Limited | up | $A mill 257.7 (82.9%) | to | (53.2) |
| Profit after tax excluding individually material items attributable to members of Dyno Nobel Limited | up | $A mill 22.6 (5.6%) | to | 423.4 |
| Revenues from continuing ordinary activities | up | $A mill 172.2 (4.9%) | to | 3,710.1 |
| Net profit from continuing operations for the period attributable to members of Dyno Nobel Limited | up | $A mill 432.0 (151.7%) | to | 147.2 |
| Profit after tax from continuing operations excluding individually material items attributable to members of Dyno Nobel Limited | up | $A mill 55.0 (16.9%) | to | 379.6 |

| **Dividends** | **Amount per security cents** | **Franked amount per security cents** |
|---|---|---|
| **Current Period** | | |
| Interim dividend | 2.4 | – |
| Final dividend | 9.5 | – |
| **Previous corresponding period** | | |
| Interim dividend | 4.3 | – |
| Special dividend | 10.2 | – |
| Final dividend | 6.3 | – |

Record date for determining entitlements to the final dividend: 2 December 2025

Payment date of final dividend: 16 December 2025

The Dividend Reinvestment Plan remains suspended until further notice and will not be in operation for the 2025 final dividend.

| | **Current period** | **Previous corresponding period** |
|---|---|---|
| **Net tangible asset backing per ordinary security** | $1.01 | $1.22 |

Net tangible assets include the right-of-use assets recognised under AASB 16 Leases.

The information should be read in conjunction with the consolidated financial report, which is set out on pages 49 to 95.

For the profit commentary, and any other significant information needed by an investor to make an informed assessment of Dyno Nobel's results, please refer to the accompanying Dyno Nobel Limited Profit Report.

**Conduit foreign income component:**

| *Current period* | | *Previous corresponding period* | |
|---|---|---|---|
| Interim dividend | | Interim dividend | |
| Ordinary | 2.4 | Ordinary | 4.3 |
| Final dividend | | Special dividend | |
| Ordinary | 9.5 | Ordinary | 10.2 |
| | | Final dividend | |
| | | Ordinary | 6.3 |

# Contents

| | |
|---|---|
| Directors' Report | 3 |
| Auditor's Independence Declaration | 48 |
| Financial Report | 49 |
| Independent Auditor's Report | 96 |

**Annual General Meeting**

The Annual General Meeting will be held as follows:

| | |
|---|---|
| Location | Dexus Place<br>Level 4, 480 Queen Street<br>Brisbane City QLD 4000 |
| Date | 17 December 2025 |
| Time | 11:30am AEST |
| Approximate date the 2025 Annual Report will be available | 17 November 2025 |

**Compliance Statement**

This report has been prepared under accounting policies which comply with the *Corporations Act 2001* (Cth), the Accounting Standards and other mandatory professional reporting requirements in Australia, and the *Corporation Regulations 2001* (Cth).

This report uses the same accounting policies as the financial statements prepared under the *Corporations Act 2001* (Cth). This gives a true and fair view of the matters disclosed. The financial report is based on accounts which have been audited.

For further information, please contact:

**Investor Relations**
Tom Dixon
T: +61 450 541 389
E: tom.dixon@dynonobel.com

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.83    Page 3 of 100

3   DYNO NOBEL    Directors' Report | Operating and Financial Review | Remuneration Report | Financial Report | Independent Auditor's Report

# Directors' Report

The directors of Dyno Nobel present their report together with the financial report of the Company and its controlled entities (the Group) for the year ended 30 September 2025 and the auditor's report.

The following sections of the Annual Report form part of, and are to be read in conjunction with, this Directors' Report:

» Board of Directors
» Operating and Financial Review (OFR)
» Remuneration Report
» Independent Auditor's Report

## Directors

Particulars of the qualifications, other directorships, experience and special responsibilities of each Director as at the date of this report are set out in the Board of Directors section.

## Directors' meetings

The number of Board and Board Committee meetings attended by each of the directors of the Company during the financial year are listed below:

| Director – Current[2][3][4] | Board | | Audit and Risk Management Committee | | People and Remuneration Committee | | Nominations Committee | | Safety and Sustainability Committee | | Additional Meetings[1] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Held | Attended | Held | Attended | Held | Attended | Held | Attended | Held | Attended | Held | Attended |
| G Robinson | 8 | 8 | – | 5 | – | 5 | 2 | 2 | – | 4 | 5 | 5 |
| B Brook | 8 | 8 | 5 | 5 | 5 | 5 | 2 | 2 | – | 3 | 5 | 5 |
| T Dwyer | 8 | 8 | 5 | 5 | 5 | 5 | 2 | 2 | – | 4 | 2 | 2 |
| M Carroll | 8 | 8 | – | 5 | 5 | 5 | – | 2 | 4 | 4 | 2 | 2 |
| J Ho | 8 | 8 | – | – | – | 1 | – | – | – | – | 2 | 2 |
| F Hick | 8 | 8 | 5 | 5 | – | 5 | – | 2 | 4 | 4 | 2 | 2 |
| M Neves | 8 | 8 | – | 5 | – | 5 | – | – | 4 | 4 | 5 | 5 |

 Chair   Member

(1) Reflects the number of additional formal Board meetings attended by each director during the financial year and includes attendance at Board Sub-Committee meetings where any two directors are required to form a quorum.
(2) 'Held' indicates the number of meetings held during the period that the director was a member of the Board or Committee.
(3) 'Attended' indicates the number of meetings attended by a director. A director is deemed to have attended a meeting if they were present for more than half of the duration of the meeting.
(4) In addition to the Board and Committee meetings held during the year, directors attended site visits at Port Hedland, Perth, Helidon, Moranbah, Moura, Cheyenne, Graham, Louisiana, Salt Lake City and Simsbury.

## Directors' interests in share capital

The relevant interests of each director in the share capital of the Company as at the date of this report is disclosed in the Remuneration Report.

## Company Secretary

Ms Richa Puri was appointed to the role of Company Secretary on 8 August 2019. Ms Puri (LLB (Hons), B. Com (Accounting), FGIA, GAICD) is a corporate lawyer and governance adviser with over 15 years relevant professional experience. She has practiced as a lawyer for legal firms in Australia and has experience in providing in-house legal, governance and company secretarial advice to ASX listed companies.

## Principal activities

The principal activities of the Group during the course of the financial year were the manufacture and distribution of industrial explosives, industrial chemicals and fertilisers, and the provision of related services. No significant changes have occurred in the nature of these activities during the financial year.

## Dividends

Dividends since Dyno Nobel's 2024 Annual Report:

| Dividend type | Dividend per share | Total amount $mill | Franked percentage | Date of payment |
|---|---|---|---|---|
| **Paid during the financial year** | | | | |
| 2024 final dividend | 6.3 cents | 118.0 | 100% unfranked | 18 Dec 2024 |
| 2025 interim dividend | 2.4 cents | 44.3 | 100% unfranked | 3 Jul 2025 |
| **To be paid after end of the financial year** | | | | |
| 2025 final dividend | 9.5 cents | $170.6[1] | 100% unfranked | 16 December 2025 |

(1) Based on number of shares on issue at 30 September 2025.

## Review and results of operations

A review of the operations of the Company during the financial year, the results of those operations and the Company's financial position is contained in the OFR.

## Significant changes in the state of affairs

There have been no significant changes to the Group's state of affairs during the financial year other than as noted in the OFR.

On 31 March 2025, the Company changed its name from Incitec Pivot Limited (ASX:IPL) to Dyno Nobel Limited (ASX:DNL).

During the year, the Company progressed the structural separation of its Dyno Nobel explosives business and Incitec Pivot Fertilisers business. On 30 September 2025, the Company completed the sale of the IPF Distribution business to Ridley Corporation. The sale of the Perdaman offtake agreement to Macquarie CGM is pending satisfaction of conditions precedent. Separately, the Gibson Island land sale has been completed in September, with proceeds of sale received on 8 October 2025, and the Company has entered into leaseback arrangements to complete the environmental remediation of the site. During the year, the Company also completed the strategic review of its Australian fertilisers manufacturing assets, with manufacturing at Geelong ceasing operations in October 2025 as a result. The sale process for Phosphate Hill is continuing. If an agreed sale cannot be reached by 31 March 2026, Dyno Nobel will progress an orderly closure of Phosphate Hill operations by 30 September 2026.

Additionally, the Group bought back shares valued at $281.6m during FY25, with $430.6m of the planned $900m on-market share buyback program completed to date. The Group remains committed to executing the remainder of the program and has sufficient cash reserves and committed bank facilities to complete the buyback.

## Events subsequent to reporting date

On 10 November 2025, Dyno Nobel announced a final dividend of 9.5 cents per share unfranked, to be paid on 16 December 2025. The record date for entitlement to this dividend is 2 December 2025. Based on the number of shares on issue at 30 September 2025, the total dividend payment will be $170.6m.

Other than the matters reported on above, the directors have not become aware of any other significant matter or circumstance that has arisen since the end of the financial year, that has affected or may affect the operations of the Group, the results of those operations, or the state of affairs of the Group in subsequent years, which has not been covered in this report.

## Likely developments

The OFR contains information on the Company's 2025 financial performance and prospects for future financial years, and refers to likely developments in the Company's operations and the expected results of these operations in future financial years. Information on likely developments in the Company's operations for future financial years and the expected results of those operations together with details that could give rise to material detriment to the Company (for example, information that is commercially sensitive, confidential or could give a third party a commercial advantage) have not been included in this report where the directors believe it would likely result in unreasonable prejudice to the Company.

5

DYNO
NOBEL

**Directors'
Report**

Operating and
Financial Review

Remuneration
Report

Financial
Report

Independent
Auditor's Report

Case 2:25-cv-00789-DBP     Document 21-1     Filed 11/14/25     PageID.85     Page 5 of 100

# Environmental regulation and performance

The operations of the Group are subject to environmental regulation under the jurisdiction of the countries in which those operations are conducted including Australia, US, Mexico, Chile, Canada, Indonesia, Papua New Guinea, Türkiye and France. The Group is committed to complying with environmental legislation, regulations, standards and licences relevant to its operations.

The environmental laws and regulations generally address certain aspects and potential impacts of the Group's activities in relation to, among other things, air and noise quality, soil, water, biodiversity and wildlife. The Group operates under a Global Health, Safety and Environment Management System which sets out guidelines on the Group's approach to environmental management, including a requirement for sites to undertake environmental risk assessments identifying controls for our significant risks and developing and implementing improvement or management plans.

In certain jurisdictions, the Group holds licences for some of its operations and activities from the relevant environmental regulator. The Group Environmental Licence Compliance Procedure requires sites with permits or licences to set up actions to maintain compliance, the completion of which are tracked through at Business Unit and Group levels. The Group also reports statutory non-compliances as required.

Measurement of the Group's environmental performance, including determination of areas of focus and assessment of projects to be undertaken, is based not only on the actual impact of incidents, but also upon the potential consequence, consistent with Dyno Nobel's risk-based focus.

During the year, the Group has continued to focus on licence compliance and identification and mitigation of environmental risks. Compliance and remediation works have progressed at several sites in Australia and the US.

Good environmental performance was achieved with zero Significant (consequence category 5+) Environmental Incidents reported in the 2025 financial year. The continued focus on identifying our environmental regulatory obligations and the development of appropriate compliance activities with regular tracking of performance of action completions have led to this result.

This year, following a pilot environmental assurance program in FY24, an environmental assurance audit was carried out at the Moranbah site as part of a formal overall Health, Safety, Environment and Operations Excellence (HSEOE) assurance audit. The conclusions of the environmental component of the audit were that there was good compliance with Dyno Nobel's Environmental Standard and associated procedures.

This financial year, there have been no fines or penalties from an environmental non-compliance perspective.

In April 2025, the 2020 Consent Decree relating to Carthage and Louisiana was resolved with the Environmental Protection Authority (EPA) submitting a stipulation requesting the court terminate the Consent Decree, which will officially end this matter.

At Gibson Island, obligations and milestones under an Environmental Protection Order (EPO) and a separate Enforceable Undertaking (EU) (both issued in June 2023) were met during the year with several agreed modifications and regular engagement with the Department of Environment, Tourism, Science and Innovation (DETSI). These obligations were related to committed improvements to stormwater release quality and groundwater contamination which were completed during FY25. In March 2025, DETSI determined that Dyno Nobel had satisfied the requirements of the EPO and that the EPO was finalised and no longer in effect. In September 2025, DETSI advised Dyno Nobel that it was satisfied that Dyno Nobel has substantially complied with the terms of the EU which is also no longer in effect.

An amendment to the Gibson Island site environmental licence set challenging stormwater discharge criteria in March 2024, and the site has significant projects underway to achieve compliance with these new licence conditions. For the site to implement these projects over a reasonable period, site management submitted a Transitional Environmental Program (TEP) which was approved by the regulator in September 2024. The TEP charts the site's transition to compliance through to May 2026.  Dyno Nobel has met all the requirements of the TEP up to the end of FY25. Further detailed planning has progressed for the remediation activities to be performed by Dyno Nobel at the Gibson Island site following completion of the land sale.

At Geelong, the EPA issued three Notices in FY24 requiring the site to:

» Revise the site's Risk Management and Monitoring Program (RMMP). A revised RMMP was submitted and the Notice revoked on 3 October 2024.

» Carry out an investigation on the potential risks to human health and the environment from tracking of materials in the vicinity of the site's exit gates. This investigation report was submitted with commitments to improve dust and tracking management and the Notice was revoked on 14 October 2024.

» Provide a plan detailing how the risk of harm from dust to nearby residents will be controlled. A plan was submitted prior to 31 October 2024, and the Notice was revoked on 8 November 2024.

## Indemnities and insurance

The Company's Constitution provides that, to the extent permitted by law, the Company must indemnify any person who is, or has been, a director or secretary of the Company against any liability incurred by that person including any liability incurred as an officer of the Company or a subsidiary of the Company and legal costs incurred by that person in defending an action.

The Constitution further provides that the Company may enter into an agreement with any current or former director or secretary or a person who is, or has been, an officer of the Company or a subsidiary of the Company to indemnify the person against such liabilities.

In accordance with the Company's Constitution, the Company has entered into Deeds of Access, Indemnity and Insurance with each director of the Company and certain officers and members of senior management. Pursuant to those deeds, the Company has paid a premium in respect of a contract insuring directors and officers of the Group against any liability for costs and expenses incurred by them in defending civil or criminal proceedings involving them as such officers, with some exceptions. The contract of insurance prohibits disclosure of the nature of the liability insured against and the amount of the premium paid.

## Auditor independence and non-audit services

Deloitte Touche Tohmatsu (Deloitte) was appointed as the Company's external auditor at the 2011 Annual General Meeting and continues in office in accordance with section 327B(2) of the *Corporations Act 2001*. Ms Suzana Vlahovic was appointed as the Company's lead audit partner commencing from FY24.

The Group may decide to engage the auditor, Deloitte, for the provision of non-audit services, where such services are not in conflict with their role as auditor and their expertise and/or detailed experience with the Company may allow cost efficiencies for the work.

The Board has considered the position and, in accordance with advice received by the Audit and Risk Management Committee, is satisfied that the provision of non-audit services during the year by Deloitte is compatible with the general standard of independence for auditors imposed by the *Corporations Act 2001* and does not compromise the external auditor's independence.

The Board also notes:

» the engagements for all non-audit services provided by Deloitte were reviewed by the Chief Financial Officer, and where relevant, approved by the Audit and Risk Management Committee, in accordance with the Committee's Charter and the Company's policy on the engagement of the external auditor for the provision of non-audit services to ensure they do not impact the integrity and objectivity of the auditor; and

» the non-audit services provided by Deloitte did not undermine the general principles relating to auditor independence as set out in APES 110 Code of Ethics for Professional Accountants, as they did not involve reviewing or auditing the auditor's own work, acting in a management or decision making capacity for the Group, acting as an advocate for the Group or jointly sharing economic risks or rewards.

Deloitte provided non-audit services to the amount of $169,000 during the year ended 30 September 2025 (refer to note 24 to the financial statements).

The lead auditor has provided a written declaration that no professional engagement for the Group has been carried out during the year that would impair Deloitte's independence as auditor. A copy of the auditor's independence declaration is set out on page 48 and forms part of this report.

## Proceedings on behalf of Dyno Nobel

No application has been made under section 237 of the *Corporations Act 2001* in respect of Dyno Nobel, and there are no proceedings that a person has brought or intervened in on behalf of Dyno Nobel under that section.

## Rounding

As the Company is of a kind referred to in *ASIC Corporations (Rounding in Financial/Directors' Reports) Instrument 2016/191*, the amounts shown in this report and in the financial statements have been rounded off, except where otherwise stated, to the nearest one hundred thousand dollars.

The Directors' Report, which includes the OFR and the Remuneration Report, is signed in accordance with a resolution of the directors of Dyno Nobel.

**Greg Robinson**
Chair

**Mauro Neves**
CEO & Managing Director

10 November 2025

**7**

DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.87    Page 7 of 100

Directors'
Report

**Operating and
Financial Review**

Remuneration
Report

Financial
Report

Independent
Auditor's Report

# Operating and Financial Review

## Group Overview

Dyno Nobel is a leading global manufacturer of explosives and blasting services provider with a history of more than 160 years of innovation. It also manufactures and distributes fertilisers to the agricultural sector, which Dyno Nobel is currently in the process of divesting. With a team of over 5,500 dedicated employees and an unrelenting focus on Zero Harm, the Company adds value to its customers through innovative technology solutions and world class products and services focused on the needs of its customers.

Sustainability is interlinked with Dyno Nobel's strategy which is aimed at delivering sustainable growth and shareholder returns. Dyno Nobel proactively manages the issues that are material to the long-term sustainability of the business, environment, and the communities in which it operates. Dyno Nobel has an ambition of achieving Net Zero operational emissions by 2050, or sooner if practical.

Dyno Nobel operates through four business units, details of which are set out in this review:

» Dyno Nobel Americas (DNA);

» Dyno Nobel Asia Pacific (DNAP);

» Dyno Nobel EMEA & LATAM (DNEL); and

» Fertilisers Asia Pacific.

Dyno Nobel plays a vital role in unlocking the world's critical resources, to help build infrastructure and generate the energy needed to live in a modern world.

Dyno Nobel has been executing its strategy to become the pure-play global leader in explosives, with significant progress made on separation of the Fertilisers business in FY25. The sale of the Fertilisers Distribution business was completed on 30 September 2025, whilst a decision on the Fertilisers manufacturing business (Phosphate Hill) is expected by 31 March 2026. The earnings attributable to the Distribution business in FY25 have been presented as discontinued operations and the manufacturing business remains part of the continuing operations.

The Company has operations in Australia, North America, Europe, Asia, Latin America and Africa.

## Dyno Nobel Americas

The Dyno Nobel Americas business comprised two businesses in FY25:

» Explosives; and

» Agriculture & Industrial Chemicals.

The ammonia manufacturing facility at WALA was divested on 1 December 2023, with comparative FY24 earnings reflected as discontinued operations.

### Explosives

DNA provides ammonium nitrate, initiating systems and services to the Quarry & Construction sector across the US; the Base & Precious Metals sector in the US mid-West, US West and Canada; and to the Coal sector in the Powder River Basin, Illinois Basin and Appalachia.

In North America, DNA manufactures ammonium nitrate at its Cheyenne, and LOMO plants. The Cheyenne plant is adjacent to the Powder River Basin, North America's most competitive thermal coal mining region and is well positioned to service the Base & Precious Metals in Western US. The LOMO plant has a competitive logistic footprint from which to support mining in both the Illinois Basin and Appalachia, as well as Quarry & Construction in the US mid-West.

Dyno Nobel is the largest industrial explosives distributor in North America, enabled by its optimised wholly owned and joint venture partner distribution structure, supplying a combination of manufactured and third party purchased AN, bundled with its initiation systems and differentiated services.

Initiating systems are manufactured at Dyno Nobel's facilities in Connecticut, Kentucky, Illinois, Missouri and Mexico.

### Agriculture & Industrial Chemicals

The Dyno Nobel Americas business manufactures and distributes nitrogen-based fertilisers in the United States from its St Helens and Cheyenne plants. With the sale of St Helens completed in FY25, this division is no longer expected to make a material contribution to earnings and will not be reported separately from FY26.

## Dyno Nobel Asia Pacific

DNAP provides ammonium nitrate based industrial explosives, initiating systems and services to the Metallurgical Coal and Base & Precious Metals sectors in Australia, Indonesia and Malaysia through its subsidiaries and joint ventures.

DNAP is the second largest industrial explosives distributor in Australia by volume, which in turn is the world's third largest industrial explosives market. DNAP primarily supplies its products to metallurgical coal mines in the east and to iron ore mines in the west, with a growing precious metals segment.

DNAP manufactures ammonium nitrate at its Moranbah plant, which is located in the Bowen Basin, the world's premier metallurgical coal region. Dyno Nobel also has a 50% interest in Queensland Nitrates Pty Ltd (QNP), a fully integrated ammonium nitrate facility near Moura in Central Queensland, also servicing the Bowen Basin coal fields.

DNAP sources some third party ammonium nitrate, including in Western Australia, to service the Iron Ore and Underground sectors.

Initiating systems are manufactured in Australia at Dyno Nobel's Helidon facility and are also sourced from Dyno Nobel facilities in the Americas and from South Africa (DetNet JV).

## Dyno Nobel EMEA & LATAM

Dyno Nobel has established EMEA & LATAM as a growth market segment. This reflects its strategy to expand in Latin America, Europe and Africa through a capital-light approach, leveraging its globally recognised brand, unique technology and strong customer relationships.

This business unit includes:

» Titanobel, a leading industrial explosives manufacturer and drilling, blasting and technical services provider based in France

» Nitromak, a distributor of explosives products and services supplier based in Türkiye

» LATAM businesses targeting growth using traded ammonium nitrate, flexible assets and proprietary initiation systems

» South African joint ventures manufacturing initiation systems and distribution of Dyno Nobel licenced products (Sasol Dyno Nobel JV (SDN) and DetNet JV).

## Fertilisers Asia Pacific

Dyno Nobel's Fertilisers business has historically been comprised of separate distribution and manufacturing divisions.

Distribution sells to major offshore agricultural markets in Asia Pacific, the Indian subcontinent, Brazil and the United States. It also procures fertilisers from overseas manufacturers to meet domestic seasonal peaks. As noted, the sale of the Distribution business completed on 30 September 2025 with earnings treated as discontinued operations and restructuring costs as Individually Material Items (IMIs).

The Fertilisers manufacturing business produces Di/mono ammonium phosphate fertilisers (DAP/MAP) at its Phosphate Hill and Mt Isa manufacturing facilities in Queensland, Australia. Earnings from this business are treated as continuing operations within the Fertilisers segment.

The sale process for Phosphate Hill is continuing, targeting 31 March 2026. If an agreed sale cannot be reached, Dyno Nobel will progress an orderly closure of Phosphate Hill by 30 September 2026.

9 DYNO NOBEL    Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.89    Page 9 of 100

Directors' Report | **Operating and Financial Review** | Remuneration Report | Financial Report | Independent Auditor's Report

# Group Summary

**Table 1**

| Dyno Nobel Group | Year ended 30 September | | |
| --- | --- | --- | --- |
| | FY25 A$m | FY24 A$m | Change % |
| Revenue | 5,345.2 | 5,364.9 | (0.4%) |
| EBITDA ex IMIs | 1,012.4 | 924.8 | 9.5% |
| EBIT ex IMIs | 714.1 | 579.8 | 23.2% |
| **NPAT ex IMIs** | **423.4** | **400.8** | **5.6%** |
| IMIs after tax | (476.6) | (711.7) | 33.0% |
| **Group NPAT** | **(53.2)** | **(310.9)** | **82.9%** |
| **Balance Sheet and Capital Returns** | | | |
| Cash generated from operating activiites | 574.7 | 290.2 | 98.0% |
| Group average TWC % revenue | 19.5% | 20.7% | 1.2% |
| Cash conversion % | 56.8% | 31.4% | 25.4% |
| **Return On Invested Capital**[1] | | | |
| Including goodwill | 8.2% | 6.3% | 1.9% |
| Excluding goodwill | 11.5% | 8.7% | 2.8% |
| **Shareholder Returns** | | | |
| *Cents Per Share* | | | |
| Earnings per share ex IMIs | 22.8 | 20.7 | 10.1% |
| Total dividends | 11.9 | 10.6 | 12.3% |
| **Credit Metrics** | | | |
| Net debt[2] | (1,180.5) | (651.6) | |
| Net debt / EBITDA (ex IMIs)[3] | 1.4x | 0.8x | |
| Net debt including TWC facilities / EBITDA (ex IMIs)[4] | 1.4x | 0.8x | |
| Interest cover[5] | 10.7x | 12.5x | |
| Tenor of debt | 3.8 | 2.6 | |
| **Zero Harm** | | | |
| TRIFR[6] | 0.89 | 1.10 | |
| Process safety incidents[7] | 15 | 18 | |
| Significant environmental incidents[8] | 0 | 0 | |

## Key Metrics

» **Group NPAT:** $53m loss (vs $311m loss in FY24), including IMIs of $477m mainly from IPF sale and non-cash impairments.

» **EBIT ex IMIs:** $714m (+23%), driven by commodity & FX tailwinds (+$155m) and transformation benefits.

» **Dyno Nobel:** EBIT down 10% to $413m impacted by successful completion of three manufacturing facility turnarounds in FY25 and the WALA sale in FY24, which cut earnings by $59m.

» **Fertilisers:** EBIT up 151% to $301m, supported by commodity & FX, strong trading and stable manufacturing.

## Zero Harm

» Marked improvement in TRIFR (19%)[6], process safety incidents[7] and injury severity.

» No incidents classified as serious harm or significant environmental incidents[8].

## Strategy

» Fertiliser separation nearing completion, marking major progress in portfolio reshaping.

» Asset sales completed; proceeds reinvested in capital management with a clear path forward for Phosphate Hill.

» Transformation program has delivered $134m to date, with a 47% exit run rate — halfway to target.

» FY26 priorities: progress buyback, deliver $30–70m in transformation benefits, and separate Phosphate Hill.

## Capital Management

» Proceeds from sale used for debt reduction under the capital management framework.

» On-market buyback progressing: $430.6m completed of $900m program; second tranche underway.

» Final (unfranked) dividend announced, aligned with payout ratio policy.

## Balance Sheet & Returns

» Strong cash generation, nearly doubling to $575m, with cash conversion improving to 57%, driven by higher EBITDA in FY25 and the repayment of TWC facilities in FY24.

» ROIC improved to 8.2% (up 1.9% YoY) supported by stronger earnings in FY25 and the impact of significant impairments recognised in FY24 in the Fertilisers business.

» Net debt increased to $1.18b (81% YoY) due to tax payment on WALA sale and shareholder returns; leverage remains within target at 1.4x.

» Debt refinanced to increase tenor.

---

(1) Return On Invested Capital (ROIC), calculated as 12 month rolling Net Operating Profit After Tax, excluding individually material items/13 month rolling average operating fixed assets and intangible assets and operating net working capital. FY24 ROIC has been restated to exclude WALA.
(2) Net debt comprises the net of interest-bearing liabilities, cash and cash equivalents, and the fair value of derivative instruments economically hedging the Group's interest- bearing liabilities.
(3) Net debt (adjusted for average exchange rate for the year)/EBITDA (adjusted for earnings from WALA) ratio is calculated using 12 month rolling EBITDA ex IMIs.
(4) Net debt including TWC facilities (adjusted for average exchange rate)/EBITDA (adjusted for earnings from WALA) ratio is calculated using 12 month rolling EBITDA ex IMIs. Net debt for this ratio has been adjusted to include the usage of factoring and reverse factoring facilities.
(5) Interest cover = 12 month rolling EBITDA ex IMIs/net interest expense before accounting adjustments.
(6) TRIFR is calculated as the number of recordable incidents per 200,000 hours worked and includes contractors. TRIFR results are subject to finalisation of the classification of any pending incidents. FY24 TRIFR has been restated due to the reclassification of injuries.
(7) Process Safety Incidents as classified by the Centre for Chemical Process Safety.
(8) Significant Environmental Incidents as assessed against Dyno Nobel's internal risk matrix with actual consequences of 5 or higher on a 6-level scale.

# Income Statement

**Table 2**

| | | Year ended 30 September | | | |
|---|---|---|---|---|---|
| | | FY25 | | FY24 | Change |
| Dyno Nobel Group | Group A$m | Dyno Nobel A$m | Fertilisers A$m | Group A$m | Group % |
| Revenue | 5,345.2 | 3,202.5[1] | 2,142.7 | 5,364.9 | (0.4%) |
| COGS & cost to serve | (3,970.8) | (2,214.0) | (1,756.8) | (4,102.2) | 3.2% |
| **Operating margin[2]** | **1,374.4** | **988.5** | **385.9** | **1,262.7** | **8.8%** |
| *Year-on-year %* | *8.8%* | *(0.8%)* | *44.7%* | | |
| Overheads[3] | (495.2) | (437.5) | (57.7) | (478.8) | (3.4%) |
| Joint Venture income | 80.3 | 80.3 | – | 62.2 | 29.1% |
| Other income | 52.9 | 51.1 | 1.8 | 78.7 | (32.8%) |
| **EBITDA ex IMIs** | **1,012.4** | **682.4** | **330.0** | **924.8** | **9.5%** |
| *EBITDA margin* | *18.9%* | *21.3%* | *15.4%* | *17.2%* | *1.7%* |
| **EBIT ex IMIs** | **714.1** | **413.3** | **300.8** | **579.8** | **23.2%** |
| *Year-on-year %* | *23.2%* | *(10.2%)* | *151.1%* | | |
| *EBIT margin* | *13.4%* | *12.9%* | *14.0%* | *10.8%* | *2.6%* |
| **NPAT ex IMIs** | **423.4** | | | **400.8** | **5.6%** |
| IMIs after tax | (476.6) | | | (711.7) | 33.0% |
| **Group NPAT** | **(53.2)** | | | **(310.9)** | **82.9%** |

## Dyno Nobel

Dyno Nobel delivered $3.2b in revenue, broadly stable year-on-year. Earnings were supported by $60m in transformation benefits across all business units in FY25, partially offset by scheduled turnarounds and the accounting loss on sale of St Helens.

The major planned turnaround at Moranbah and minor turnarounds at LOMO and Cheyenne had a combined negative EBIT impact of $49m. These three manufacturing facility turnarounds were successfully completed, enhancing operational resilience.

The Ag&IC business contributed an additional $26m YoY earnings, supported by strong commodity prices and depreciation benefits following the FY24 impairment of St Helens, partially offset by the accounting loss on sale of the St Helens plant in August 2025.

Additionally, Dyno Nobel sold its ammonia manufacturing facility at WALA, effective 1 December 2023. With two months of earnings included in FY24 and nil in FY25, the sale inflated FY24 comparatives by $59m.

Despite these headwinds, Dyno Nobel maintained resilience, delivering EBITDA of $682m and EBIT margin of 12.9%. Income from joint ventures also increased meaningfully, reinforcing the effectiveness of Dyno Nobel's strategic partnerships and their alignment with the broader strategy.

## Fertilisers

Fertilisers delivered a solid result, with EBIT up 151% to $301m and operating margin rising by 45% ($386m).

Phosphate Hill led the uplift (+237% YoY), driven by $159m in commodity and FX tailwinds (DAP +21%, weaker AUD) and depreciation benefits post the FY24 impairment.

IPF Distribution also performed strongly, delivering EBIT of $68m (+33% YoY), supported by margin expansion and depreciation benefits following its held-for-sale classification in March 2025.

As a result of the sale process and ongoing uncertainty regarding gas supply, a full impairment of the Phosphate Hill operations was recorded in FY25.

(1)   Includes Group elimination arising from intersegment sales between Dyno Nobel and Fertilisers.
(2)   Operating margin represents revenue after deducting cost of goods sold and other cost directly attributable to generating customer sales.
(3)   Overheads includes costs that cannot be directly linked to customer sales, such as corporate and administrative expenses.

# Individually Material Items

NPAT includes the following items, classified as IMIs:

**Table 3**

| IMIs | Gross A$m | Tax A$m | Net A$m |
|---|---|---|---|
| Loss on sale of IPF Distribution and Gibson Island land | 175.2 | (7.6) | 167.6 |
| Geelong manufacturing site closure | 65.1 | (19.6) | 45.5 |
| Fertiliser separation costs | 13.3 | (4.0) | 9.3 |
| Impairment of Phosphate Hill facility | 213.0 | (63.9) | 149.1 |
| Impairment of US Fertilisers business | 32.4 | (8.4) | 24.0 |
| **Fertiliser related individually material items** | **499.0** | **(103.5)** | **395.5** |
| Business transformation costs | 38.8 | (11.0) | 27.8 |
| Tax on sale of WALA | – | 53.3 | 53.3 |
| **Total individually material items** | **537.8** | **(61.2)** | **476.6** |

### Loss on sale of IPF Distribution and Gibson Island

In September 2025, Dyno Nobel recognised the sale of the IPF Distribution business to Ridley Corporation Limited and the Gibson Island land sale to Goodman Group. The accounting loss on sale includes the provision for remediation at Gibson Island of $157m which was also recognised in September 2025.

### Geelong manufacturing site closure

Dyno Nobel has ceased manufacturing at the Geelong manufacturing facility. Costs will be incurred to close the facility, transition to an import model, pay redundancies to impacted employees and remediate the land. Once the site has been remediated, ownership of the land will be transferred to Ridley as part of the sale of the IPF Distribution business.

### Fertilisers separation costs

Separation costs, primarily advisor fees and IT transition costs, were incurred to optimally position IPF for standalone operation, including costs associated with the preparation for sale of Phosphate Hill or as a separately managed business within the Dyno Nobel Group.

### Impairment of Phosphate Hill facility

Dyno Nobel has fully written down the carrying value of the Phosphate Hill operations due to the increased uncertainty regarding the near-term and long-term cost of gas across the east coast of Australia.

### Impairment of US Fertilisers business

In April 2025, Dyno Nobel made the decision to exit the Fertilisers manufacturing facility located in St Helens as the asset was not core to the strategic direction of the business. As exit would occur through either a sale or plant closure, a full impairment of the facility was recognised at 31 March 2025. In August 2025, the site was sold to a third party with the accounting loss on sale recorded in the DNA segment result.

### Business transformation costs

In FY24, Dyno Nobel initiated a business transformation project for the Dyno Nobel business. The project has identified opportunities for innovation, collaboration and more efficient ways of working and is expected to deliver significant value. The one-off project costs primarily reflect redundancy costs and advisor fees.

### Tax on sale of WALA

During 2024, Dyno Nobel prepaid taxes related to the sale of the WALA facility. The payment of Louisiana state tax was deductible for US Federal tax purposes. On lodgement of the FY24 Louisiana state tax return, it was determined that taxes had been overpaid, and the resulting refund was received in October 2025. The refund will be taxable for Federal tax purposes and the provision has been increased accordingly.

Furthermore, the unique nature of the WALA sale and the size of the transaction resulted in Dyno Nobel falling into higher tax brackets in states with a graduating tax system. In FY24, when estimating the tax provision, this impact was underestimated. The provision has been adjusted in FY25 to allow for the higher tax liability.

# Balance Sheet

**Table 4**

| Balance Sheet A$m | Year ended 30 September | | |
|---|---|---|---|
| | 30 Sep 2025 | 30 Sep 2024 | Change A$m |
| **Assets** | | | |
| TWC – Fertilisers | (24.6) | 266.6 | (291.2) |
| TWC – Explosives | 633.4 | 575.5 | 57.9 |
| **Group TWC** | **608.8** | **842.1** | **(233.3)** |
| Net PP&E | 2,203.7 | 2,435.9 | (232.2) |
| Lease assets | 149.2 | 243.4 | (94.2) |
| Intangible assets | 2,626.2 | 2,545.7 | 80.5 |
| Net tax assets / (liabilities) | 33.3 | (270.0) | 303.3 |
| Net other assets | 578.3 | 183.5 | 394.8 |
| **Total Assets** | **6,199.5** | **5,980.6** | **218.9** |
| **Liabilities** | | | |
| Environmental & restructure liabilities | (374.6) | (212.8) | (161.8) |
| Lease liabilities | (211.5) | (271.3) | 59.8 |
| Net debt | (1,180.5) | (651.6) | (528.9) |
| **Total Liabilities** | **(1,766.6)** | **(1,135.7)** | **(630.9)** |
| **Net Assets** | **4,432.9** | **4,844.9** | **(412.0)** |
| **Equity** | **4,432.9** | **4,844.9** | **(412.0)** |
| **Key Performance Indicators** | | | |
| Net Tangible Assets per Share | 1.01 | 1.22 | |
| Explosives average TWC % revenue[1] | 20.4% | 21.6% | |
| Fertilisers average TWC % revenue[1] | 17.9% | 19.4% | |
| Group average TWC % revenue[1] | 19.5% | 20.7% | |
| **Credit Metrics** | | | |
| Net debt[2] | (1,180.5) | (651.6) | |
| Net debt / EBITDA (ex IMIs)[3] | 1.4x | 0.8x | |
| Net debt including TWC facilities / EBITDA (ex IMIs)[4] | 1.4x | 0.8x | |
| Interest cover[5] | 10.7x | 12.5x | |

Major movements in the Group's Balance Sheet during the year include:

## Assets

**Trade working capital (TWC):** Net decrease of $233m since 30 September 2024 ($292m excluding the impact of FX translation) mainly due to the divestment of the IPF Distribution business at 30 September 2025 ($384m). This is partly offset by an increase in underlying TWC levels at Phosphate Hill ($93m) driven by a combination of higher commodities and additional inventories on hand which will be sold in FY26. Underlying TWC levels also increased for the Explosives business ($58m) largely due to commodities & FX impacts in the DNA business.

Trade working capital for the Explosives business averaged 20.4% of sales in FY25, representing a 1.2% improvement compared to 30 September 2024. This reduction reflects enhancements across the entire cash cycle, supported by strong debtor compliance and improved creditor payment terms. Optimising trade working capital remains a key focus of the transformation program, with solid progress achieved across both DNA and DNAP throughout the year.

Trade working capital for the Fertilisers business averaged 17.9% of sales in FY25, a 1.5% improvement compared to 30 September 2024. This reduction was driven by a significant improvement in days sales outstanding and more favourable creditor payment terms, reflecting continued focus on cash cycle optimisation.

### Trade Working Capital Facilities

Dyno Nobel has historically used trade working capital facilities to effectively manage the Group's cash flows, which are impacted by seasonality, demand and supply variability.

The Group has a non-recourse receivable purchasing agreement. As at 30 September 2025, there were nil receivables sold under this arrangement (September 2024: nil).

Dyno Nobel also offers suppliers the opportunity to use supply chain financing. As at 30 September 2025, the balance of the supply chain finance program was nil (September 2024: nil).

(1) Average TWC as % of revenue = 13-month average trade working capital/12 months rolling revenue. FY24 metrics have been restated to exclude WALA.
(2) Net debt comprises the net of interest-bearing liabilities, cash and cash equivalents, and the fair value of derivative instruments economically hedging the Group's interest- bearing liabilities.
(3) Net debt (adjusted for average exchange rate for the year)/EBITDA (adjusted for earnings from WALA) ratio is calculated using 12 month rolling EBITDA ex IMIs.
(4) Net debt including TWC facilities (adjusted for average exchange rate)/EBITDA (adjusted for earnings from WALA) ratio is calculated using 12 month rolling EBITDA ex IMIs. Net debt for this ratio has been adjusted to include the usage of factoring and reverse factoring facilities.
(5) Interest cover = 12 month rolling EBITDA ex IMIs/net interest expense before accounting adjustments.

**13** DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.93    Page 13 of 100

Directors' Report | **Operating and Financial Review** | Remuneration Report | Financial Report | Independent Auditor's Report

**Property, Plant & Equipment (PP&E):** Decrease of $232m compared to 30 September 2024 ($278m excluding the impact of FX translation) mainly driven by divestment of the IPF Distribution assets ($198m), annual depreciation ($207m), asset impairments at Phosphate Hill ($153m) and St Helens ($32m), reclassifications to intangibles ($25m) and asset disposals ($77m) including the Gibson Island land. This was partly offset by capital expenditure ($426m).

**Lease assets:** Decrease of $94m compared to 30 September 2024 mainly due to divestment of the IPF Distribution assets ($145m), annual depreciation ($56m) and an asset impairment at Phosphate Hill ($9m), partly offset by additions during the year ($115m).

**Intangible assets:** Increase of $81m compared to 30 September 2024 ($5m decrease excluding the impact of FX translation) largely due to annual amortisation ($35m) and disposal of the IPF Distribution assets ($18m), partly offset by additions ($24m) and reclassifications from PP&E ($25m).

**Tax assets and liabilities:** The net tax provision decreased by $303m (from a net liability position of $270m at 30 September 2024 to a net asset position of $33m at 30 September 2025) mainly due to tax payments made during FY25 of $443m which largely related to the WALA sale in FY24. This was partly offset by a refund on overpaid tax in Louisiana (received in October 2025) and FX impacts.

**Net other assets:** Increase of $395m compared to 30 September 2024 largely due to a current receivable from the Goodman Group for the sale of the Gibson Island land ($198m) which was received in October 2025, non-current receivables for the deferred consideration from Ridley ($109m), and prepayments made to QPM during the year for the purchase of gas to be supplied under the new supply contract to Moranbah.

## Liabilities

**Environmental & restructure liabilities:** Increase of $162m mainly due to the Gibson Island remediation provision ($111m), the Geelong closure provision ($66m) and the transition of the Gibson Island PDC to a new facility ($18m). This was partly offset by payments made during the year ($34m).

**Lease liabilities:** Decrease of $60m ($67m excluding the impact of FX translation) mainly due to divestment of the IPF Distribution business ($170m) and annual lease payments ($66m), partly offset by lease additions during the year ($158m) including the Gibson Island leaseback to complete remediation activities, and interest unwind ($12m).

**Net debt:** Increase of $529m ($462m excluding the impact of FX translation) largely driven by a scheduled tax payment related to the sale of WALA ($416m), shareholder returns including the share buyback ($286m) and dividends paid ($162m). This was partly offset by net cash proceeds from the sale of the IPF Distribution business ($360m).

**Table 5**

| Net debt A$m | Maturity Month/ Year | Facility Amount | Drawn Amount | Undrawn Amount |
|---|---|---|---|---|
| Syndicated Term Loan | 04/28 | 550.0 | – | 550.0 |
| Syndicated Term Loan | 04/29 | 250.0 | – | 250.0 |
| EMTN / Regulation S notes | 02/26 | 109.4 | 109.4 | – |
| Medium Term Notes | 03/26 | 431.3 | 431.3 | – |
| Medium Term Notes | 11/32 | 250.0 | 250.0 | – |
| Medium Term Notes | 08/35 | 250.0 | 250.0 | – |
| US Private Placement Notes | 10/28 | 380.1 | 380.1 | – |
| US Private Placement Notes | 10/30 | 380.1 | 380.1 | – |
| **Total debt** | | **2,600.9** | **1,800.9** | **800.0** |
| Fair value and other adjustments | | | (22.5) | |
| Loans from JVs, associates/other short term facilities | | | 27.1 | |
| Cash and cash equivalents | | | (647.2) | |
| Fair value of hedges | | | 22.2 | |
| **Net debt[1]** | | | **1,180.5** | |
| **Net debt / EBITDA (ex IMIs)[2]** | | | **1.4x** | |

Financial indebtedness increased by $470m as explained in the Cash Flow section of this report.

**Table 6**

| Financial indebtedness | 30 Sep 2025 A$m | 30 Sep 2024 A$m | Change A$m |
|---|---|---|---|
| Net debt[1] | 1,181 | 652 | 529 |
| Lease liabilities | 212 | 271 | (59) |
| **Total financial indebtedness** | **1,393** | **923** | **470** |

## Credit Metrics

**Net debt / EBITDA:** The increased debt position at 30 September 2025, together with the removal of WALA earnings has resulted in an increase in the net debt / EBITDA ratio to 1.4x at 30 September 2025 (30 September 2024: 0.8x). This position is within Dyno Nobel's capital allocation framework up to 2.0x.

**Interest cover:** Decreased to 10.7x (30 September 2024: 12.5x) and was above the target range of equal or more than 6.0x.

**Credit ratings:** Investment Grade credit ratings remained unchanged:
» S&P: BBB (stable outlook)
» Moody's: Baa2 (stable outlook)

(1) Net debt comprises the net of interest-bearing liabilities, cash and cash equivalents, and the fair value of derivative instruments economically hedging the Group's interest-bearing liabilities.

(2) Net debt (adjusted for average exchange rate for the year)/EBITDA (adjusted for earnings from WALA) ratio is calculated using 12 month rolling EBITDA ex IMIs.

# Debt facilities

In March 2025, the Group entered into a new Syndicated Term Facility of A$800m. The new facility is domiciled in Australia and consists of two tranches: Tranche A has a limit of A$550m maturing in April 2028 and Tranche B has a limit of A$250m maturing in April 2029. The new facility replaced the pre-existing Syndicated Term Facility domiciled in Australia which was due to mature in October 2025.

In August 2025, the Group successfully priced A$500m bonds in the Australian debt capital market across two tranches: A$250m with a fixed rate semi-annual coupon of 5.4% maturing in November 2032 and A$250m with a fixed rate semi-annual coupon of 5.82% maturing in August 2035.

In September 2025, the Group redeemed the USD305.7m 10 year bond on issue in the Regulation S capital market at par (without any premium) which was due to mature in August 2027. This was to reduce USD debt given the Group's exposure to USD earnings is expected to decrease following the Fertiliser business separation and to extend the tenor of the Group's debt profile.

The Group has two bonds valued at A$540.7m which are expected to be repaid on maturity using the proceeds from the IPF Distribution sale and surplus liquidity.

Dyno Nobel has sufficient liquidity and headroom with A$800m of available undrawn committed debt facilities at 30 September 2025.

The Group's average tenor of its drawn interest bearing liabilities at 30 September 2025 is 4.2 years (2024: 3.4 years) and the average tenor of its total debt facilities is 3.8 years (2024: 2.6 years). No committed debt facilities are due to mature until February 2026.

# Capital Expenditure

Dyno Nobel's capital allocation process is centralised and overseen by the Group's Corporate Finance function. Capital is invested on a prioritised basis and all submissions are assessed against risk factors including health, safety, sustainability, operational, financial and other strategic risks. Capital is broadly categorised into sustenance, turnaround, sustainability, digital & technology, customer growth and growth initiatives.

The table below includes a summary of cash spend per business unit on capital:

**Table 7**

| Capital expenditure | Year ended 30 September | | |
|---|---|---|---|
| | FY25 A$m | FY24 A$m | Change A$m |
| DNA | 79.3 | 93.5 | (14.2) |
| DNAP | 42.1 | 36.0 | 6.1 |
| DNEL | 4.2 | 7.8 | (3.6) |
| Fertilisers | 54.3 | 53.3 | 1.0 |
| **Sustenance** | **179.9** | **190.6** | **(10.7)** |
| DNA | 36.9 | 3.9 | 33.0 |
| DNAP | 84.9 | 15.3 | 69.6 |
| Fertilisers | 21.2 | 12.1 | 9.1 |
| **Turnaround** | **143.0** | **31.3** | **111.7** |
| DNA | 6.8 | 9.1 | (2.3) |
| DNAP | _ | 9.2 | (9.2) |
| Fertilisers | _ | 5.5 | (5.5) |
| **Sustainability** | **6.8** | **23.8** | **(17.0)** |
| **Digital & Technology** | **39.1** | **28.8** | **10.3** |
| DNA | 16.8 | 9.1 | 7.7 |
| DNAP | 7.4 | 7.9 | (0.5) |
| DNEL | 4.6 | 1.0 | 3.6 |
| **Customer Growth** | **28.8** | **18.0** | **10.8** |
| DNA | 11.8 | 3.8 | 8.0 |
| DNAP | 11.7 | 14.0 | (2.3) |
| DNEL | 0.8 | 2.3 | (1.5) |
| **Growth Initiatives** | **24.3** | **20.1** | **4.2** |
| **Total Continuing Operations** | **421.9** | **312.6** | **109.3** |
| Discontinued Operations | 52.3 | 66.1 | (13.8) |
| **Total** | **474.2** | **378.7** | **95.5** |

The FY25 sustenance spend of $180m was within the FY25 guidance previously provided of $180m to $220m. Sustenance capital expenditure is used to ensure reliable operations at the Group's manufacturing and distribution facilities in line with long term asset plans.

The turnaround spend in FY25 of $143m mainly related to scheduled turnarounds at Moranbah, Cheyenne, LOMO and Mount Isa. The FY25 digital & technology spend of $39m mainly related to Nobel Fire customer digital platform and IT upgrades. The FY25 customer growth spend of $29m mainly related to capital spend for a new customer in Canada and the expansion strategy in LATAM.

Total capital expenditure for Dyno Nobel is expected to be in the range of $280m to $330m in FY26. The range of capital expenditure is reflective of potential contract wins in the DNEL business.

Sustenance spend is influenced by asset management plans and strategies. The Group is focused on improving capital effectiveness and efficiency to ensure asset reliability and optimal returns are delivered.

FY26 outlook for Fertilisers is ~$35m.

**15** DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.95    Page 15 of 100

Directors' Report | **Operating and Financial Review** | Remuneration Report | Financial Report | Independent Auditor's Report

# Cash Flow

**Table 8**

| Cash Flow | Year ended 30 September | | |
| --- | --- | --- | --- |
| | FY25 A$m | FY24 A$m | Change A$m |
| Operating Cash Flow | | | |
| EBITDA continuing operations ex IMIs | 930.6 | 787.6 | 143.0 |
| EBITDA discontinued operations ex IMIs | 81.8 | 137.2 | (55.4) |
| Net interest paid | (104.6) | (83.1) | (21.5) |
| Net income tax paid | (26.6) | (122.1) | 95.5 |
| TWC movement (excl FX movements) | (140.1) | (311.4) | 171.3 |
| Profit from JVs and associates | (80.3) | (62.2) | (18.1) |
| Dividends received | 52.9 | 32.8 | 20.1 |
| Environmental and site clean-up | (14.2) | (14.0) | (0.2) |
| Restructuring costs | (11.7) | (7.8) | (3.9) |
| Settlement of Dyno Nobel employees entitlement | – | (4.5) | 4.5 |
| Other non-TWC | (113.1) | (62.3) | (50.8) |
| **Operating cash flow** | **574.7** | **290.2** | **284.5** |
| Investing Cash Flow | | | |
| Capital expenditure | (474.2) | (378.7) | (95.5) |
| Proceeds from asset sales | 9.8 | 30.4 | (20.6) |
| (Payment for) / proceeds from sale of discontinued operations | (55.8) | 1,639.7 | (1,695.5) |
| Acquisition of subsidiaries & non-controlling interests | – | (4.3) | 4.3 |
| **Investing cash flow** | **(520.2)** | **1,287.1** | **(1,807.3)** |
| Financing Cash Flow | | | |
| Dividends paid to members of Dyno Nobel | (162.3) | (378.2) | 215.9 |
| Capital returned to members of Dyno Nobel | – | (302.5) | 302.5 |
| Share buyback | (286.2) | (140.6) | (145.6) |
| Lease liability payments | (54.2) | (53.0) | (1.2) |
| Purchased shares for Dyno Nobel employees | (2.6) | (5.5) | 2.9 |
| Capital returned to non-controlling interests | (6.4) | – | (6.4) |
| Non-cash gain on translation of foreign currency net debt | (67.0) | 68.1 | (135.1) |
| Non-cash movement in net debt | (4.7) | (2.2) | (2.5) |
| **Financing cash flow** | **(583.4)** | **(813.9)** | **230.5** |
| Change to net debt | (528.9) | 763.4 | (1,292.3) |
| Opening balance net debt | (651.6) | (1,415.0) | 763.4 |
| **Closing balance net debt** | **(1,180.5)** | **(651.6)** | **(528.9)** |

## Operating Cash Flow

Operating cash flows of $575m improved by $285m compared to the pcp. Significant movements included:

**EBITDA continuing operations ex IMIs:** Increased by $143m mainly driven by favourable commodities and transformation benefits delivered during the year. This was partly offset by the Moranbah, LOMO and Cheyenne turnarounds in FY25.

**EBITDA discontinued operations ex IMIs:** Decreased by $55m mainly relating to the non-recurring WALA earnings in FY24.

**Net interest paid:** Increased by $22m principally as a result of lower interest income due to reduced cash deposits compared to FY24, mainly driven by a scheduled tax payment on the sale of WALA ($416m), and shareholder returns including the share buyback program ($286m) and dividends paid ($162m).

**Net income tax paid:** Decreased by $96m due to lower tax payments in the DNA business with reduced earnings in FY25 following the sale of WALA in FY24 and a net tax refund in Australia. This does not include the tax payment relating to the sale of WALA ($416m) which was included in the investing cash flows below.

**TWC movement (excl FX movements):** Improved by $171m largely due to repayment of the TWC facilities in FY24.

**Dividends received:** Increased by $20m largely driven by improved earnings compared to the pcp.

**Other non-TWC:** Increased by $51m mainly due to prepayments made during the year for the purchase of gas to be supplied under the new supply contract to Moranbah.

## Investing Cash Flow

Net investing cash outflows were $520m in FY25 compared to cash inflows of $1,287m in FY24. Significant movements included:

**Capital expenditure:** Increased by $96m mainly due to completion of the scheduled Moranbah, LOMO and Cheyenne turnarounds during FY25.

**Sale of discontinued operations:** A scheduled tax payment of $416m was paid in FY25 related to the sale of WALA, partly offset by the net proceeds from the sale of the IPF Distribution business of $360m. FY24 reflects the gross proceeds from the WALA sale.

## Financing Cash Flow

Net financing cash outflows of $583m were $231m lower compared to the pcp. Significant movements included:

**Dividends paid to members of Dyno Nobel:** The interim 1H25 dividend of $44m and final FY24 dividend of $118m were paid to shareholders in FY25. Dividend payments decreased by $216m mainly due to the $198m special dividend component of the $500m pro-rata capital return paid to shareholders in February 2024.

**Capital returned to members of Dyno Nobel:** The $303m outflow in FY24 represented the capital reduction component of the $500m pro-rata capital return noted above.

**Share buyback:** During the year, the Group repurchased $286m worth of shares as part of its planned $900m on-market buyback program. This included $8m related to FY24 that was settled in FY25. A further $4m related to FY25 will be settled in FY26.

**Foreign exchange on net debt:** The non-cash impact of $67m reflects the impact from translating US dollar denominated debt at a lower exchange rate.

# Underlying Income Statement[1]

**Table 9**

| Dyno Nobel | DNAP A$m | %YoY | DNA A$m | %YoY | DNEL A$m | %YoY | Corporate & Elims A$m | %YoY | Dyno Nobel A$m | FY24 A$m | YoY A$m |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Year ended 30 September FY25 | | | | | | |
| Revenue | 1,182.8 | (4.6%) | 1,516.9 | 4.2% | 324.5 | 12.4% | (54.1) | 14.9% | 2,970.1[2] | 2,920.9[2] | 1.7% |
| COGS & cost to serve | (746.7) | 8.6% | (1,057.8) | (0.6%) | (239.0) | (14.0%) | 54.1 | (14.9%) | (1,989.4) | (2,015.0) | 1.3% |
| **Operating margin**[3] | **436.1** | **3.2%** | **459.1** | **13.6%** | **85.5** | **8.4%** | **–** | **–** | **980.7** | **905.9** | **8.3%** |
| Overheads[4] | (107.2) | 7.0% | (209.7) | (8.7%) | (56.5) | (17.2%) | (37.1) | 27.4% | (410.5) | (407.6) | (0.7%) |
| Joint Venture income | 29.0 | 70.6% | 40.1 | 3.6% | 11.2 | 72.3% | – | – | 80.3 | 62.2 | 29.1% |
| Other income / (expenses) | (6.2) | nm | 45.9 | (0.2%) | 7.0 | nm | 4.4 | 41.9% | 51.1 | 50.9 | 0.4% |
| EBITDA ex IMIs | 351.7 | 8.9% | 335.4 | 13.3% | 47.2 | 16.8% | (32.7) | 31.9% | 701.6 | 611.4 | 14.8% |
| *EBITDA margin* | *29.7%* | *3.7%* | *22.1%* | *1.8%* | *14.5%* | *0.5%* | *nm* | *nm* | *23.6%* | *20.9%* | *2.7%* |
| EBIT ex IMIs | 254.6 | 7.8% | 188.9 | 12.6% | 30.5 | 33.2% | (40.4) | 23.9% | 433.6 | 373.6 | 16.1% |
| *EBIT margin* | *21.5%* | *2.5%* | *12.5%* | *1.0%* | *9.4%* | *1.5%* | *nm* | *nm* | *14.6%* | *12.8%* | *1.8%* |

nm = not meaningful

## Overview

FY25 delivered disciplined execution and strategic transformation, driving underlying EBIT up 16% YoY and operating margin up 8% despite revenue headwinds. Strong contributions from DNAP and DNA, and DNEL's first full year of operations, underpinned growth. Joint venture income for both DNAP and DNEL increased over 70%, reflecting contract repricing and improved market conditions.

» **Dyno Nobel Underlying EBIT ex IMIs:** $434m (+16% YoY) driven by margin expansion and cost efficiencies

» **Operating Margin:** Increased 8% YoY reflecting pricing discipline and structural cost savings

» **Joint Venture Income:** $80m (+29% YoY) on QNP and SDN contract repricing and improved market conditions

» **Commercial Momentum:** New contracts, pricing uplift, and regional diversification position Dyno Nobel for sustainable growth in FY26

## Dyno Nobel Explosives: Segment Performance

### DNAP | EBIT $254.6m (+8% YoY)

FY25 was a year of transformation for DNAP, with disciplined execution driving margin improvement despite revenue headwinds. Operating margin rose 3% YoY, supported by pricing discipline, recontracting wins, and cost savings, while joint venture income increased 71% on QNP customer recontracting. DNAP has a 50% interest in QNP, a fully integrated ammonium nitrate facility in Central Queensland, servicing the Bowen Basin coal fields.

The result is particularly strong given headwinds in Indonesia and ~$7m FX losses driven mainly by the Indonesia Rupiah (IDR) weakening against the Australian dollar on local receivables. Looking ahead, DNAP enters FY26 with strong commercial momentum and regional diversification positioning it for sustainable growth.

### DNA | EBIT $188.9m (+13% YoY)

DNA delivered a strong performance in FY25, with operating margin up 14% and underlying EBIT growing 13% despite volume pressure from TNT shortages and softer market demand during the year. Transformation initiatives across pricing, procurement, and operations delivered structural cost reductions and efficiency gains, while commercial momentum accelerated through new contracts. Manufacturing reliability improved, with Cheyenne and LOMO plants performing above plan outside scheduled outages, and ammonia output finishing 2% higher than prior year. DNA exits FY25 with a leaner cost base, diversified portfolio, and clear momentum for sustainable growth in FY26.

### DNEL | EBIT $30.5m (+33% YoY)

FY25 was a pivotal year for DNEL, delivering its first full year of operations with strong financial performance and strategic progress. Revenue grew 12% and EBIT increased 33%, supported by margin improvement and joint venture income up 72%, driven by SDN's contract repricing and improved market conditions. Growth was underpinned by expansion in LATAM and EMEA, with Türkiye emerging as a key driver through major infrastructure projects and enhanced electronics manufacturing capability. DNEL enters FY26 with a clear roadmap focused on base business growth, strategic tenders, and continued cost competitiveness.

### Corporate | Costs reduced 24% YoY

Corporate costs decreased by $13m (24% YoY), driven by transformation benefits including operating model savings, disciplined overhead management, procurement efficiencies, and strategic IT enhancements. These actions reflect Dyno Nobel's commitment to cost efficiency.

---

(1) The underlying income statement has been re-based across each relevant line item for FY25 and FY24 to reflect adjustments for: (a) turnaround impacts at Moranbah, LOMO and Cheyenne in FY25, (b) Ag&IC earnings and Ag&IC stranded costs in FY25 and FY24, (c) WALA earnings in FY24, (d) Cheyenne land sale in FY24, and (e) a one-off IP provision in FY25.
(2) Includes Group elimination arising from intersegment sales between Dyno Nobel and Fertilisers.
(3) Operating margin represents revenue after deducting cost of goods sold and other cost directly attributable to generating customer sales.
(4) Overheads includes costs that cannot be directly linked to customer sales, such as corporate and administrative expenses.

17 DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.97    Page 17 of 100

Directors' Report | **Operating and Financial Review** | Remuneration Report | Financial Report | Independent Auditor's Report

# Dyno Nobel Asia Pacific

**Table 10**

|  | Year ended 30 September | | |
|---|---|---|---|
| Dyno Nobel Asia Pacific | FY25 | FY24 | Change % |
| **Underlying Income Statement A$m**[1] | | | |
| Australian Coal | 552.7 | 593.8 | (7%) |
| Base & Precious Metals | 566.3 | 540.2 | 5% |
| International | 63.8 | 106.1 | (40%) |
| **Revenue** | **1,182.8** | **1,240.1** | **(5%)** |
| COGS & cost to serve | (746.7) | (817.4) | 9% |
| **Operating margin** | **436.1** | **422.7** | **3%** |
| Overheads | (107.2) | (115.3) | 7% |
| Joint Venture income | 29.0 | 17.0 | 71% |
| Other expenses | (6.2) | (1.4) | (343%) |
| **EBITDA** | **351.7** | **323.0** | **9%** |
| *EBITDA margin* | *29.7%* | *26.0%* | |
| **EBIT** | **254.6** | **236.1** | **8%** |
| *EBIT margin* | *21.5%* | *19.0%* | |
| **Key Metrics** | | | |
| Ammonium Nitrate manufactured at Moranbah | 276.8 | 331.2 | (16%) |
| Ammonium Nitrate sold | 565.3 | 672.6 | (16%) |

## Overview

Despite external challenges, the business improved operating margins and strengthened its commercial pipeline. Transformation initiatives across pricing, supply chain, and operations offset revenue headwinds and position DNAP for sustainable growth in FY26.

» Operating margin rose 3% YoY, supported by pricing discipline, recontracting wins, and cost savings.

» Joint venture income grew 71% YoY following QNP's customer recontracting cycle.

» EBIT up 8% on an underlying basis despite FX losses and weather impacts.

» Operational milestones included Moranbah turnaround and debottlenecking projects delivering capacity uplift.

» Positive FY26 outlook driven by strong commercial momentum and regional diversification.

## Unlocking Value Through Transformation

DNAP advanced its transformation agenda in FY25, delivering $19m in EBIT uplift through targeted commercial, operational, and supply chain initiatives. These efforts reflect a shift toward a more agile, efficient, and resilient operating model.

Commercial execution focused on recontracting and new business wins, strengthening the portfolio and enhancing margins. Pricing discipline and portfolio management delivered meaningful benefits and set the stage for margin expansion and revenue growth in FY26.

Supply chain and procurement initiatives drove logistics optimisation and sourcing improvements, reinforcing cost efficiency and operational discipline.

Operational enhancements included upgrades at key sites, notably the PSA debottlenecking project at Moranbah and the automated assembly technology project at Helidon, delivering measurable performance improvements.

Together, these actions helped offset revenue headwinds relating to weather impacts and supported operating margin growth despite lower top-line performance.

## Market Dynamics

Revenue declined 5%, outperforming broader market trends which saw significantly steeper declines.

### Australian Coal (47% of revenue)

Volumes were down 7% YoY due to adverse weather events in Queensland in the first half. Challenges persisted through Q3, but demand partially recovered in Q4, returning to more normalised levels. Australian east coast coal markets ended FY25 in a balanced AN position and are expected to remain relatively tight longer term.

### Base & Precious Metals (48% of revenue)

This sector includes iron ore operations in Western Australia, as well as hard rock and underground mines across Australia. Overall market demand remained relatively flat during the year. DNAP volumes were down 8% YoY, reflecting the impact of mine closures in the nickel sector. The outlook for the year ahead is anticipated to remain steady. Closures in the nickel and lithium mines are anticipated to be offset by growth in gold and copper.

### International (5% of revenue)

The AN market in Indonesia is in oversupply with additional manufacturing capacity coming online in recent years. As a result, the Government has enforced import restrictions which has resulted in a decrease in revenue. The reduction relates to reduced AN sales, however this has been partially offset by an increase of 14% in IS revenue which is in line with the regional strategy.

## Australia: Stable Foundations and Strong Finish

The Australian coal business remained a cornerstone, providing a stable earnings base despite a slow start. Weather impacts reduced volumes and revenue early in the year, but the business recovered strongly in H2.

Q4 was particularly robust, supported by improved demand, operational reliability, and strategic customer wins that will drive momentum into FY26. Recontracting benefits and new business wins strengthened the pipeline and margins. Joint venture income also increased 71% YoY, driven by QNP's customer recontracting process.

Australia remains a critical driver of DNAP's long-term success.

[1]    The underlying income statement has been re-based across each relevant line item for FY25 to reflect adjustments for turnaround impacts at Moranbah.

## Asia: Navigating Market Constraints and Expanding Footprint

DNAP is focused on diversifying earnings and expanding into new markets to build resilience against challenges in Indonesia. The region made a strong start in Malaysia, securing new business and establishing a foothold for future growth. Further opportunities are being explored across Asia, reinforcing DNAP's commitment to regional diversification and long-term sustainability.

Indonesia faced tighter AN import quotas, reduced volumes, and regulatory constraints. To mitigate these pressures, DNAP's focus remains on value-added technology delivery which will support commercial resilience and customer value across the region.

## Operational Discipline and Financial Outcomes

FY25 demonstrated strong operational discipline and efficiency. Overheads decreased by 7% due to one-off benefits in FY25 including the recovery of bad debts in Indonesia, as well as operating model savings as part of the transformation project.

The Moranbah turnaround — the largest ever at the site — was completed on time and on budget, reflecting strong planning and execution. The PSA debottlenecking project unlocked additional capacity, with further initiatives planned for FY26. Combined benefits are expected to deliver an uplift in AN equivalent production going forward.

Revenue declined year-on-year primarily due to weather-related impacts on the East Coast coal business and restrictions on AN imports to Indonesia. EBIT was further impacted by ~$7m FX losses driven by the deterioration of the IDR against the Australian dollar on receivables denominated in the local IDR currency.

Despite these challenges, operating margin improved by 3%, supported by transformation benefits, recontracting wins, and supply chain savings. Operating margin as a percentage of revenue rose to 37%, while underlying EBIT increased 8% YoY to $255m, reflecting disciplined execution and transformation benefits.

# Dyno Nobel Americas

**Table 11**

| Dyno Nobel Americas | Year ended 30 September | | |
|---|---|---|---|
| | FY25 | FY24 | Change % |
| Underlying Income Statement US$m[1] | | | |
| Revenue | 976.5 | 959.2 | 2% |
| COGS & cost to serve | (680.4) | (692.8) | 2% |
| **Operating margin** | **296.1** | **266.4** | **11%** |
| Overheads | (136.2) | (127.0) | (7%) |
| Joint Venture income | 26.2 | 25.6 | 2% |
| Other income | 29.5 | 30.5 | (3%) |
| **EBITDA** | **215.6** | **195.5** | **10%** |
| *EBITDA margin* | *22.1%* | *20.4%* | |
| **EBIT** | **121.4** | **110.9** | **10%** |
| *EBIT margin* | *12.4%* | *11.6%* | |
| Underlying Income Statement A$m[1] | | | |
| Revenue | 1,516.9 | 1,455.8 | 4% |
| EBITDA | 335.4 | 296.0 | 13% |
| EBIT | 188.9 | 167.7 | 13% |
| Key Metrics | | | |
| Average realised A$/US$ exchange rate | 0.64 | 0.66 | |

(1) The underlying income statement has been re-based across each relevant line item for FY25 and FY24 to reflect adjustments for: (a) turnaround impacts at LOMO and Cheyenne in FY25, (b) Ag&IC earnings and Ag&IC stranded costs in FY25 and FY24, (c) WALA earnings in FY24, and (d) Cheyenne land sale in FY24.

## Overview

Despite external challenges in FY25, relating to tariff impacts and TNT supply, the business strengthened its commercial position, improved operating margins, and delivered significant progress on cost and efficiency initiatives. Transformation initiatives across pricing, procurement, and operations offset market softness and positioned DNA for sustainable growth in FY26.

» Operating margin rose 11% YoY, supported by pricing discipline, recontracting wins, and cost savings.

» Underlying EBIT grew by US$11m (+10%), despite pressures from TNT shortages and seasonal impacts.

» Commercial momentum accelerated, with new contracts in key sectors and continued pricing improvements.

» Manufacturing reliability improved, with Cheyenne and LOMO plants performing above plan outside scheduled outages, and ammonia output finishing the year up 2%.

» Positive FY26 outlook, underpinned by structural cost reductions, strong sector diversification, and ongoing transformation benefits.

These results underscore resilience in core operations and disciplined execution across markets and manufacturing.

**19**

DYNO
NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.99    Page 19 of 100

Directors'
Report

**Operating and
Financial Review**

Remuneration
Report

Financial
Report

Independent
Auditor's Report

# Resilience Beneath the Headlines

The core explosives business demonstrated strength. Underlying EBIT increased by US$11m (+10%), supported by favourable booster pricing and customer growth, even as market conditions softened. Pricing discipline and mix improvements helped offset these pressures, and EBIT per tonne improved by $5 YoY, continuing a multi-year trend of increases— a clear indicator of operational efficiency and commercial strength.

External cost pressures were well managed. US tariffs on imported raw materials had only a minor impact, with proactive mitigation strategies including supplier diversification and contract renegotiations.

## Market Dynamics

Explosives revenue remained well diversified across key sectors, supporting strong growth despite softness in underlying markets.

### Quarry & Construction (42% of revenue)

Volumes were down 6% YoY, stabilising after early-year weather disruptions, even as broader construction activity was constrained by high interest rates, labour shortages and impacts of tariffs. Looking ahead, modest growth is expected in the non-residential sector, with federal infrastructure spending expected to be the strongest category in FY26.

### Base & Precious Metals (40% of revenue)

Volumes declined 6% YoY, with strong growth in the second half offsetting earlier weakness from mine closures and softer iron ore pricing. In FY26, metals demand is anticipated to remain firm, underpinned by industrial activity and continued strength in gold as a safe-haven asset.

### Coal (18% of revenue)

Volumes decreased 3% YoY, amid supply chain constraints and freight rate volatility, while overall market conditions were marked by high inventories and price fluctuations. For FY26, coal markets are expected to show a slower rate of decline than prior years, towards a potentially flat market year-on-year due to higher natural gas prices.

# Manufacturing Performance

Manufacturing reliability remained a priority throughout FY25. At Cheyenne, ammonia operations experienced an unplanned outage in February due to extreme winter weather but produced at or above plan outside that downtime. Ammonia output finished the year up 2% on prior year, while nitric acid was down 5% due to the planned NAP3 turnaround. At LOMO, overall production was down 7% versus prior year, largely due to the planned turnaround in the first half, which was executed on time and on budget, with post-turnaround performance exceeding prior-year rates for most months.

# Transformation That Delivers

The year marked significant progress on transformation initiatives, embedding efficiency and margin improvement across the business and delivering A$22m in benefits in FY25. Commercial performance strengthened through recontracting wins and disciplined pricing strategies. Manufacturing initiatives reduced feedstock gas consumption and optimised ammonia production, lowering costs while improving reliability. Procurement delivered meaningful savings through renegotiated chemical and freight contracts, reformulation projects, and logistics efficiencies. Organisational changes under operating model redesign created a leaner, more agile structure, reducing fixed costs and positioning the business for faster decision-making. Transformation is now part of DNA's operating rhythm, driving performance today and setting the foundation for sustainable growth in FY26.

# Building Momentum for What's Next

The DNA business exits the year in a stronger position. Structural cost reductions are now embedded, commercial wins have reinforced market positioning, and transformation initiatives continue to deliver tangible benefits. Combined with disciplined pricing and mix improvements, the business is well positioned to drive sustainable growth and margin expansion in FY26. Strengthening this outlook, the newly announced Nitradyn joint venture with REPKON USA Holdings, Inc. (Repkon USA) marks a strategic step forward expanding Dyno Nobel's capabilities in energetics. DNA is also partnering with Repkon USA for the construction of a new TNT manufacturing facility securing a reliable domestic TNT supply. These initiatives support the long-term growth across both commercial and defence sectors, enhancing resilience and unlocking new opportunities for innovation.

# Dyno Nobel EMEA & LATAM

**Table 12**

| Dyno Nobel EMEA & LATAM | Year ended 30 September | | |
|---|---|---|---|
| | FY25 | FY24 | Change % |
| Income Statement A$m | | | |
| Revenue | 324.5 | 288.6 | 12% |
| COGS & cost to serve | (239.0) | (209.7) | (14%) |
| Operating margin | 85.5 | 78.9 | 8% |
| Overheads | (56.5) | (48.2) | (17%) |
| Joint Venture income | 11.2 | 6.5 | 72% |
| Other income | 7.0 | 3.2 | 119% |
| EBITDA | 47.2 | 40.4 | 17% |
| EBITDA margin | 14.5% | 14.0% | |
| EBIT | 30.5 | 22.9 | 33% |
| EBIT margin | 9.4% | 7.9% | |

## Overview

FY25 marked a pivotal year for DNEL, reflecting strategic progress as the business unit completed its first full year of operations. Despite FX volatility and inflationary pressures, DNEL delivered a strong financial performance and advanced its growth agenda across Latin America, Europe, and Africa.

» Revenue growth of $36m (+12%) and EBIT uplift of $8m (+33%), supported by improved margins and joint venture contributions.

» Joint ventures delivered $11m income, up 72% YoY, predominantly driven by SDN's recovery following contract repricing and improved market conditions.

» Positive FY26 outlook supported by base business expansion and strategic tenders.

## DNEL: A Year of Strategic Momentum

The DNEL business unit was created to accelerate Dyno Nobel's growth in Latin America, Europe, and Africa through a capital-light model. This approach leverages Dyno Nobel's globally recognised brand, proprietary technology, and strong customer relationships to capture opportunities in high-growth markets. During the first half of the year, Dyno Nobel invested in establishing the business unit and building the infrastructure needed to support long-term growth.

By year-end, DNEL delivered on its strategic intent, achieving double-digit revenue growth and a significant uplift in EBIT, despite inflationary and FX headwinds. This strong result, supported by $10m in transformation benefits, validates DNEL's role as a key growth engine within Dyno Nobel.

## EMEA: Building Scale and Efficiency

In EMEA, Türkiye emerged as the growth engine for the region. Performance was driven by a major construction contract that showcased Nitromak's ability to secure large-scale infrastructure projects. France experienced a more subdued environment, with activity impacted by a slowdown in new construction projects and heightened competition in African export markets. However, profitability improved through restructuring initiatives that delivered cost efficiencies and helped offset margin pressure. DNEL has invested in local electronic detonator assembly capability in Türkiye positioning the business to expand detonator penetration across Europe and strengthen cost competitiveness.

## LATAM: Accelerating Growth in Mining Markets

LATAM delivered strong momentum, underpinned by increased emulsion volumes and higher electronic detonator sales. The region focused on strengthening its operational base and building credibility with local customers, leveraging Dyno Nobel's superior technology offerings to secure long-term growth. These efforts have positioned LATAM as a critical contributor to DNEL's overall performance and a foundation for future expansion.

## South African Joint Ventures: A Strong Rebound

The joint ventures delivered a standout performance in FY25, predominantly driven by SDN. Combined, the joint ventures contributed $11m in income, representing a 72% increase YoY. This uplift was supported by contract repricing and improved market volumes despite raw material supply constraints and increased sourcing costs.

## Looking Ahead: Positioned for Growth

For FY26, DNEL is focused on sustaining momentum through base business expansion and strategic initiatives across its core regions. In LATAM, growth will be supported by new mining projects and trial programs, while EMEA will benefit from enhanced electronics manufacturing capability in Türkiye, enabling greater penetration into key markets. Strategic customer tenders in Chile, Peru, and Africa remain a priority as DNEL continues to leverage its capital-light model to deliver strong returns and long-term growth.

FY25 demonstrated DNEL's ability to deliver strong growth and margin improvement while investing in future opportunities. With a clear roadmap for FY26 and beyond, DNEL is positioned to sustain momentum and create long-term shareholder value.

Case 2:25-cv-00789-DBP   Document 21-1   Filed 11/14/25   PageID.101   Page 21 of 100

21   DYNO NOBEL   Directors' Report   **Operating and Financial Review**   Remuneration Report   Financial Report   Independent Auditor's Report

# Fertilisers

**Table 13**

| Fertilisers | Year ended 30 September | | |
|---|---|---|---|
| Income Statement A$m | FY25 | FY24 | Change % |
| **Phosphate Hill** | | | |
| Revenue | 507.6 | 357.4 | 42% |
| COGS & cost to serve | (259.4) | (230.0) | (13%) |
| **EBITDA** | **248.2** | **127.4** | **95%** |
| *EBITDA margin* | *48.9%* | *35.6%* | |
| **EBIT – Phosphate Hill** | **233.2** | **69.1** | **237%** |
| *EBIT margin* | *45.9%* | *19.3%* | |
| **EBIT – Discontinued operations** | **67.6** | **50.7** | **33%** |
| **EBIT – Total Fertilisers** | **300.8** | **119.8** | **151%** |
| **Key Metrics** | | | |
| Phosphate Hill production (ammonium phosphates) | 769.0 | 739.5 | 4% |
| Total Fertilisers volumes sold (kmt) | 2,517.7 | 2,714.2 | (7%) |
| Domestic Fertilisers volumes sold (kmt) | 1,951.1 | 2,169.2 | (10%) |
| Phosphate Hill production sold (k mt) | 728 | 765 | (5%) |
| Realised AP freight margin (US$/mt) | 5.7 | 4.9 | 16% |
| Realised Cost per Tonne of AP (A$/mt)* | 720 | 766 | 6% |
| Realised A$/US$ exchange rate[1] | 0.65 | 0.66 | (2%) |
| Realised AP Price (US$/mt) | 690 | 569 | 21% |

*\* Weighted Average of AP including port costs*

## Overview

Despite early challenges, the business delivered a strong financial result and advanced strategic priorities, positioning itself to navigate future opportunities.

» Phosphate Hill EBIT of $233m, up 237% YoY, supported by favourable commodity pricing and FX movements.

» Strong second-half production recovery at Phosphate Hill, delivering an annualised run rate of 936kt, following early-year disruptions.

» Strategic actions progressed with Geelong closure and Phosphate Hill sale process underway.

» IPF Distribution delivered a solid EBIT before successful divestment, supported by margin resilience and cost discipline.

» FY26 outlook supported by portfolio optimisation and continued focus on reliability and cost efficiency.

## Strong EBIT Growth Driven by Pricing and FX

Phosphate Hill achieved a significant uplift in earnings during FY25, with EBIT reaching $233m, up $164m (237%) from the prior year. This growth was primarily driven by favourable commodity pricing and FX movements, which contributed an additional $159m to the result YoY. DAP prices rose 21% to $690/t, while a weaker Australian dollar provided additional margin support.

Gas supply disruptions remained a headwind during the year due to underperformance of a third-party provider, and required additional short-term contract arrangements and spot purchases. These measures increased costs by $57m compared to contract pricing in FY25 ($13m YoY increase). The result also benefited from lower depreciation following the FY24 impairment of Phosphate Hill.

## Operational Recovery at Phosphate Hill

Phosphate Hill delivered a solid operational recovery in FY25, with production volumes increasing compared to the prior year. This was largely due to the non-repeat of maintenance activities and adverse weather events that significantly impacted FY24 performance. In the first half of FY25, Phosphate Hill faced production constraints due to scheduled maintenance at Mount Isa, interruptions in metallurgical gas supply, and flooding related rail closures between Phosphate Hill and Townsville.

Despite these challenges, the second half marked a strong rebound. Production averaged 78kt per month, delivering 468kt for the half and an annualised rate of 936kt. This recovery drove a substantial reduction in cost per tonne—from $850 in the first half to $636 in the second half—reflecting improved reliability, operational continuity, and a meaningful contribution to EBIT. Sales volumes were lower YoY, due to timing of shipments.

## Strategic Review of Manufacturing Operations

The sale process for Phosphate Hill is ongoing. If an agreement cannot be reached by 31 March 2026, Dyno Nobel will progress an orderly closure by 30 September 2026. As a result of the sale process and ongoing uncertainty regarding gas supply, a full impairment of the Phosphate Hill operations was recorded in FY25. The business continues to engage with government stakeholders to secure critical gas supply, which remains essential to the site's future viability.

At Geelong, closure planning was completed, with final production occurring in October 2025. A provision of $61m[2] ($43m after tax) was raised in FY25 to reflect estimated closure costs. These actions reflect the Group's disciplined approach to portfolio optimisation and strategic alignment.

## IPF Distribution Delivers Solid EBIT Ahead of Divestment

IPF Distribution delivered a solid EBIT result despite softer market conditions. Demand was down approximately 10% compared to prior year, in line with the overall market decline. This was driven by persistent dry conditions across South Australia and southern NSW, along with cyclonic weather across much of Queensland and northern NSW.

---

(1)   This rate is after allowing for the impact of hedging and is therefore different to the average spot rate for the year.

(2)   A provision of $65.5m was recognised during the year for the costs to close the Geelong manufacturing facility offset by $4.3m of transitional related revenue and cost recovery from Ridley.

# Outlook and Sensitivities

## Dyno Nobel Group

The Dyno Nobel transformation program is progressing well. The Group currently expects an FY26 exit run rate of ~65-75% of the estimated total ~$300m EBIT uplift from the program.

FY26 EBIT for the Dyno Nobel explosives business is expected to be ~$460m-$500m, with an earnings split of approximately 40% in the first half and 60% in the second half[1].

## Dyno Nobel Asia Pacific

DNAP earnings are expected to be positively impacted by the non-recurrence of the Moranbah turnaround and continued transformation benefits, including growth from new customers, an increase in technology deployment and cost savings initiatives.

Australian east coast coal markets returned to a balanced AN position towards the end of FY25 and are expected to remain relatively tight longer term. In Western Australia, demand for iron ore is expected to remain relatively flat, with the closure of nickel / lithium mines expected to be offset by growth in gold and copper.

Moranbah production is expected to improve in FY26 due to plant debottlenecking initiatives, the major turnaround of the ammonia plant in FY25 and increased customer demand following 1H25 weather impacts.

## Dyno Nobel Americas

Earnings are expected to be positively impacted from continued transformation benefits and the non-recurrence of turnarounds at LOMO and Cheyenne, partly offset by the planned WALA turnaround performed by CF Industries in March 2026.

Under the current US tariff environment, the impact of tariffs is expected to be ~US$10m with mitigation[2]. As the DNA business purchases raw materials from Europe, Asia and Africa, this impact is subject to change if there are further changes to the US tariff policy.

The Metals markets are expected to continue to perform strongly and grow at above GDP rates.

Quarries & Construction markets have been hampered by increased material costs due to tariffs, as well as high interest rates slowing residential construction starts. GDP growth levels are expected in the non-residential sector, with federal infrastructure spending expected to be the strongest category in FY26.

Coal markets are expected to show a slower rate of decline than prior years, towards a potentially flat market year-on-year due to higher natural gas prices.

## Dyno Nobel EMEA & LATAM

EMEA base business growth is expected to continue with a focus on the expansion of initiation systems production and further electronic detonator conversion.

The business unit has established key capabilities in Africa and LATAM which includes the construction of a new emulsion plant in Peru and delivery of mobile processing units (MPU's) to participate in trials and tenders across targeted accounts.

## Phosphate Hill

The following outlook statements assume a full year of operation of the Phosphate Hill plant in FY26.

The FY26 production range for Phosphate Hill is forecast to be between 790kmt to 850kmt.

Costs per tonne are expected to be in the range of $720 to $780[3].

The first half / second half earnings split for FY26 is expected to be approximately 40% in the first half and 60% in the second half. Phosphate Hill earnings remain subject to DAP prices, FX and the gas price profile secured for the site over the year.

## Group

**Corporate:** Corporate costs are expected to be approximately ~$35m to $40m in FY26.

**Borrowing Costs:** Net borrowing costs for FY26 will be impacted by the size and timing of any returns of capital to shareholders, including the on-market share buyback. Net interest expense in FY26 is forecast to be ~$110m to $120m.

**Taxation:** Dyno Nobel's effective tax rate for FY26, excluding IMIs is expected to be between 20% and 25%. The tax rate range is highly sensitive to earnings mix movements across jurisdictions.

## Sensitivities

The table provides sensitivities to key earnings drivers:

**Table 14**

| Commodity | Proxy Index | EBIT Sensitivities |
|---|---|---|
| **Americas** | | |
| FX EBIT Translation[4] | | + / - A$/US$0.01x = -/+ A$3.1m |
| **Asia Pacific** | | |
| AP[2] | FOB China / Saudi | + / - US$10/mt = +/-A$12.7m |
| FX EBIT Transactional[5] | | + / - A$/US$0.01 = -/+A$13.3m |

Note: Proxy Index prices are available on Bloomberg.

(1) Disclaimer: FY26 EBIT guidance and related outlook statements are estimated based on key assumptions described on this page and are subject to uncertainties and risks. See "Principal Risks" section of this Operating and Financial Review for further information regarding the principal risks and uncertainties associated with the Group's business and operations.
(2) Based on the current US tariff environment as at 7 November. As the DNA business purchases raw materials from Europe, Asia and Africa, this impact is subject to change if there are further changes to the US tariff policy.
(3) Cost per tonne includes all variable and fixed costs of production, inclusive of depreciation and corporate cost allocations, but excludes sales freight and other selling costs. Cost per tonne is mainly impacted by PWC gas supply curtailment, expected gas pricing and sulphur cost.
(4) Based on the actual FY25 Dyno Nobel Americas statutory EBIT of US$136.7m and an average foreign exchange rate of AUD:USD 0.66.
(5) Based on Phosphate Hill's mid point full year expected rate forecast of 790kmt to 850kmt; average realised FY25 DAP price of US$690/t; and an average realised FY25 foreign exchange rate of AUD:USD 0.65.


# Principal Risks

The principal risks and uncertainties associated with Dyno Nobel's business and operations are outlined below. These risks, which may occur individually or concurrently, could have a significant impact on the Group's strategy. Any loss from such risks may not be recoverable in whole or in part under Dyno Nobel's insurance policies. The treatment strategies noted below are not exhaustive and do not eliminate the risks. While in some cases they may partially or fully mitigate the exposure, residual risk remains. The Group's risk management framework is set out in the Corporate Governance Statement.

| Risk Categories | Description and potential consequences | Treatment strategies employed by Dyno Nobel |
|---|---|---|
| **Health, Safety, Environment, Community** | Dyno Nobel's values — Zero Harm, Care for the Community & our Environment, Challenge the Status Quo, and Deliver on our Promises — guide daily operations. The company's highest priority is ensuring everyone working with or alongside Dyno Nobel returns home safely. Operations involve hazardous materials, presenting risks of serious injury, environmental damage, or harm to the community. Regulatory non-compliance or failure to meet stakeholder expectations may result in disruption, reputational damage, or financial penalties. In FY25, safety performance improved, with no significant environmental breaches occurring, and community partnerships continued to foster trust in local operations. | » Dyno Nobel's HSEC Management System ensures regulatory compliance and continuous improvement, supported by ISO-aligned standards, audit programs, and dangerous goods stewardship across all sites.<br>» Safety culture is reinforced through leadership programs like SafeTEAMS and SafeGROUND, alongside the Operational Risk Transformation (ORT) initiative, which embeds accountability and psychological safety.<br>» Environmental and community risks are managed through site-level programs focused on emissions, energy, water, and waste, combined with transparent incident learning and proactive engagement with regulators, emergency services, and local communities to build trust and confidence.<br>» Following recent high-energy explosion events at explosives facilities in the USA, India, and Brazil, Dyno Nobel is undertaking a comprehensive assessment of explosion risks across its manufacturing sites, to further strengthen critical control verification, hazard identification, and safety culture in line with its Zero Harm value. |
| **Climate Change** | The global energy transition presents risks and opportunities for Dyno Nobel. Scenario modelling across four climate futures (1.5°C to 4°C+) highlights transition risks, including declining thermal coal demand, carbon pricing, and stranded asset risk if decarbonisation lags. In 2025, thermal coal accounted for ~14% of DNA and 4% of DNAP revenues; management is shifting its growth strategy to focus on metals, quarrying, and construction. $N_2O$ abatement is underway, but uncertainty remains around CCS and green hydrogen. Carbon pricing affects operations and suppliers, with mitigation tracked via KPIs and contract structures. Physical risks, such as heat and cyclones, may disrupt operations, as seen during Cyclones Kirrily and Alfred. | » Dyno Nobel has updated its scope 1 and 2 emissions targets to 25% reduction by 2030, 50% by 2036, and net zero by 2050, supported by dedicated sustainability capital and scenario-based risk planning. Oversight is provided by the Audit and Risk Management Committee (ARMC) and the Executive Leadership Team's Decarbonisation and Energy Transition Committee.<br>» Operational resilience is being strengthened through site-specific adaptations—such as logistics switching and wet-season procedures—and by hardening critical assets based on physical risk assessments and recent extreme weather events.<br>» Strategic growth is focused on copper and transition minerals through the DNEL business unit, while government grants and eligible projects support decarbonisation of manufacturing.<br>» Further information on climate change risks and opportunities can be found in the FY25 Climate Change Report. |
| **Macroeconomic Factors** | Geopolitical uncertainty—driven by supply chain challenges in China, the impacts of Russia's invasion of Ukraine, tensions in the Middle East, and global inflation—could affect Dyno Nobel's cost base, sales, and market share. The reinstatement of US import tariffs and potential retaliation by affected countries heightens exposure to volatility in trade policy, especially in North America. These factors may raise input costs, disrupt supply reliability, and reduce competitiveness in key markets. | » Dyno Nobel monitors commodity trends and supply chain reliability to inform planning and align explosives growth with customer demand and technology delivery.<br>» Country-specific risks are reviewed regularly to manage exposures, while the US Tariff Mitigation Plan offsets trade impacts through supplier diversification and product substitutions.<br>» Engagement with regulators helps anticipate fiscal and trade developments, supporting proactive responses to geopolitical and policy shifts. |
| **Strategy** | Dyno Nobel faces rising competition and pricing pressure in a consolidating explosives industry, with risks to market share and IP protection. The fertilisers–explosives separation depends on market conditions; delays at Phosphate Hill may extend costs and distract leadership. The execution of the Transformation Program is critical, with poor change management risking disruption and missed EBIT targets. Strategic growth includes DNEL's expansion into new countries, but simultaneous mobilisation across jurisdictions presents operational and compliance risks. | » Dyno Nobel delivered strong FY25 earnings, with explosives performance and transformation benefits tracking to plan. The fertiliser distribution sale and progress on Phosphate Hill transition reflect disciplined execution. Governance over transformation and capital allocation remains central to strategic resilience.<br>» The company continues to strengthen its market position through portfolio management, technology investment, and innovation in premium blasting. Governance frameworks support the safe and compliant separation of fertilisers, including oversight of remediation. |

| Risk Categories | Description and potential consequences | Treatment strategies employed by Dyno Nobel |
|---|---|---|
| **Manufacturing** | Dyno Nobel's manufacturing operations face risks from equipment failures, process safety incidents, asset integrity issues, and supply chain disruptions. FY25 saw stable performance and progress on asset transitions. FY26 will focus on safe operations, advancing Phosphate Hill divestment or closure, and embedding asset integrity as a core operational priority.<br><br>The separation of the Fertilisers business presents additional risks relating to site remediation and decontamination obligations. These activities require careful planning to ensure safe decommissioning, regulatory compliance, and the minimisation of long-term environmental liabilities. | » Dyno Nobel continues to embed critical control verification and reliability practices through the ORT Program, supported by global engineering standards and lifecycle maintenance frameworks. Business continuity and disaster plans are maintained and regularly tested across all sites, with insurance coverage in place to mitigate property and business interruption risks.<br>» Dyno Nobel's Global Insurance Program provides financial protection against catastrophic material risks, including property damage and business interruption, across all major manufacturing operations.<br>» Closure and rehabilitation provisions are regularly reviewed to ensure compliancewith regulatory and accounting standards.<br>» Phosphate Hill remains operational, with a transition plan underway. If unsold by 31 March 2026, closure will proceed by 30 September 2026, funded from site cash flows with no impact on the Group's financial position. |
| **Supply Chain** | Dyno Nobel's operations rely on the cost-effective supply of key raw materials and stable logistics to deliver its products. Disruptions due to trade restrictions, tariffs, transport issues, or supplier failures could impact manufacturing, plant uptime, and earnings. Recent US tariff increases have raised input costs and heightened exposure to trade policy risks in the US. In FY25, mitigation plans were implemented across key inputs, with diversified sourcing and pass-through pricing helping to manage near-term tariff impacts and support supply chain stability. | » Dyno Nobel continues to implement its Tariff Mitigation Plan, using supplier diversification, renegotiated contracts, and product substitutions to offset cost impacts from new US trade tariffs.<br>» Alternative sourcing strategies and logistics flexibility such as qualifying new suppliers, leveraging free-trade zones, and expanding storage help reduce exposure to single-source or route dependencies.<br>» Ongoing supply chain risk reviews and climate-resilient logistics planning ensure readiness for trade or transport disruptions, supporting operational continuity and margin protection. |
| **Customer** | Dyno Nobel's performance depends on strong, long-term relationships with key customers in explosives and industrial markets. Loss of a major customer or a decline in demand could impact revenue and profitability. In FY25, relationships remained strong, supported by contract renewals and product innovation. | » Dyno Nobel continues to diversify its customer base and geographic footprint to reduce reliance on individual contracts and improve portfolio resilience.<br>» Long-term agreements with key explosives customers remain central to sustaining predictable revenue and strong relationships. |
| **People** | Dyno Nobel's performance depends on attracting and retaining skilled, diverse talent, especially in regional areas with tight labour markets. Loss of key personnel or workforce shortages could disrupt operations and increase costs. Industrial relations pressures and organisational changes under the Transformation Program require careful management to maintain engagement and preserve knowledge. In FY25, workforce transitions were completed, and retention improved. | » Succession planning and capability development are embedded through regular reviews of critical roles, supported by career pathways and targeted training. Competitive remuneration is benchmarked to market standards to attract and retain talent.<br>» Employment compliance is actively monitored across all regions, while leadership engagement focuses on building team connection, modelling values, and maintaining transparent communication.<br>» Employee relations are managed constructively with unions and representatives, and workforce changes under the Transformation Program are guided by structured change management and consultation. |
| **Finance** | Dyno Nobel's financial performance is affected by foreign exchange and interest rate movements, as well as tariff changes, which can influence operating costs and offshore earnings. Tax law changes across jurisdictions may also raise compliance costs or regulatory risks. | » Dyno Nobel's capital management strategy prioritises maintaining an investment-grade credit profile, supported by a balanced mix of A$ and US$ debt and access to diversified funding sources to reduce refinancing risk and enhance financial flexibility.<br>» In FY25, the company issued an oversubscribed A$500m AMTN, strengthening its debt maturity profile. Combined with hedging and disciplined governance, this supports a stable funding base and financial flexibility as we head into FY26. The Group has two Bonds with a near-term maturity, which will be repaid with surplus liquidity.<br>» Financial risks are managed under Board-approved policies, with hedging strategies in place to mitigate exposure to interest rate movements, foreign exchange volatility, and commodity price fluctuations across global operations.<br>» The company engages proactively with governments and regulators to anticipate fiscal and tax changes, while active liquidity management ensures sufficient headroom for debt maturities, strategic capital programs, and market volatility. |

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.105    Page 25 of
100

25  DYNO
     NOBEL                 Directors'        Operating and        Remuneration      Financial       Independent
                           Report           Financial Review     Report            Report          Auditor's Report

| Risk Categories | Description and potential consequences | Treatment strategies employed by Dyno Nobel |
|---|---|---|
| **Cyber** | Dyno Nobel's operations rely on secure and resilient digital systems to protect sensitive information and maintain business continuity. A cyber-attack, system failure, or unauthorised disclosure of confidential data could disrupt critical operations, compromise customer and employee information, breach regulatory obligations, or damage the company's reputation and competitive position. As the business continues to digitise and integrate IT and operational technologies, cyber threats have become increasingly sophisticated and represent a material enterprise risk. | » Dyno Nobel's Cybersecurity Program governs digital risk through enterprise-wide policies covering data protection, system access, IT usage, and network security. The Cyber Acceleration Program, launched in FY25, is a three-year initiative aligned with the National Institute of Standards and Technology (NIST) Cybersecurity Framework to enhance resilience and reduce recovery times.<br>» Independent audits, penetration testing, and disaster recovery exercises validate the effectiveness of controls and readiness to respond to threats. A formal Data Breach Response Plan ensures rapid containment and recovery, overseen by the Global Crisis Management Team.<br>» Continuous monitoring via the Security Operations Centre, threat intelligence, and analytics supports early detection and proactive defence against cyber risks. |
| **Compliance** | Dyno Nobel operates across multiple jurisdictions under complex legal and regulatory frameworks, including anti-bribery, sanctions, competition, human rights, and trade laws. Geopolitical shifts may alter these frameworks and disrupt the flow of goods and capital. Non-compliance may result in financial penalties, legal action, reputational damage, or operational disruption. Regulatory investigations, disputes, and litigation may arise from business activities or policy changes. No major compliance issues were identified in FY25, and governance systems continue to be strengthened to uphold ethical standards and stakeholder trust. | » Dyno Nobel's compliance framework includes regular regulatory risk assessments by corporate and regional teams to monitor legal changes and enforcement trends. Comprehensive screening of customers, suppliers, and counterparties addresses sanctions, export controls, and modern slavery risks.<br>» Procurement processes ensure supply chain compliance with ethical sourcing and human rights standards. Targeted training reinforces awareness of legal obligations across functions and regions.<br>» The company engages proactively with regulators and industry bodies to anticipate policy changes. An independent whistleblower hotline enables the anonymous reporting of unethical or illegal conduct, with structured escalation and investigation protocols in place to ensure accountability and remediation. |
| **Security** | Dyno Nobel's global operations involve hazardous materials, exposing the company to security threats such as sabotage, theft, or terrorism that could disrupt operations, compromise safety, and impact financial performance. A significant breach may also damage customer confidence and regulatory standing. In FY25, no material incidents occurred. Ongoing vigilance, investment in site security systems, and coordinated emergency response planning across regions continue to protect people, assets, and communities while supporting Dyno Nobel's license to operate. | » Dyno Nobel applies rigorous security and stewardship protocols to manage the handling, movement, and storage of explosives and hazardous materials, ensuring compliance with strict regulatory and licensing requirements.<br>» Business continuity and emergency preparedness plans are maintained and regularly tested at major sites to support operational resilience and enable rapid response to potential security incidents.<br>» The company collaborates with law enforcement, regulators, and industry partners to enhance intelligence sharing and threat mitigation. Physical security controls are continuously reviewed and aligned with international best practices to safeguard people, assets, and operations. |



# Introduction from the Chair of the People and Remuneration Committee

Dear Shareholders,

On behalf of the Board, I am pleased to present the Remuneration Report for FY25 which sets out the remuneration arrangements for the Executive Key Management Personnel (KMP) and the Non-executive Directors.

## Our approach

The Board's goal is to ensure our remuneration framework provides a clear link between Group and individual performance and the creation of shareholder value, while also supporting alignment with our broader stakeholders.

Performance is measured using targets that align to Dyno Nobel's values, long-term strategy, shorter term financial outcomes, and relevant individual goals.

## Financial Year 2025 in review

Under the leadership of CEO & Managing Director (MD) Mauro Neves, Dyno Nobel continued to deliver on its transformation strategy with strong execution against key priorities.

A major milestone was achieved with the sale of the IPF Distribution business to Ridley Corporation and the Gibson Island land to Goodman Group. The Perdaman Offtake Agreement sale to Macquarie Group's Commodities and Global Markets business also continues to progress.

The sale process for Phosphate Hill is continuing. If an agreed sale cannot be reached by 31 March 2026, Dyno Nobel will progress an orderly closure of Phosphate Hill by 30 September 2026.

Another significant achievement of the year was the completion of the eight-week major Moranbah turnaround project, which was delivered safely, on time, and within budget, demonstrating disciplined project management and operational excellence.

Our Climate Change initiatives delivered tangible results again this year. The tertiary nitrous oxide (N2O) abatement installed at the nitric acid plant at Moranbah last year is continuing to perform well, achieving a 7% reduction in emissions. The LOMO abatement project, operational from 1 January 2025, has already delivered a 19% reduction in N2O emissions.

Safety remained a critical focus throughout FY25. Compared to the previous year, the business achieved a 19% improvement in Total Recordable Injury Frequency Rate (TRIFR), saw a 40% reduction in employee lost workday case severity rates and recorded no incidents classified as serious harm. Incident reporting also improved significantly. These improvements reflect Dyno Nobel's commitment to the safety and wellbeing of our people and embedding a culture of care, responsibility, and accountability across all operations.

The Group delivered NPAT (excluding IMIs) of $423m on revenue of $5,345m. EBIT (ex IMIs) rose 23% to $714m, underpinned by favourable commodity and FX movements, as well as continued momentum from the transformation program. Dyno Nobel EBIT (excluding Fertilisers) declined 10% to $413m, reflecting the planned completion of three major manufacturing turnarounds during FY25 and the divestment of WALA in FY24.

Reported Group NPAT was a loss of $53m, primarily driven by individually material items associated with the sale of the Fertiliser business and non-cash impairments.

The Company also advanced its capital return program with shares valued at $430.6m bought back to date as part of the planned $900m on-market share buyback, representing 48% of the issued share capital with the second tranche underway, reflecting disciplined capital management and strong commitment to shareholder returns.

The Board declared an interim dividend of 2.4 cents per share on 12 May 2025 and a final dividend of 9.5 cents per share, resulting in a total ordinary dividend of 11.9 cents per share for the financial year.

## KMP changes in FY25

In April we were pleased to announce the appointment of Mr Nitesh Naidoo as Chief Financial Officer (CFO) following the departure of his predecessor, Mr Paul Victor in February 2025. Mr Naidoo joined Dyno Nobel from Vocus, where he held the role of Chief Executive – Consumer Division and Group CFO. Prior to this, he held senior financial and leadership roles at Optus, Telefonica and T Mobile, in Australia and the UK. Mr Naidoo commenced employment in July 2025.

Following the sale of the Fertilisers Distribution business, Mr Scott Bowman transitioned to Ridley Corporation, effective 1 October. The Board wishes to thank Mr Bowman for his significant contribution to the business and the successful execution of the sale.

In October 2025 we announced the appointment of Mr Stuart Sneyd as President - Dyno Nobel Asia Pacific (DNAP). Mr Sneyd was most recently President of Asia Pacific for Metso, where he successful integrated the regional operations of Metso and Outotec. He brings extensive international experience in establishing and profitably growing operations across Europe, China, India, Australia and South East Asia Pacific. Mr Sneyd will commence employment in November 2025.

## Remuneration Framework changes in FY25

The Board remains focused on maintaining strong alignment between remuneration outcomes and long-term shareholder value creation.

**27** DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.107    Page 27 of 100

Directors' Report | Operating and Financial Review | Remuneration Report | Financial Report | Independent Auditor's Report

As disclosed in our FY24 Remuneration Report, in light of the ongoing business transformation program and the proposed sale of the Fertiliser business, the Board simplified the LTI program for FY25. The changes included reverting to the grant solely of performance rights in the LTI 2024-27 plan (noting the issue of a component of options in the LTI 2023-26 plan) and the removal of ROIC as a measure, recognising the material judgements and adjustments that would be required as a consequence of the disposal of the Fertiliser business. As a result, the performance measures in the LTI 2024-27 plan are equal weightings of Relative and Absolute TSR, with performance hurdles consistent with the LTI 2023-2026 grant.

In addition, to further align KMP outcomes with shareholder outcomes, the remuneration mix for Executives was adjusted to place greater weighting on long-term incentives (LTI), consistent with the structure applied to the CEO & MD. Specifically, the short-term incentive (STI) opportunity for Executives (other than the CEO) was reduced from 60% of Fixed Annual Remuneration (FAR) at target and 120% at maximum, to 50% and 100% of FAR, respectively. At the same time, their LTI opportunity was increased to 120% of FAR. The CEO & MD's pay mix remained unchanged with STI at 80% of FAR (target) and 120% of FAR (maximum) and LTI opportunity at 200%.

Finally, the Minimum Shareholding Requirement (MSR) for the CEO & MD was increased to 200% of FAR and for other Executives, from 50% to 100%. The mandatory 25% STI deferral was amended to continue after an Executive's MSR is achieved.

Further details of the changes to LTI and STI arrangements can be found in Section 4 in our FY24 Remuneration Report.

### FY25 remuneration outcomes

*Fixed annual remuneration (FAR)*

KMP Fixed Remuneration was increased as foreshadowed in our FY24 Remuneration Report and detailed in section 2.2.

*Short-term incentive*

The CEO & MD achieved an STI outcome of 76.3% of maximum opportunity, with the average Executive KMP outcome being 57.8% of maximum.

» At Group level, Headline NPAT (excluding IMIs) was achieved at between target and stretch levels

» Adjusted NPAT (excluding IMIs and adjusted for currency and commodity prices) was achieved at between threshold and target.

» Adjusted EBIT for the DNA, DNAP and DNEL business units was achieved between threshold and target, while IPF did not reach threshold.

» Climate Change initiatives and business transformation measures delivered outcomes ranging from target to stretch.

Further details on FY25 performance and incentive outcomes are set out in Section 2.1 and 2.3.

*Long-term incentive*

The LTI 2021 – 2024 plan included four metrics: Relative TSR (40%), ROIC (35%), Long-Term Value Metrics (15%) and

Sustainability (ESG 10%). Relative TSR testing for 2021 – 2024 plan was completed in November 2024, which, when combined with the outcomes of the other metrics resulted in 47.68% of performance rights vesting (see Section 2.4).

The LTI 2022 – 2025 plan included four metrics: Relative TSR (40%), ROIC (35%), Long-Term Value Metrics (15%) and Sustainability (10%). Of the 60% of Rights linked to non-TSR performance conditions, 25% will vest (see section 2.5). The ROIC outcome was 0% of the 35% weighting, reflecting below threshold performance over the period. TSR for the period will be tested following Dyno Nobel's full year results in November 2025, with final outcomes reported at the AGM and in the FY26 Remuneration Report. We expect that no rights will vest under the TSR measure with likely total vesting under the Plan therefore being 25%.

*Non-executive Director fees*

Non-executive Director fees were restructured as foreshadowed in our FY24 Remuneration Report by the reduction in the Chair fee, introduction of a composite fee for Non-executive Directors other than the Chair, and the introduction of a travel allowance for the attendance of overseas board meetings. See Section 6.

### FY26 Remuneration Framework

Fixed remuneration for Executive KMP will remain unchanged in FY26.

Following the changes implemented in FY25 outlined above, the FY26 framework will remain consistent with FY25 save that, following the sale of the Fertiliser business, ROIC will be reintroduced as a 25% component of LTI with performance measures of 7% (threshold), 8% (target) and 8.5% (stretch). The reintroduction of ROIC reflects our focus on improving returns on capital over time as a focused explosives business. Absolute TSR (weighted at 50%) and Relative TSR (weighted at 25%), will be retained with vesting performance measures unchanged from FY25.

There will be no increase to Non-executive Director fees for FY26 however the Board will seek shareholder approval at the Annual General Meeting to increase the Fee Cap from $2,000,000 to $2,500,000 to facilitate Board succession planning by enabling an overlap in director appointments.

With the divestment of the Fertiliser business, Dyno Nobel is now a focused explosives business with a clear ambition. During FY26 the Board will review the remuneration framework to ensure it continues to support strategy execution and aligns rewards with performance outcomes.

*Closing*

On behalf of the Board, I thank you for your ongoing support of Dyno Nobel and of our remuneration practices.

**Tonianne Dwyer**
Chair, People and Remuneration Committee

# Remuneration Report

**1. Introduction and Remuneration Report Summary** ............ **29**

**2. Remuneration Outcomes in 2025 Financial Year
relative to the 2025 Financial Year Performance** ........ **31**

2.1 Analysis of relationship between the Company's performance, shareholder wealth and remuneration ......31

2.2 2025 Fixed annual remuneration changes .........................................................................32

2.3 2025 STI outcome ....................................................................................................32

2.4 LTI 2021/24 outcomes ...............................................................................................34

2.5 LTI 2022/25 outcomes ...............................................................................................34

2.6 Remuneration and Exit arrangement for the new CFO and former CFO .........................................37

**3. Executive Remuneration and Governance** ................... **37**

3.1 Executive remuneration strategy ....................................................................................37

3.2 Executive remuneration governance .................................................................................37

**4. 2025 Executive Remuneration Framework** .................. **38**

4.1 Overview ...............................................................................................................38

4.2 Fixed annual remuneration ...........................................................................................38

4.3 Short-term incentive – key terms ...................................................................................38

4.4 Long-term incentive – key terms ....................................................................................40

4.5 Executive service agreement terms .................................................................................42

4.6 Performance related remuneration ..................................................................................42

4.7 Further details of Executive remuneration ..........................................................................44

**5. Overview of Remuneration Changes
for the 2026 Financial Year** ..................................... **45**

**6. Non-executive Director Remuneration** ...................... **45**

**7. Shareholdings in Dyno Nobel** .................................. **46**

**8. Other KMP Disclosures** ........................................... **47**

29    DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.109    Page 29 of 100

Directors'
Report

Operating and
Financial Review

Remuneration
Report

Financial
Report

Independent
Auditor's Report

# 1.  Introduction and Remuneration Report Summary

The Directors of Dyno Nobel present the Remuneration Report prepared in accordance with the *Corporations Act 2001 (Cth)* for the Company for the year ended 30 September 2025. This Remuneration Report is audited.

This Remuneration Report sets out remuneration information for KMP who had authority and responsibility for planning, directing and controlling the activities of the Company during the 2025 financial year, being each of the Non-executive Directors and designated Executives. The use of the term "Executives" in this report is a reference to the CEO & MD's direct reports and KMP during the 2025 financial year.

Refer to Table 1 for all individuals comprising Dyno Nobel's KMP for the 2025 financial year. All KMP held their positions for the entirety of the 2025 financial year, unless noted otherwise.

**Table 1 – Current and former individuals forming Dyno Nobel's KMP for the 2025 reporting period**

| Name | Role | Term as KMP | Country of residence |
|---|---|---|---|
| **Non-executive Board** | | | |
| Mr Gregory Robinson | Chair and Independent Non-executive Director | Full year | Australia |
| Mr Bruce Brook | Independent, Non-executive Director | Full year | Australia |
| Mr Michael Carroll | Independent, Non-executive Director | Full year | Australia |
| Ms Tonianne Dwyer | Independent, Non-executive Director | Full year | Australia |
| Ms Fiona Hick | Independent, Non-executive Director | Full year | Australia |
| Mr John Ho | Non-Independent, Non-executive Director | Full year | Hong Kong |
| **CEO and Managing Director** | | | |
| Mr Mauro Neves | CEO and Managing Director | Full year | Australia |
| **Executive** | | | |
| Mr Nitesh Naidoo | Chief Financial Officer | Appointed 1 July 2025 | Australia |
| Mr Greg Hayne | President, Dyno Nobel Americas | Full year | USA |
| Mr Scott Bowman[1] | President, IPF | Full year | Australia |
| **Former** | | | |
| Mr Paul Victor | Former CFO | Ceased 15 February 2025 | Australia |
| Tanya Rybarczyk[2] | President, Dyno Nobel Asia Pacific | Ceased 30 May 2025 | Australia |
| Dr Braden Lusk[3] | Former President Dyno Nobel Americas | Ceased 30 September 2024 | USA |

(1)    Mr Bowman's role as President IPF ceased as of 30 September 2025 with the sale of the IPF Distribution business.
(2)    Ms Rybarczyk commenced on 20 January 2025 as President Dyno Nobel Asia Pacific and concluded on 30 May 2025.
(3)    Dr Lusk accepted a new non KMP role within Dyno Nobel as Chief Officer Marketing and Technology effective 1 October 2024.

A summary of the Company's approach to Executive remuneration for the 2025 financial year, including performance conditions and their link to the overall remuneration strategy, is set out below:

## Our key remuneration principles

Dyno Nobel's remuneration strategy is designed to support the objectives of the business and to enable the Company to attract, retain and reward Executives of the requisite skill and calibre.

The key principles of the Company's remuneration strategy are to:

» reward Executives for outcomes that deliver lasting value for shareholders at both the Group and business unit level;

» require behaviours that represents the Company's values, culture, and code of conduct;

» promote strong alignment with shareholder interests for mutual success;

» design Executive remuneration to focus on high performance, tied to ambitious financial and non-financial objectives;

» maintain a globally competitive compensation structure to attract and retain top talent;

» reward individual high performance while promoting a collaborative, one-team culture; and

» ensure the remuneration framework is fair, transparent, and easy to understand, communicate, and implement.

| Component | Purpose | Link to strategy and performance | Policy Mix (at target) |
|---|---|---|---|
| **Fixed Annual Remuneration (FAR)** Salary and other benefits  *Refer section 4.2 for further details* | **Reflects the accountabilities and expectations of the role.** | Attract, retain and motivate the right talent to deliver on Dyno Nobel's strategy.  Benchmarked against relevant Australian and international peer companies of similar size and complexity. Future increases linked to individual performance and effectiveness whilst continuing to have regard to market relevance. | **CEO & MD** 100% in cash  **Other Executive KMP** 100% in cash |
| **Short Term Incentive** Annual incentive opportunity delivered in cash/restricted shares  *Refer section 4.3 for further details* | **Motivate and reward performance aligned to near term strategy and supports longer-term value creation.** **Period: 1 year** | Achievement of outcomes is subject to meeting both financial and non-financial performance objectives.  Safety performance reflects the Company's unwavering commitment to Zero Harm for Everyone, Everywhere.  The financial performance conditions are designed to support the Company's financial direction and strategy, with achievement expected to translate into sustainable shareholder returns. These measures are clearly defined, measurable, and aligned to business performance.  The non-financial performance conditions align to the Company's broader strategy and focus on long-term value creation through environmental, social, and governance (ESG) priorities.  Key strategic objectives emphasise targeted individual and collective impact, driving sustainable outcomes and reinforcing Dyno Nobel's purpose and values.  These objectives are aligned with Dyno Nobel's Sustainability commitments, including Zero Harm (safety), GHG reductions in line with targets and the implementation of diversity initiatives. | **CEO & MD** 80% of FAR at Target 120% of FAR at Maximum 50% deferral in equity  **Other Executive KMP** 50% of FAR at Target 100% of FAR at Maximum 25% deferral in equity |
| **Long Term Incentive** Delivered through performance rights.  *Refer section 4.4 for further details* | **Supports the delivery of outstanding long-term returns to shareholders and align Executive and stakeholder interests through share ownership.** **Period: 3 years** | Performance conditions designed to encourage Executives to focus on the key performance drivers which underpin sustainable growth in shareholder value.  Subject to two performance hurdles, measured over 3 years:  » Performance Rights: Subject to Relative TSR (50%) and Absolute TSR (50%) for 2024/27. | **CEO & MD** 200% of FAR 100% awarded in equity  **Other Executive KMP** 120% of FAR 100% awarded in equity |

## Remuneration outcomes summary

| FY25 STI | LTI (2021/24) | Payout |
|---|---|---|
| **Results** **CEO & MD:** 114.4% of target 76.3% of maximum **Other KMP (average):** 115.7% of target 57.8% of maximum Full details in section 2.3 | RTSR: 27.7% vesting (40%) ROIC: 0% vesting (35%) LTVM: 10% vesting (15%) Sustainability: 10% vesting (10%) | 47.7% of total LTI vested Announced at 2024 AGM. Full details in section 2.4 |
| | **LTI (2022/25)** | **Forecast payout** |
| | RTSR: Forecast 0% vesting (40%) ROIC: 0% vesting (35%) LTVM: 15% vesting (15%) Sustainability: 10% vesting (10%) | 25% of total LTI vested |

31 DYNO NOBEL

Case 2:25-cv-00789-DBP     Document 21-1     Filed 11/14/25     PageID.111     Page 31 of 100

Directors' Report | Operating and Financial Review | **Remuneration Report** | Financial Report | Independent Auditor's Report

# 2. Remuneration Outcomes in 2025 Financial Year relative to the 2025 Financial Year Performance

## 2.1 Analysis of relationship between the Company's performance, shareholder wealth and remuneration

The table below summarises key financial indicators of the performance of the Company and relevant shareholder returns over the current financial year and the preceding four financial years.

**Table 2 – Indices relevant to the Board's assessment of the Company's performance and the benefit to shareholders**

| NAME | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| NPAT before IMIs and excluding non-controlling interests ($m) | 358.6 | 1,027.1 | 582.1 | 400.8 | 423.4 |
| EPS before IMIs (cents) | 18.5 | 52.9 | 30.0 | 20.7 | 22.8 |
| Share price ($) (Financial Year End)[1] | 2.94 | 3.51 | 3.14 | 3.11 | 3.10 |
| TSR (%) over 3 years[2] | (25) | 24 | 61 | 20 | – |
| ROIC (including goodwill) (%)[3] | 7.7 | 12.4 | 6.1 | 6.3 | 8.2 |
| Dividends per share (DPS) paid in the financial year (cents) | 1.0 | 18.3 | 27.0 | 19.5 | 8.7 |
| DPS declared in respect of the financial year (cents)[4] | 9.3 | 27.0 | 15.0 | 10.6 | 11.9 |
| On-market share buyback ($m) | – | – | – | 149.0 | 281.6 |
| Capital return to shareholders of Dyno Nobel Limited ($m)[5] | – | – | – | 500.0 | – |

(1) Share Price as at the end of the 2020 financial year was $2.03.
(2) TSR is calculated in accordance with the rules of the LTI 2021/24, LTI 2022/25 and LTI 2023/26 plans as applicable, over the three-year performance period, having regard to the volume weighted average price (VWAP) of the shares over the 5 business days immediately following the day that Dyno Nobel's annual results are released in November. The TSR for LTI 2022/25 was not known at the time of printing and will be disclosed in next year's report.
(3) Current year ROIC % excludes WALA. ROIC for the previous 4 financial years has also been restated to exclude WALA.
(4) The Board declared an interim dividend of 2.4 cents per share on 12 May 2025 and a final dividend of 9.5 cents per share, resulting in a total ordinary dividend of 11.9 cents per share for the year 2025.
(5) Following the sale of WALA in FY24, Dyno Nobel returned approximately $500m to shareholders via a pro-rata capital return including a share capital reduction of $302m and an unfranked special dividend of $198m. During FY25, the Group bought back shares valued at $281.6m (2024: $149.0m) as part of a planned $900.0m on-market share buyback program. The Group has now bought back a total of $430.6m worth of shares since the program commenced.

*Relationship between the Company's performance and Executive KMP STI outcomes*

The graph below shows the relationship between the Company's performance and STI awards for Executive KMP in respect of the year. For the 2025 financial year, Group NPAT (before IMIs and excluding non-controlling interests) increased from $400.8m to $423.4m. The financial gate for the STI opened as outlined in section 4.3 of this report, resulting in all Executives earning on average, 60.7% of Maximum 2025 STI awards.

*Relationship between the Company's performance and Executive KMP LTI outcomes*

The graph below shows the relationship between Dyno Nobel's TSR percentile ranking relative to its S&P/ASX 100 peer group over the three years that each plan operated, and the overall LTI vesting percentage that occurred for each plan. The LTI 2021/24 that vested in the 2025 financial year delivered 47.68% of total opportunity available for that plan. The LTI 2022/25 outcomes will be outlined in next year's report (refer to footnote (2) under Table 2 above).

**Group performance and STI outcomes**



**LTI Vesting %, ASX 100 Percentile Ranking**



## 2.2 2025 Fixed annual remuneration changes

As outlined in our FY24 Remuneration Report, the following changes were made to Fixed Annual Remuneration (FAR) arrangements for KMP during FY25:

» Mr Greg Hayne commenced his new role as President Dyno Nobel Americas (DNA) on 1 October 2024, with a FAR of $900,000, reflecting a 13.25% increase.

» CEO & MD and other Executive KMPs did not receive a FAR increase during FY25.

In addition, Mr Nitesh Naidoo commenced as Chief Financial Officer (CFO) on 1 July 2025 with a FAR of $870,000. Further details of his appointment and related remuneration arrangements are provided in Section 2.6 of this Report.

## 2.3 2025 STI outcomes

The STI awards reflect the Board's recognition of a strong and successful year for the Company with notable achievements across multiple areas of the business. These include strong financial performance, significant progress on the transformation agenda, the successful sale of the IPF Distribution business and the Gibson Island land, and the establishment of a joint venture with Repkon USA to secure reliable, low-cost domestic supply of TNT.

The statutory results for FY25 included individually material items (IMI's) of $476.6m (net of tax) in aggregate, resulting in a statutory net loss after tax of $53.2m. The Board considered these items in assessing Executive STI outcomes and whether any further adjustments were appropriate. The Board determined that these items predominantly reflected the costs and accounting impacts of the Group's strategic decision to exit the Fertilisers business and that the results adjusted for IMI's more accurately represents the Group's operational performance for the year.

On this basis, Mr Neves, the CEO & MD achieved a STI score of 114.4% against his objectives resulting in a payment of 76.3% of his maximum opportunity. The Board considers this an appropriate outcome given his leadership during the year and the financial and other strategic achievements.

*CEO & MD*

| Measure | Objective (at Target) | Weighting (at Target) | Performance Outcome | | | Performance against Objective | Weighted Outcome | Commentary |
|---|---|---|---|---|---|---|---|---|
| | | | Threshold | Target | Stretch | | | |
| **Health, Safety & Environment** | | | | | | | | |
| Balanced Scorecard | **Lag Indicators:** Personal Safety; Process Safety; Environmental Incidents. **Leading Indicators:** Significant Event Management; Zero Harm Plan. | 10% | | | | Scorecard achieved a target result | 9.0% | Outcome between Threshold and Target. The business recorded three fewer Tier 1 and Tier 2 process safety incidents than last year, improved TRIFR by 19%, reduced lost-time injury severity by 40%, and enhanced incident reporting and safety leadership behaviours. These results demonstrate continued progress towards Dyno Nobel's Zero Harm objectives. |
| **Headline Financial** | | | | | | | | |
| Group Headline NPAT[1] | $362m (excluding individually significant items) | 40% | | | | $441m | 54.1% | Group Headline NPAT was between Target ($361.9m) and Stretch ($474.3m). This reflects strong financial performance, underpinned by disciplined operating performance and effective cost management. |
| **Adjusted Financial** | | | | | | | | |
| Group Adjusted NPAT [1][2] | $362m | 20% | | | | $333m | 10.8% | Outcome between Threshold and Target, driven by strong underlying performance in the explosives business, partially offset by weaker Fertilisers results. |
| **Climate Change** | | | | | | | | |
| Delivery of various Climate change and Diversity related projects | Dyno Nobel is committed to long-term sustainable business growth through strong governance and management of GHG and other potential environmental impacts, climate-related risks and opportunities, diversity equity and inclusion, and ethical transparent practices. | 10% | | | | Projects achieved at above target | 12.5% | Outcome between Target and Stretch, reflecting the development of four new decarbonisation opportunities in North America and Australia and improved diversity, equity and inclusion outcomes. |
| **Individual Objectives** | | | | | | | | |
| Strategic objectives | Initiatives aligned to Dyno Nobel's transformation program, including financial performance, cultural transformation, strategy and Australian Fertilisers divestment. | 20% | | | | Projects achieved between target and stretch | 28.0% | Outcome between Target and Stretch, driven by strong delivery on transformation priorities, portfolio optimisation, and execution of the Fertilisers divestment, positioning the business for long-term growth. |
| **Overall STI Outcome** | | % of Target Opportunity Awarded | | | | | 114.4% | |
| | | % of Maximum Opportunity Awarded | | | | | 76.3% | |

(1) For STI calculation purposes, the Board determined at the commencement of FY25 that due to the uncertainty of delivery of contracted gas from PWC, both Headline and Underlying NPAT would be adjusted to reflect any variance from the budgeted Phosphate Hill gas cost assumptions. Accordingly, the performance outcomes were adjusted for the impact of gas costs incurred.

(2) Adjusted means that results have been normalised to remove the impact of foreign exchange and commodity price movements.

33 DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.113    Page 33 of 100

Directors' Report | Operating and Financial Review | Remuneration Report | Financial Report | Independent Auditor's Report

*CFO*

Mr. Naidoo commenced as Chief Financial Officer on 1 July 2025. As he was not eligible to participate in the FY25 short-term incentive (STI) program, he was granted Performance Rights and Share Options in recognition of incentives forgone upon accepting the role at Dyno Nobel. Further details are provided in section 2.6.

*Individual STI outcomes for Executive KMP are summarised below.*

| Executive KMP | Objective (at Target) | Weighting (at Target) | Performance Outcome | | | Weighted Outcome | Result % Target / % Max | Commentary |
|---|---|---|---|---|---|---|---|---|
| | | | Threshold | Target | Stretch | | | |
| **Current Executive KMP** | | | | | | | | |
| **G Hayne** | Health, Safety & Environment (HSE) | 10% | | ● | | 9.0% | 131.3% (Target) 65.7% (Max) | Mr Haynes delivered a strong performance across key operational and strategic measures, resulting in an overall STI outcome of 131.3%. DNA achieved 90% of its HSE target, reflecting improved operational risk management and process safety, although TRIFR remained below target. Financial outcomes were solid, with performance against Headline NPAT and Adjusted EBIT supported by disciplined cost management and strong manufacturing reliability. Near-stretch results were achieved under the ESG component, driven by progress in N₂O abatement and diversity initiatives. Strong execution of strategic priorities, including the Repkon TNT project and manufacturing reliability improvements, further underpinned the overall outcome. |
| | Headline NPAT | 20% | | | ● | 34.1% | | |
| | Adjusted EBIT DNA | 40% | | | ● | 35.7% | | |
| | Environmental, Social and Governance (ESG) | 10% | | | ● | 18.7% | | |
| | Strategic Objectives | 20% | | | ● | 33.8% | | |
| **S Bowman**[1] | Health, Safety & Environment (HSE) | 10% | | ● | | 9.0% | 85.3% (Target) 42.7% (Max) | Mr Bowman delivered a solid performance across key operational and strategic priorities. IPF achieved 90% of its HSE target, reflecting improved operational risk management and process safety, although TRIFR remained below target. While sustainability outcomes were below target across several areas, strong delivery was achieved on key strategic objectives, and continued improvement in manufacturing reliability and cost control. In line with the transition arrangements agreed upon the sale of Ridley, Mr Bowman's STI outcome was assessed at 100% of target. |
| | Headline NPAT | 20% | | ● | | 34.1% | | |
| | Adjusted EBIT IPF | 40% | ● | | | 0.0% | | |
| | Environmental, Social and Governance (ESG) | 10% | | ● | | 6.2% | | |
| | Strategic Objectives | 20% | | | ● | 36% | | |

(1)   For STI calculation purposes, the Board determined at the commencement of FY25 that due to the uncertainty of delivery of contracted gas from PWC, both Headline and Underlying NPAT would be adjusted to reflect any variance from the budgeted Phosphate Hill gas cost assumptions. Accordingly, the performance outcomes were adjusted for the impact of gas costs incurred.

**Table 3 – Short-term incentives awarded for the year ended 30 September 2025**

The vesting profile of STI payments awarded as remuneration to each Executive KMP for the year ended 30 September 2025 is set out below:

| | Short-term incentive for the year ended 30 September 2025 | | | | |
|---|---|---|---|---|---|
| | Cash STI $000 | Minimum share holding allocation[A] $000 | Included in remuneration $000 | % earned of maximum opportunity | % forfeited of maximum opportunity |
| **CEO & MD** | | | | | |
| M Neves | 618 | 618 | 1,236 | 76 | 24 |
| **Current Executive KMP** | | | | | |
| N Naidoo | – | – | – | – | – |
| G Hayne | 414 | 138 | 552 | 61 | 39 |
| S Bowman | 328 | – | 328 | 50 | 50 |
| **Former Executive KMP** | | | | | |
| P Victor[1] | | | | | |

(A)   Under the terms of the 2025 STI, where Executives have not met their Minimum Shareholding Requirements (MSR), the following applies: 25% of the ELT and 50% of the CEO & MD's award is delivered in deferred shares with a 15-year restriction. When the MSR is met, the remaining deferred STI award will be delivered in deferred shares subject to a 12-month restriction. Shares are generally allocated around December.

(1)   Mr Victor ceased employment with Dyno Nobel on the 15 February 2025 and was not eligible to participate in the FY25 Executive STI Plan.

## 2.4  LTI 2021/24 outcomes

The performance period for the Absolute ROIC, Sustainability (Climate Change) and Long-Term Value Metrics conditions of the LTI 2021/24 ended on 30 September 2024 and the outcomes were reported in the 2024 Remuneration Report. The performance period for the Relative TSR condition concluded five days after the release of the Company's full year results in November 2024.

At the time of the 2024 Remuneration Report, the Relative TSR component was not known, and vesting was estimated to be in the range of 20% – 50% of maximum opportunity. The Relative TSR component (40% of award) vested at 27.68%. As a result, taking account of testing against all the performance conditions, the Board determined that 47.68% of the performance rights granted under the plan vested, with the remaining 52.32% lapsing. This was consistent with the estimated vesting range disclosed to shareholders in the 2024 Remuneration Report.

## 2.5  LTI 2022/25 outcomes

The performance period for the Average ROIC, Sustainability (Climate Change) and Long-Term Value Metrics conditions of the LTI 2022/25 ended on 30 September 2025. The measurement of performance against these Metrics is set out below. The performance period for the Relative TSR condition will conclude following disclosure of the Company's full year results in November 2025 and therefore after the date of this report.

Total vesting of the LTI 2022/25 is currently expected to be 25% of maximum opportunity.

*Average ROIC – 35% of award*

The Average ROIC component (35% of the award) will not vest, as the Company's average ROIC performance of 6.9% over the period was below the 10% threshold performance level.

*Sustainability – 10% of award*

The performance period for the Sustainability metric commenced on 1 October 2022 and ended on 30 September 2025. Outcomes were assessed by the Board against progress toward Dyno Nobel's 2030 Targets, development of a scope 3 emissions reduction strategy, and progress on the following initiatives:

1. **Moranbah $N_2O$ Tertiary Abatement Project:** Completed in 2024, this project cuts greenhouse gas emissions (GHG) by around 200,000 $tCO_2e$ annually, removing current and future carbon pricing risks under the Safeguard Mechanism. The facility now operates below its emissions baseline and qualifies for Safeguard Mechanism Credits.

2. **Waggaman CCS permanent geological $CO_2$ sequestration project:** This project progressed up until divestment of the asset in December 2023.

3. **Louisiana, Missouri Tertiary $N_2O$ Abatement Project:** Completed in 2025, this initiative reduces GHG by 520,000 $tCO_2e$ annually and lowers upstream customer scope 3 emissions by 1.7 $tCO_2e$ per one of ammonium nitrate sold from this facility.

4. **Gibson Island Green Ammonia Project in partnership with FFI:** The FFI Green Ammonia project, advanced by Dyno Nobel but discontinued by Fortescue Future Industries following the absence of a Final Investment Decision.

The Board determined that, in light of the success of the abatement projects, the material progress achieved on the WALA project prior to disposal and the Group's wider progress on sustainability initiatives as outlined in the Sustainability Report, this component should vest in full.

*Long-Term Value Metrics – 15% of award*

The Board determined that 100% of the 15% allocated to Long-Term Value Metrics will vest. Commentary on the performance against these conditions is set out in the following table.

| Long-Term Value Metric Condition | Objectives | Performance Outcome | | | Commentary |
| --- | --- | --- | --- | --- | --- |
| | | Threshold | Target | Stretch | |
| Margin of Technologies | Achieve measurable improvement in Total Margin from sales of new technology products. This includes revenue generated from new technology and product releases, such as increased sales of current premium products (Delta E/Titan 1000 and Gen 4 Digishot), as well as any future innovations like WebGen or gassed emulsions. | | | | The Margin is calculated as Operating Margin, which represents revenue after deducting cost of goods sold and other cost directly attributable to generating customer sales. Over the Long-Term Value Metrics Performance Period, the goal is to increase total margin compared to the FY22 baseline by at least $30m (threshold) and ideally $45m (stretch).<br><br>The 2022 baseline of AUD $138.7m was significantly exceeded, resulting in a cumulative total margin of $242.6m over the performance period spanning FY23, FY24, and FY25. During this period, regional allocations were adjusted with EMEA and LATAM being moved to DNEL. |
| Profitable Growth | **Dyno Global Growth:** Measured by cumulative EBITDA growth above the FY22 Explosives EBITDA baseline of $508m. | | | | The stretch target for this metric was 10% compound annual growth (CAGR) over the 2022 baseline fully absorbed margin per metric tonne for DNA and DNAP. An outcome of 10.99% CAGR was attained which is above stretch (10%). |
| | **Fertiliser Distribution Network:** Leverage the distribution network to grow recurring earnings by increasing the FY22 baseline EBIT of $50.6m by $25m. | | | | The stretch target for this metric was a cumulative excess EBIT of $25m over the performance period FY23, FY24 and FY25. A near stretch outcome of $21.8m was achieved. |
| | **Vesting for this component (%)** | | 100% | | **Having regard to the outcomes in relation to the input and output measures, the Board determined that 100% of the performance goals were delivered against the balanced scorecard delivering 15.0%.** |

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.115    Page 35 of 100

35  DYNO NOBEL    Directors' Report    Operating and Financial Review    **Remuneration Report**    Financial Report    Independent Auditor's Report

*Relative TSR – 40% of award*

Current projections indicate that the Relative TSR component (40% of the award) will not vest, as Dyno Nobel's TSR is below the 50th percentile of the S&P/ASX 100 index.

Details of rights vested and lapsed for each performance condition will be confirmed at the upcoming Annual General Meeting and reported in full in the 2026 Remuneration Report.

**Table 4 – Value of equity granted to Executive KMP during FY25**

The table below sets out the equity grants awarded to Executive KMP during financial year 2025.

| | Equity granted in the year ended 30 September 2025 | | | | | |
|---|---|---|---|---|---|---|
| | Rights LTI 2024/27[A] | FY24 STI Deferred Shares[B] | LTI 2023/26 Rights[C] | LTI 2023/26 Options[C] | Other STI Rights | Totals |
| | $000 | $000 | $000 | $000 | $000[1] | $000 |
| **CEO & MD** | | | | | | |
| M Neves | 2,700 | 377 | 1,059 | 1,577 | – | 5,713 |
| **Current Executive KMP** | | | | | | |
| N Naidoo[1] | – | – | 522 | 522 | 350 | 1,394 |
| G Hayne | 1,080 | – | – | – | – | 1,080 |
| S Bowman | 786 | 27 | – | – | – | 813 |
| **Former Executive KMP** | | | | | | |
| P Victor[2] | – | – | – | – | – | – |

(A) LTI 2024/27 Rights of 888,625 allocated on 15 January 2024 for Mr Neves were approved at the AGM in December 2024. LTI 2024/27 is due to be released after Dyno Nobel's full year results in 2027 subject to satisfaction of performance conditions. No Options were granted under the LTI2024/27 award. VWAP at allocation of performance Rights was $3.0384.

(B) STI Deferred Shares awarded are subject to a maximum deferral period of 15 years from the STI offer date. VWAP at allocation was $3.0384 (5 business days prior to full year results announcement).

(C) The Rights and Options under the LTI 2023/26 Plan agreed to be issued to Mr Neves upon joining the Group as CEO & MD were approved by shareholders at the AGM in December 2024 and were therefore issued during the FY25 financial year. Full details were provided in the FY24 Remuneration Report. Rights and Options under the LTI 2023/26 Plan were also awarded to Mr Naidoo upon joining the Group to replace LTI incentives forgone at his previous employer and to ensure full alignment with the CEO & MD and the Executive Leadership Team in achieving the Plan's targets. Accordingly:
  i.  LTI 2023/26 Rights (total number of Rights 198,781) were granted to Mr Naidoo on 7 July 2025 and are due to vest following the release of Dyno Nobel's financial year 2026 results subject to his continuous employment with the Group.
  ii. LTI 2023/26 Options (total number of Options 1,569,925) were granted to Mr Naidoo on 7 July 2025 and will be subject to Absolute Total Shareholder Return performance conditions (aligned to the LTI2023/26 award conditions).

(1) Mr Naidoo was awarded 133,283 Other STI Rights to the value of $350,000 in lieu of foregone incentives. The value was determined using the VWAP of 2.626 Dyno Nobel shares over the five business days period immediately prior to the announcement of his employment to the Australian Securities Exchange (ASX). These Rights are due to vest in the first trading period 6 months post grant.

(2) Mr Victor ceased as a KMP on the 15 February 2025.

**Table 5 – Actual pay**

The table below provides a summary of actual remuneration received by the Executives in the 2025 financial year. The accounting values of the Executive remuneration, as reported in accordance with the Accounting Standards, may not always reflect what the Executives have actually received, particularly due to the valuation of share-based payments.

To create greater transparency, this table sets out the remuneration, actually paid to Executives and the value of rights that vested during the 2025 financial year. The STI amounts shown relate to awards granted in the 2024 financial year and paid in the 2025 financial year. STI awarded for the 2025 financial year will be paid during the 2026 financial year.

Executive remuneration prepared in accordance with statutory requirements and the Accounting Standards are presented separately in Table 9 of this report.

| | Year | Salary & Fees | Short term incentive & other bonuses[A] | Other short-term benefits[B] | Superannuation / Pension benefits | Other long-term benefits[C] | Termination benefits | Total |
|---|---|---|---|---|---|---|---|---|
| | | $000 | $000 | $000 | $000 | $000 | $000 | $000 |
| **CEO & MD** | | | | | | | | |
| **M Neves** | **2025** | **1,295** | **755** | **–** | **30** | **–** | **–** | **2,080** |
| CEO & MD | 2024 | 848 | – | – | 21 | – | – | 869 |
| **Current Executive KMP** | | | | | | | | |
| **N Naidoo[1]** | **2025** | **210** | **–** | **1** | **8** | **–** | **–** | **219** |
| CFO | 2024 | – | – | – | – | – | – | – |
| **G Hayne[2]** | **2025** | **870** | **739** | **226** | **30** | **323** | **–** | **2,188** |
| President, Dyno Nobel Americas | 2024 | 760 | 393 | 102 | 28 | 764 | – | 2,047 |
| **S Bowman** | **2025** | **625** | **525** | **2** | **30** | **–** | **–** | **1,182** |
| President, IPF | 2024 | 209 | – | – | 10 | – | – | 219 |
| **Former Executive KMP** | | | | | | | | |
| **P Victor[3]** | **2025** | **333** | **969** | **49** | **15** | **–** | **529** | **1,895** |
| CFO | 2024 | 1,003 | 708 | 177 | 28 | – | – | 1,916 |
| **T Rybarczyk[4]** | **2025** | **262** | **–** | **–** | **15** | **–** | **21** | **298** |
| President, Dyno Nobel Asia Pacific | 2024 | – | – | – | – | – | – | – |
| **B Lusk[5]** | **2025** | **–** | **–** | **–** | **–** | **–** | **–** | **–** |
| President, Dyno Nobel Americas | 2024 | 1,001 | 388 | 126 | 30 | 871 | – | 2,416 |
| **Total Executives** | **2025** | **3,595** | **2,988** | **278** | **128** | **323** | **550** | **7,862** |
| | 2024 | 3,821 | 1,489 | 405 | 117 | 1,635 | – | 7,467 |

(A)  Short term incentive & other bonuses include the Senior Manager Long Term Incentive pro-rata payment for Mr Bowman.

(B)  Other short-term benefits include rent and mortgage interest subsidies, dividend equivalent payments, relocation allowances and other allowances, where applicable.

(C)  Other long-term benefits include any long service leave paid and the value of shares that vested under the Group's LTI plans. Long-Term Incentives include all plan-related instruments that vested during the year. The theoretical cash price is based on the Dyno Nobel share price on the day that shares were purchased.

(1)  Remuneration for Mr Naidoo reflects his remuneration as CFO from 1 July 2025.

(2)  Mr Hayne was appointed President, DNA with effect from 1 October 2024.

(3)  Mr Victor ceased as a KMP on 15 February 2025. Disclosures for the 2025 financial year are up until that date.

(4)  Ms Rybarczyk ceased as a KMP on 30 May 2025. Disclosures for the 2025 financial year are up until that date.

(5)  Dr Lusk ceased as a KMP on 1 October 2024 accepting a role as Chief Technology and Marketing Officer at Dyno Nobel.

37 DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.117    Page 37 of 100

Directors' Report | Operating and Financial Review | **Remuneration Report** | Financial Report | Independent Auditor's Report

### 2.6 Remuneration and Exit arrangements for the new CFO and former CFO

Mr Naidoo was appointed Chief Financial Officer effective 1 July 2025. He joined Dyno Nobel from Vocus Group, where he previously served as Group Chief Financial Officer. His FAR on appointment was $870,000. As CFO, he has a target STI opportunity of 50% of FAR with a maximum opportunity of 100% of FAR. Mr Naidoo was not eligible to participate in the STI plan for the 2025 financial year.

On commencement, Mr Naidoo was granted Options valued at $522,000 (1,569,925 Options), based on the original fair value calculation of the LTI 2023/26 at award. He was also granted service-based performance Rights valued at $522,000 (198,781 Rights), scheduled to vest following the release of the Company's FY26 results, subject to continued employment. These awards were designed to replace long term incentive arrangements that Mr Naidoo forfeited on resignation from his previous employer and to fully align him with the rest of the Executive team in relation to the targets associated with the transformation program which underpin the LTI 2023/26 plan. In addition, Mr Naidoo was awarded equity in lieu of foregone short-term incentives, in the form of Performance Rights to the value of $350,000 (133,282 Rights). The number of Performance Rights was determined using the VWAP of Dyno Nobel shares over the five business days immediately prior to the ASX announcement of his appointment. These rights will vest six months after commencement, earliest on 31 December 2025.

Mr Victor ceased employment with Dyno Nobel on the 15 February 2025. Mr Victor received his contractual entitlements on cessation including a pro-rata share of Performance Rights and Options under the 2022-25 and 2023-26 LTI Plans which will be tested at the conclusion of the relevant performance period, in accordance with Plan rules.

## 3. Executive Remuneration and Governance

### 3.1 Executive remuneration strategy

Dyno Nobel embraces a set of Strategic Value Drivers that underpin the Company's business and form the platform for the Company's future earnings growth and shareholder returns. The Company's commitment to addressing Environmental, Social and Governance (ESG) challenges and looking for opportunities in the decarbonisation of the world's energy systems is an important constituent of the business strategy and integrated across all the Strategic Value Drivers:

**Zero Harm** – Broadening and setting year-on-year improvement objectives across key metrics including environmental care and process safety.

**Talented and Engaged People** – A safe, inclusive, high performing culture with engaged, diverse and inclusive teams focused on customers and value creation.

**Customer Focus** – Partnering with our customers to create added value and practical solutions for today and the future.

**Manufacturing Excellence** – Driving consistently high performance across all our assets and investigating ways to address our greenhouse gas emissions.

**Leading Technology Solutions** – Innovation on the ground with practical solutions that our customers can use today to improve their operations and environmental outcomes.

**Profitable Growth** – Focus on opportunities that are distinctive to our differentiated technology, core markets, core capabilities and market segments.

Under the Strategic Value Driver of 'Talented and Engaged People', Dyno Nobel recognises that, to generate competitive returns for its shareholders, it requires talented people who are capable, committed and motivated. Dyno Nobel's remuneration strategy is designed to support the objectives of the business and to enable the Company to attract, retain and reward Executives of the requisite skill and calibre.

### 3.2 Executive remuneration governance

The remuneration of the Executives is set by the Board, having regard to recommendations from the People and Remuneration Committee.

Where appropriate, the People and Remuneration Committee of the Board engage external advisors to provide input into the process of reviewing Executive and Non-executive Director remuneration. For the 2025 financial year, the People and Remuneration Committee received market and benchmarking data from various sources, but this information did not constitute a remuneration recommendation for the purposes of the *Corporations Act 2001 (Cth)*.

Further information in relation to the Board and the People and Remuneration Committee can be found in Dyno Nobel's Corporate Governance Statement available on Dyno Nobel's website.

# 4. 2025 Executive Remuneration Framework

## 4.1 Overview

The charts below set out the theoretical breakdown of the Executives' total remuneration package for the 2025 financial year. The FAR component is inclusive of cash and superannuation only, whilst 'at risk' compensation is based on maximum entitlement that could potentially be awarded under the STI and LTI plans.

The restricted shares component of the STI (50% for the CEO & MD, 25% for other Executive KMP) must be deferred until an Executive's MSR is attained.





## 4.2 Fixed annual remuneration

Executives receive their fixed annual remuneration (FAR) in a variety of forms, including cash, superannuation, and any applicable fringe benefits. The Executives' FAR is set by reference to appropriate benchmark information for each Executive's role, level of knowledge, skill, responsibilities and experience. The level of remuneration is reviewed annually in alignment with the financial year and with reference to, among other things, Company and individual performance and market data provided by an appropriately qualified and independent external data specialist. The following comparator groups are used to benchmark fixed annual remuneration:

*Comparator groups*

S&P/ASX listed companies with market capitalisation between 50% and 200% of Dyno Nobel market capitalisation (Primary Benchmark). S&P/ASX 100 listed companies.

A select group of 17 S&P/ASX listed companies from the Industrials, Materials and Energy Sectors, selected on the basis of market capitalisation and related industry exposure, consisting of: AGL Energy, ALS, Ampol Australia, Atlas Arteria, Aurizon, BlueScope Steel, Brickworks, Cleanaway, Downer EDI, Fletcher Building, Orica, Origin Energy, Orora, Qube, Reliance Worldwide, Seven Group and Sims.

For roles located outside Australia, market-specific data is used as an additional reference point for benchmarking purposes.

## 4.3 Short-term incentive – key terms

The STI is an annual 'at risk' incentive which is dependent on the achievement of particular performance measures. The following table summarises the STI plan that applied in the 2025 financial year (2025 STI):

| | |
|---|---|
| What was the performance period? | The performance period for the 2025 STI was the financial year from 1 October 2024 to 30 September 2025. |
| Who was eligible for the STI? | Executives who were employed prior to 31 March 2025 participated in the 2025 STI. |
| What were the Performance Conditions and Measures? | Performance conditions under the STI are determined by the Board for each financial year. The performance conditions for the 2025 STI are set out below: |

39 **DYNO NOBEL**

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.119    Page 39 of 100

Directors' Report | Operating and Financial Review | **Remuneration Report** | Financial Report | Independent Auditor's Report

| Performance Conditions | Measures to assess satisfaction of Performance Conditions | Rationale for the Performance Conditions |
|---|---|---|
| Zero Harm | Safety performance balanced scorecard across the dimensions of behavioural and process safety management comprising input and output measures[1]. | To align with the Company's commitment to "Zero Harm for Everyone, Everywhere". |
| Group Financial Performance | Group NPAT (Net Profit After Tax)[2]. Group Adjusted NPAT[3]. | To align Executive KMP with targeted profits that would contribute to shareholder returns. |
| Business Unit Financial Performance | Business Unit Adjusted EBIT (Earnings Before Interest and Tax)[3]. | To ensure robust alignment of performance in a particular business unit with reward for the Executive managing that business unit. |
| Environmental, Social and Governance (ESG) Measures | Diversity, Equity, Inclusion (DEI) and Sustainability related measures targeted at an Executive's area of influence. | Performance conditions are designed to align with the overall ESG strategy of the business and focuses an Executive on the key short-term objectives within their area of influence, that contribute towards the Company's longer-term milestones. |
| Strategic Outcomes | Measures based on performance criteria for the execution and implementation of strategic objectives and business priorities. These include measures related to portfolio review and growth initiatives, product innovation and input to the delivery of key strategic projects. | Tailored to individual Executive's role, to drive performance and behaviours consistent with achieving critical aspects of the Group's strategy. |

(1)  In assessing the safety balanced scorecard, the Board may, in its discretion, have regard to the results achieved against the measures comprising the scorecard without applying a specific weighting to any particular measure. The balanced scorecard category measures include: Personal Safety; Process Safety/Significant Event Management; Operations Risk Transformation; Effective Safety Leadership; and the Zero Harm Plan.

(2)  The Board determined that the adjusted Headline NPAT target would be adjusted for material gas cost impacts. Accordingly, the Headline NPAT for STI purposes was adjusted to exclude the $16 million gas market impact, recognising it arose from external factors beyond management's control.

(3)  Adjusted means that results have been restated to remove the impact of foreign exchange and commodity price movements.

Where any Individually Material Item (IMI) is separately recognised in the financial report, the Board has discretion to include or exclude the IMI for the purpose of determining any STI award, taking into account the nature of the IMI and having regard to whether, in the circumstances, it would be appropriate for the IMI to be attributable to Management.

Determination of the extent to which each of the above measures was satisfied was based on a review by the Board of the audited financial report and performance of the Group for the financial year, following the annual performance review process for the Executives.

| **Are there minimum performance levels which must be achieved before awards can be made under the STI?** | For the 2025 financial year, to ensure STI awards are aligned with business performance outcomes, the Board determined that a STI Financial Gate would operate. The STI Financial Gate reflects a requirement to exceed a designated level of the Group's NPAT performance, or all non-safety components of the STI will be capped at a maximum of target payment. For FY25, this was determined to be threshold NPAT performance.

The STI Financial Gate does not apply to any awards payable in relation to the Zero Harm performance condition, reflecting the primacy of safety.

In relation to the Zero Harm performance condition, the Board retains discretion to forfeit all or part of the award payable for this performance condition in the event of a fatality or major incident having regard to the circumstances of the incident. |
|---|---|

**What were the weightings for the STI performance measures?**

The weighting of Executives' STI performance measures (as a percentage of 100%) for 2025 were:

Table 6 – Weighting of Executive STI performance measures

| | Group Headline NPAT | Group Adjusted NPAT | Business Unit Adjusted EBIT | HSE | ESG | Strategic Outcomes |
|---|---|---|---|---|---|---|
| **CEO & MD** | | | | | | |
| M Neves* Chief Executive Officer | 40% | 20% | – | 10% | 10% | 20% |
| **Current Executive KMP** | | | | | | |
| N Naidoo * Chief Financial Officer | 40% | 20% | – | 10% | 10% | 20% |
| G Hayne** President, Dyno Nobel Americas | 20% | – | 40% | 10% | 10% | 20% |
| S Bowman** President, Fertilisers | 20% | – | 40% | 10% | 10% | 20% |

*Group role **Business Unit role

| Is there an STI deferral component? | A mandatory STI deferral applies until an Executive's MSR is achieved – 25% for Executives and 50% for the CEO & MD. The MSR is 200% of FAR for the CEO & MD and 100% of FAR for Executives. |
|---|---|
| | » Before MSR is met: deferral shares are subject to a 15-year restriction period. |
| | » After MSR is met: the relevant portion of the Executive's STI remains subject to a 12-month deferral period. |
| How is the STI delivered? | The STI is delivered in cash and restricted shares. |
| Was there a clawback mechanism? | Yes. The 2025 STI includes a clawback provision requiring repayment of all or part of any STI awarded within three years of payment where: |
| | » a material misstatement is made, in the event of a material misstatement or omissions in Dyno Nobel's financial statements results in a restatement of the audited financial report; or |
| | » a participant has materially breached their obligations to the Company. |

## 4.4 Long-term incentive – key terms

The LTI is the long-term incentive component of remuneration for Executives. The LTI 2024/27 is provided in the form of Performance Rights (Rights).

| What are the key changes to the LTI in FY25? | » Reverting to a grant of Performance Rights only in respect of the LTI 2024/27, reflecting that the grant of Options under the LTI 2023/26 was a one-off award. |
|---|---|
| | » Simplifying the plan structure to focus on total shareholder returns with the LTI 2024/27 to be measured on both Relative TSR and Absolute TSR performance (50% weighting to each measure). |
| | » The range of Relative TSR performance spans from the 50th percentile (threshold) to the 100th percentile (maximum), with a sliding scale applied between the 50th and 75th percentiles, prorated between 50% and 99.9%. |
| | » The range of Absolute TSR performance is retained from the LTI 2023/26 grant (10% (threshold) to 25% (maximum) compound annual growth). The vesting schedule has been simplified to provide for partial vesting at threshold performance (30% of Rights subject to Absolute TSR) and sliding scale vesting from threshold to 100% vesting where 25% compound annual growth is achieved. It is considered there is a significant degree of stretch performance in these targets and full vesting under the Absolute TSR component will not occur unless there is a substantial return to shareholders over the performance period. |
| Why were only two measures selected for FY25? | » The Company decided not to include Average Return on Invested Capital (ROIC) in the LTI 2024/27 due to the significant adjustments required from material asset movements, which reduce transparency compared to RTSR and ATSR measures. |
| | » While improving ROIC remains a key Group objective, the Company notes that achieving ROIC improvements is necessary to meet ATSR targets. |
| | » Following the sale of the Fertilisers business, ROIC will be reintroduced into the LTI program for FY26. |
| What LTI plans were granted for the 2025 financial year? | The LTI Plan granted during the 2025 financial year was the LTI 2024/27. Under the LTI Plan, participants are entitled to acquire ordinary shares in the Company, on a one-right to one-share basis, for no consideration at a later date. The Rights are issued by Dyno Nobel and the entitlement of the participants to acquire ordinary shares is subject to the satisfaction of certain conditions. As no shares are provided to participants until vesting, Rights have no dividend entitlement. Rights lapse on expiry or exercise. |
| What is the purpose of the LTI? | The LTI is designed to link reward with the key performance drivers which underpin sustainable growth in shareholder value. |
| | As Rights granted under the LTI Plan result in share ownership on the achievement of demanding targets, the LTI ties remuneration to Company performance, as experienced by shareholders. The arrangements also support the Company's strategy for retention and motivation of the Executives. |
| What is the process for determining eligibility? | The decision to grant the LTI Plans and to whom they will be granted is made annually by the Board, noting that the grant of Rights to the CEO & MD is subject to shareholder approval. Grants of Rights are calculated using the relevant percentage of an Executive's FAR. |
| What is the maximum LTI opportunity (face value)? | For the CEO & MD – 200% FAR. |
| | 100% of the LTI opportunity was granted as Rights. |
| | Grants to the CEO & MD under the LTI 2024/27 were subject to shareholder approval at the 2024 Annual General Meeting. |
| | For all other Executives – 120% FAR. 100% of the LTI opportunity was granted as Rights. |
| How was the number of Rights calculated under the LTI Plan? | For the LTI 2024/27, the number of Rights issued to a participant was based on the volume weighted average price (VWAP) of the Company's shares over the 5 business days immediately preceding the AGM on 19 December 2024 being $3.0384. |
| | Each issuance was determined by dividing the dollar value of the relevant participant's LTI opportunity by this VWAP. |
| What is the exercise price? | Nil |

41 | DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.121    Page 41 of 100

Directors' Report | Operating and Financial Review | **Remuneration Report** | Financial Report | Independent Auditor's Report

| | |
|---|---|
| **What are the performance conditions attached to the Rights?** | **Relative TSR condition (50% of Rights)** |
| | The Relative TSR condition requires growth in the Company's TSR to be at or above the median of the companies in the comparator group, being the S&P/ASX 100. This condition provides shareholder alignment as it takes into account the Company's share price movement as well as dividends paid, relative to other organisations comparable to the Company. |
| | The S&P/ASX 100 has been chosen as the comparator group because, having regard to the business segments in which the Company operates and, specifically, the absence of a sufficient number of direct comparator companies, the Board considers the S&P/ASX 100 to represent the most appropriate, and objective, comparator group. It also represents the group of companies against which the Company competes for shareholder capital. The Board has the discretion to vary the comparator group at any time, including to remove companies from, or include companies in, the comparator group. |
| | The table below sets out the Relative TSR condition, and the percentage of the Rights that will vest based on satisfaction of this condition. |

| Relative TSR ranking of Dyno Nobel | % of Rights subject to the Relative TSR condition that will vest |
|---|---|
| Less than 50th percentile | Nil |
| 50th percentile | 50% |
| Greater than 50th percentile and up to 75th percentile | Pro rata between 50% and 99.9% |
| At 75th percentile to 100th percentile | 100% |

The Relative TSR condition will be measured over the period from the commencing on the 6th Business Day after the day of Dyno Nobel's 2024 full year results announcement and ending on the 10th Business Day after the day of Dyno Nobel's 2027 full year results announcement (expressed as a percentage).

**Absolute TSR condition (50% of Rights)**

The Absolute TSR condition requires the Company to achieve a specific target level of total shareholder return over the performance period, independent of the performance of other companies. This condition drives a direct focus on delivering positive returns to shareholders through share price appreciation and dividends, ensuring alignment with shareholder interests by emphasising absolute value creation rather than relative performance.

The table below sets out the Absolute TSR condition for the LTI 2024/27, and the percentage of Rights that will vest based on satisfaction of this condition:

| Absolute TSR Targets (CAGR) | % of Rights subject to the Absolute TSR condition that will vest |
|---|---|
| Less than 10% | Nil |
| At 10% | 30% |
| Between 10% and up to and including 25% | Pro-rata from 30% to 100% on a straight-line basis |

The Absolute TSR condition will be measured over the period commencing on the 6th Business Day after the day of Dyno Nobel's 2024 full year results announcement and ending on the 10th Business Day after the day of Dyno Nobel's 2027 full year results are announcement (expressed as a percentage).

| | |
|---|---|
| **When are the performance conditions measured?** | After the expiry of the relevant performance period, the Board determines whether the performance condition attached to the Rights are satisfied. The performance conditions are tested once, at the end of the relevant performance period. |
| | If the performance conditions are satisfied and the Rights vest, the participant is entitled to receive ordinary shares in the Company. The participant does not pay for those shares. |
| **What happens if a participant leaves the Company?** | Generally, the Rights granted under the LTI Plans will lapse on cessation of employment except where the participant has died, becomes totally and permanently disabled, is retrenched, retires or is terminated without cause (good leaver). In those circumstances (subject to Board discretion), the number of Rights retained by the participant will be reduced pro rata to reflect the proportion of days worked during the relevant performance period and will be tested in the ordinary course. |
| **In what other circumstances may the performance rights vest (which may be before or after the expiry of the performance period) under the LTI Plans?** | The Board may provide a notice to the participants specifying that the Rights will vest at a time stipulated in the notice on the occurrence of one of the following events in relation to the Company: |
| | » a takeover bid; |
| | » a change of control; |
| | » the Court ordering a meeting be held in connection with a scheme for the reconstruction of the Company or its amalgamation with any other companies; or |
| | » a voluntary or compulsory winding-up. |
| **Is there a mechanism for claw back?** | The LTI Plan includes a clawback provision, which requires the repayment of vested awards where payment has exceeded the restated position. This includes overpayments resulting from a material misstatement or omissions in Dyno Nobel's financial statements on where a participant has materially breached their obligations to the Company. |

## 4.5  Executive service agreement terms

Remuneration and other terms of employment for the Executives are formalised in service agreements. Most Executives are engaged on similar contractual terms, with minor variations to reflect differing circumstances. Each agreement is of unlimited duration, but may be terminated by the Company:

» Immediately for cause, in which case no separation payments are made other than accrued entitlements such as leave; or

» Without cause, with or without notice, in which case the Company must pay a separation payment in accordance with the terms of the agreement, in addition to any accrued entitlements.

The notice periods applicable to Executives are summarised in the table below:

| Current Executives KMP | Notice period to be provided by the Executive | Notice period to be provided by the Company |
|---|---|---|
| M Neves | 52 weeks | 52 weeks |
| N Naidoo | 26 weeks | 26 weeks |
| G Hayne[1] | 26 weeks | 52 weeks |
| S Bowman[2] | 26 weeks | 26 weeks |

(1) Mr Hayne is employed under an historical service agreement that provides for a separation payment equivalent to 52 weeks of Fixed Annual Remuneration (FAR), subject to the termination provisions of the Corporations Act.

(2) Mr Bowman transitioned to the buyer of the Fertilisers business effective 1 October 2025.

## 4.6  Performance related remuneration

**Table 7 – Details of Rights granted and vested in the year ended 30 September 2025 and the vesting profile of Rights granted as remuneration**

Rights vested and forfeited during the year, as set out in the table below, relate to the Rights granted under the LTI 2021/24 Plan (refer to section 2.4 of this Report) and to additional grants made to Mr Naidoo upon commencement of his role as Chief Financial Officer (CFO).

The performance period for the Relative TSR condition in the LTI 2022/25 plan concludes in November 2025. Accordingly, only the non-TSR performance conditions attached to the LTI 2022/25 Plan can be reported in the current year (refer to section 2.5 of this Report). Detailed reporting on the LTI 2021/24 tranche is included under section 2.4.

| Key Management Personnel | Grant date | Granted during 2025 as remuneration[A] $000 | Exercised in year $000 | Vested in year % | Forfeited in year % | Financial year in which grant vested or could vest | Maximum value of outstanding rights[A] $000 |
|---|---|---|---|---|---|---|---|
| **CEO & MD** | | | | | | | |
| **M Neves** | | | | | | | |
| **Long-term incentive rewards** | | | | | | | |
| LTI 2023/26 – Rights | 15 January 2025 | 789 | – | – | – | 2026 | 789 |
| LTI 2023/26 – Rights (capital return additional grant) | 15 January 2025 | 46 | – | – | – | 2026 | 46 |
| LTI 2023/26 – Options | 15 January 2025 | 1,208 | – | – | – | 2026 | 1,208 |
| LTI 2023/26 – Options (capital return additional grant) | 15 January 2025 | 71 | – | – | – | 2026 | 71 |
| LTI 2024/27 – Rights | 15 January 2025 | 875 | – | – | – | 2027 | 875 |
| **Current Executive KMP** | | | | | | | |
| **N Naidoo** | | | | | | | |
| **Short term incentive rewards** | | | | | | | |
| 2025 Special Performance Rights | 7 July 2025 | 350 | – | – | – | 2026 | 350 |
| **Long term incentive rewards** | | | | | | | |
| LTI 2023/26 – Rights | 7 July 2025 | 374 | – | – | – | 2026 | 374 |
| LTI 2023/26 – Options | 7 July 2025 | 381 | – | – | – | 2026 | 381 |
| **G Hayne** | | | | | | | |
| **Long-term incentive rewards** | | | | | | | |
| LTI 2021/24 – Rights | 17 January 2022 | – | 291 | 48 | 52 | 2024 | – |
| LTI 2021/24 – Rights (capital return additional grant) | 29 August 2024 | – | 32 | 48 | 52 | 2024 | – |
| LTI 2022/25 – Rights | 23 November 2022 | – | – | – | – | 2025 | 382 |
| LTI 2022/25 – Rights (capital return additional grant) | 29 August 2024 | – | – | – | – | 2025 | 22 |
| LTI 2023/26 – Rights | 8 March 2024 | – | – | – | – | 2026 | 314 |
| LTI 2023/26 – Rights (capital return additional grant) | 29 August 2024 | – | – | – | – | 2026 | 18 |
| LTI 2023/26 – Options | 8 March 2024 | – | – | – | – | 2026 | 348 |
| LTI 2023/26 – Options (capital return additional grant) | 29 August 2024 | – | – | – | – | 2026 | 20 |
| LTI 2024/27 – Rights | 15 January 2025 | 355 | – | – | – | 2027 | 355 |

43 DYNO NOBEL

Directors' Report | Operating and Financial Review | Remuneration Report | Financial Report | Independent Auditor's Report

Case 2:25-cv-00789-DBP   Document 21-1   Filed 11/14/25   PageID.123   Page 43 of 100

| Key Management Personnel | Grant date | Granted during 2025 as remuneration[A] $000 | Exercised in year $000 | Vested in year % | Forfeited in year % | Financial year in which grant vested or could vest | Maximum value of outstanding rights[A] $000 |
|---|---|---|---|---|---|---|---|
| **S Bowman** | | | | | | | |
| LTI 2023/26 – Rights | 27 June 2024 | – | – | – | – | 2026 | 87 |
| LTI 2023/26 – Rights (capital return additional grant) | 29 August 2024 | – | – | – | – | 2026 | 5 |
| LTI 2023/26 – Options | 27 June 2024 | – | – | – | – | 2026 | 287 |
| LTI 2023/26 – Options (capital return additional grant) | 29 August 2024 | – | – | – | – | 2026 | 17 |
| LTI 2024/27 – Rights | 15 January 2025 | 259 | – | – | – | 2027 | 259 |
| **Former Executive KMP** | | | | | | | |
| **P Victor** | | | | | | | |
| LTI 2022/25 – Rights | 23 November 2022 | – | – | – | 23 | 2025 | 345 |
| LTI 2022/25 – Rights (capital return additional grant) | 29 August 2024 | – | – | – | 23 | 2025 | 20 |
| LTI 2023/26 – Rights | 8 March 2024 | – | – | – | 57 | 2026 | 158 |
| LTI 2023/26 – Rights (capital return additional grant) | 29 August 2024 | – | – | – | 57 | 2026 | 9 |
| LTI 2023/26 – Options | 8 March 2024 | – | – | – | 60 | 2026 | 162 |
| LTI 2023/26 – Options (capital return additional grant) | 29 August 2024 | – | – | – | 60 | 2026 | 10 |

(A) For the long-term incentive awards, the value of Rights granted in the year represents the fair value at the grant date, determined using a Black-Scholes option-pricing model. The fair value of these Rights is disclosed in Table 9 and is expensed over the vesting period, being the 2024, 2025 and 2026 financial years. The maximum value of outstanding Rights is based on the fair value at the grant date. This may differ from the actual value realised should the Rights vest, depending on the Company's share price and performance at that time. The minimum value of Rights yet to vest is zero, as vesting is contingent on the achievement of specified performance conditions.

### Modification of terms of equity-settled share-based payment transactions

No terms of equity-settled share-based payment arrangements (including performance rights) granted to any KMP were altered, modified or varied by the issuing entity during the reporting period.

### Table 8 – Movements in rights over equity instruments in the Company

The table below summarises the movement during the reporting period in the number of rights and options over ordinary shares in the Company held directly, indirectly or beneficially by each KMP, including their related parties, is as follows:

| Key Management Personnel | Opening balance | Number of Rights and Options | | | Closing balance |
|---|---|---|---|---|---|
| | | Granted as compensation[A] | Vested[B] | Forfeited[C] | |
| **CEO & MD** | | | | | |
| **M Neves** | | | | | |
| Long term incentive rewards (Rights) | – | 1,259,985 | – | – | 1,259,985 |
| Long term incentive rewards (Options) | – | 4,779,656 | – | – | 4,779,656 |
| **N Naidoo** | | | | | |
| Short-term incentive rewards (Rights) | – | 133,282 | – | – | 133,282 |
| Long-term incentive rewards (Rights) | – | 198,781 | – | – | 198,781 |
| Long-term incentive rewards (Options) | – | 1,569,925 | – | – | 1,569,925 |
| **G Hayne** | | | | | |
| Long-term incentive rewards (Rights) | 542,158 | 355,450 | (95,020) | (104,269) | 698,319 |
| Long-term incentive rewards (Options) | 1,519,356 | – | – | – | 1,519,356 |
| **S Bowman** | | | | | |
| Long-term incentive rewards (Rights) | 48,781 | 258,688 | – | – | 307,469 |
| Long-term incentive rewards (Options) | 1,252,269 | – | – | – | 1,252,269 |
| **Former Executive KMP** | | | | | |
| **P Victor** | | | | | |
| Long-term incentive rewards (Rights) | 400,741 | – | – | (162,016) | 238,725 |
| Long-term incentive rewards (Options) | 1,775,738 | – | – | (1,068,064) | 707,674 |

(A) For the 2025 financial year, this represents the Rights granted to Executives during the reporting period under the LTI 2024/27. The FY25 award for Mr Neves will be allocated subject to shareholder approval at the 2025 Annual General Meeting (AGM).

(B) For the 2025 financial year, this represents the number of Rights vested during the reporting period under medium-term incentive and the LTI 2021/24 Plan. Each Right entitles the participating Executive to acquire one fully paid ordinary share in Dyno Nobel for zero consideration.

(C) For the 2025 financial year, for Mr Hayne, this represents rights forfeited during the period under the LTI 2021/24 Plan. For Mr Victor, this represents the Rights and Options forfeited upon cessation of employment.

## 4.7  Further details of Executive remuneration

**Table 9 – Executive remuneration**

Details of the remuneration for each Executive KMP for the year ended 30 September 2025 in accordance with Accounting Standards are set out below:

| | Year | Short-term benefits | | | Post employment benefit | Other long term benefits(B) | Termination benefits | Share-based payments | | | Total |
| | | Salary & Fees | Short term incentive & other bonuses | Other short term benefits(A) | Super-annuation / Pension benefits | | | Accounting values | | | |
| | | | | | | | | Current period expense(C) | Prior periods expense write-back(C) | Total share-based payments | |
| | | $000 | $000 | $000 | $000 | $000 | $000 | $000 | $000 | $000 | $000 |
| **CEO & MD** | | | | | | | | | | | |
| M Neves CEO & MD | 2025 | 1,295 | 1,236 | – | 30 | 11 | – | 1,082 | – | 1,082 | 3,654 |
| | 2024 | 848 | 755 | – | 21 | 4 | – | – | – | – | 1,628 |
| **Current Executive KMP** | | | | | | | | | | | |
| N Naidoo(1) Chief Financial Officer | 2025 | 210 | – | 1 | 8 | 1 | – | 678 | – | 678 | 898 |
| | 2024 | – | – | – | – | – | – | – | – | – | – |
| G Hayne(2) President, Dyno Nobel Americas | 2025 | 870 | 552 | 226 | 30 | 67 | – | 426 | (28) | 398 | 2,143 |
| | 2024 | 760 | 739 | 102 | 28 | 27 | – | 403 | (77) | 326 | 1,982 |
| S Bowman President, IPF | 2025 | 625 | 328 | 2 | 30 | 11 | – | 217 | – | 217 | 1,213 |
| | 2024 | 209 | 162 | – | 10 | 92 | – | 132 | – | 132 | 605 |
| **Former Executive KMP** | | | | | | | | | | | |
| P Victor(3) Chief Financial Officer | 2025 | 333 | – | 49 | 15 | – | 529 | 181 | (200) | (19) | 907 |
| | 2024 | 1,003 | 969 | 177 | 28 | 9 | – | 361 | (4) | 357 | 2,543 |
| T Rybarczyk(4) President, Dyno Nobel Asia Pacific | 2025 | 262 | – | – | 15 | – | 21 | – | – | – | 298 |
| | 2024 | – | – | – | – | – | – | – | – | – | – |
| B Lusk(5) President, Dyno Nobel Americas | 2025 | – | – | – | – | – | – | – | – | – | – |
| | 2024 | 1,001 | 609 | 126 | 30 | – | – | 473 | (88) | 385 | 2,151 |
| **Total Executives** | 2025 | 3,595 | 2,116 | 278 | 128 | 90 | 550 | 2,584 | (228) | 2,356 | 9,113 |
| | 2024 | 3,821 | 3,234 | 405 | 117 | 132 | – | 1,369 | (169) | 1,200 | 8,909 |

(A)  Other short-term benefits include medical insurance benefits, travel allowances and other allowances, where applicable.

(B)  Other long-term benefits represent long service leave accrued during the reporting period.

(C)  In accordance with accounting standards, remuneration includes the amortisation of the fair value at grant date of performance rights issued under the LTI Plans that are expected to vest, less any write-back on performance rights lapsed or expected to lapse as a result of actual or expected performance against non-market hurdles ("Option Accounting Value"). The value disclosed in the above Table 9 represents the portion of fair value allocated to this reporting period and is not indicative of the benefit, if any, that may be received by the Executive should the performance conditions with respect to the relevant long-term incentive plan be satisfied. For Mr Neves expenses for FY24 and FY25 are stated above.

(1)  Mr Naidoo received the following sign-on grants: Performance Rights (STI replacement*) to the value of $350,000 (133,282 Rights), Performance Rights (aligned to LTI2023/26) to the value of $522,000 (198,781 Rights) and Options (aligned to LTI2023/26) to the value of $522,000 (1,569,925 Options). *Performance Rights in lieu of foregone STI will vest six months post commencement on the condition of being employed at the time of vesting. Rights will be subject to restrictions (earlier of 15 years or termination of employment).

(2)  FAR payments for Mr Hayne are in AUD.

(3)  Mr Victor ceased as KMP on 15 February 2025.

(4)  Ms Rybarczyk ceased as KMP on 30 May 2025.

(5)  Dr Lusk ceased KMP responsibilities on 30 September 2024.

| | Fair value per share treated as rights at grant date |
| --- | --- |
| LTI 2020/23 – TSR | $1.69 |
| LTI 2020/23 – Long-Term Value Metrics | $2.29 |
| LTI 2020/23 – Absolute ROIC | $2.29 |
| LTI 2021/24 – TSR | $1.75 |
| LTI 2021/24 – Long-Term Value Metrics | $2.86 |
| LTI 2021/24 – Absolute ROIC | $2.86 |
| LTI 2021/24 – Sustainability | $2.86 |
| LTI 2022/25 – TSR | $1.48 |
| LTI 2022/25 – Long-Term Value Metrics | $3.08 |
| LTI 2022/25 – Average ROIC | $3.08 |
| LTI 2022/25 – Sustainability | $3.08 |
| LTI 2023/26 – rTSR (Rights) | $1.28 |
| LTI 2023/26 – Average ROIC (Rights) | $2.48 |
| LTI 2023/26 – aTSR (Options Tranche 1) | $0.26 |
| LTI 2023/26 – aTSR (Options Tranche 2) | $0.23 |
| LTI 2023/26 – aTSR (Options Tranche 3) | $0.22 |
| LTI 2024/27 – rTSR (relative) | $1.42 |
| LTI 2024/27 – aTSR (absolute) | $0.55 |

# 5. Overview of Remuneration Changes for the 2026 Financial Year

The Board continues to review the objectives and operation of the Executive Remuneration Framework to ensure it remains appropriate to best support the execution of our strategies to increase shareholder value, retain and motivate our key talent and ensures alignment with our other key stakeholders.

### Long Term Incentive

Following the sale of the Fertilisers business and in the context of the Company's ongoing business transformation program, the Board undertook a review of the Long Term Incentive (LTI) structure and determined to reintroduce Return on Invested Capital (ROIC) as a measure under the FY26 LTI Plan with performance measures of 7% (threshold), 8% (target) and 8.5% (stretch).

The reintroduction of ROIC reflects Dyno Nobel's strategic focus on capital efficiency and disciplined investment, and reinforces the importance of achieving sustainable returns above the Company's cost of capital. The Board considers that a balanced combination of Absolute TSR (50%), Relative TSR (25%), and ROIC (25%) performance measures provides a clear line of sight between long term executive rewards, business performance, and shareholder outcomes.

Otherwise, there will be no changes to the broader Executive Remuneration Framework for FY26, and no adjustment to Executive KMP remuneration levels.

However, in light of the sale of the Fertilisers business, the Board will conduct a comprehensive review of the Executive Remuneration Framework during FY26 to ensure it continues to appropriately incentivise and reward delivery of the Company's refocused strategy.

Full details of any updated remuneration arrangements applicable to the 2027 financial year will be disclosed in the 2026 Remuneration Report for implementation in FY27.

# 6. Non-executive Director Remuneration

Dyno Nobel's policy is to:

» remunerate Non-executive Directors by way of fees and payments which may be in the form of cash and superannuation benefits; and

» set the level of Non-executive Directors' fees and payments to be consistent with the market and to enable the Dyno Nobel Group to attract and retain directors of an appropriate calibre.

Non-executive Directors are not remunerated by way of options, shares, performance rights, bonuses nor by incentive based payments.

As outlined in our FY24 Remuneration Report, the fees for Non-executive Directors were restructured in FY25. The Chair's fee was reset at $500,000 per annum, reflecting the responsibilities and commitment associated with the role.

All other Non-executive Directors (excluding the Chair) receive a composite fee of $225,000 per annum, comprising a notional base fee element of $180,000 and $45,000 per year to recognise Committee memberships and participation. This approach acknowledges that most directors attend all Committee meetings, not solely those of which they are formal members.

An additional fee is paid to committee chairs in recognition of their increased workload and responsibilities, being:

» $25,000 per annum for the Audit & Risk Management Committee (ARMC) Chair; and

» $20,000 per annum for the Safety & Sustainability Committee (SSC) and People & Remuneration Committee (PRC) Chairs.

Director minimum shareholding requirements are measured by reference to the notional base fee of $180,000, consistent with current practice.

A travel allowance of $5,000 per overseas trip is payable to all directors to reflect the additional time commitment associated with international travel for Board meetings and site visits. The total travel allowance payable to an Australian-based director is capped at $10,000 per annum. This cap does not apply to overseas-based directors travelling regularly to Australia for Board meetings.

Shareholder approval will be sought at the 2025 Annual General Meeting (AGM) for an increase in the total annual NED fee pool from $2.0m to $2.5m, providing the Board with capacity to appoint additional directors in the future to support Board succession planning.

There will be no increase in Non-Executive Directors fees in FY26.

**Table 10 – Non-executive Directors' remuneration**

Details of the Non-executive Directors' remuneration for the financial year ended 30 September 2025 are set out in the following table:

| | Year | Board and Committee Fees | Cash allowances and other short-term benefits[A] | Post-employment benefits | Other long term benefits | Total |
|---|---|---|---|---|---|---|
| | | Fees | | Superannuation benefits | | |
| | | $000 | $000 | $000 | $000 | $000 |
| **Current Non-executive Directors** | | | | | | |
| G Robinson | **2025** | **478** | **5** | **22** | **–** | **505** |
| | 2024 | 472 | – | 28 | – | 500 |
| B Brook | **2025** | **237** | **5** | **13** | **–** | **255** |
| | 2024 | 240 | – | 13 | – | 253 |
| M Carroll | **2025** | **202** | **5** | **23** | **–** | **230** |
| | 2024 | 176 | – | 20 | – | 196 |
| T Dwyer | **2025** | **238** | **5** | **7** | **–** | **250** |
| | 2024 | 221 | – | 25 | – | 246 |
| F Hick | **2025** | **219** | **5** | **26** | **–** | **250** |
| | 2024 | 15 | – | 2 | – | 17 |
| J Ho[1] | **2025** | **–** | **–** | **–** | **–** | **–** |
| | 2024 | – | – | – | – | – |
| **Former Non-executive Directors** | | | | | | |
| G Biltz[2] | **2025** | **–** | **–** | **–** | **–** | **–** |
| | 2024 | 43 | 5 | – | – | 48 |
| B Kruger, Chair[3] | **2025** | **–** | **–** | **–** | **–** | **–** |
| | 2024 | 54 | – | 7 | – | 61 |
| X Liu[4] | **2025** | **–** | **–** | **–** | **–** | **–** |
| | 2024 | 158 | – | – | – | 158 |
| **Total Non-executive Directors** | **2025** | **1,374** | **25** | **91** | **–** | **1,490** |
| | 2024 | 1,379 | 5 | 95 | – | 1,479 |

(A)  Cash allowances and other short-term benefits include travel allowances.
(1)  Mr Ho elected to waive his entitlement to receive Non-executive Director fees from Dyno Nobel.
(2)  Mr Biltz ceased to be a Non-executive Director with effect from 20 December 2023.
(3)  Mr Kruger ceased to be Chair and a Non-executive Director with effect from 11 November 2023.
(4)  Dr Liu ceased to be a Non-executive Director with effect from 31 May 2024.

# 7. Shareholdings in Dyno Nobel

The Board considers that an important element of the Dyno Nobel's remuneration framework is the requirement of Executive KMP and Non-executive Directors to accumulate and hold a meaningful shareholding in the Company. The approach ensures alignment of their interest with those of shareholders and reinforces a long-term focus on sustainable value creation.

## Executives

Executive KMP are required to attain and maintain a MSR to strengthen alignment between Executive and Shareholder interests.

» The CEO & MD must hold the equivalent of 200% of Fixed Annual Remuneration (FAR) in Dyno Nobel shares, within five years of appointment.

» Other Executive KMP are required to hold Dyno Nobel shares equivalent to 100% of FAR, within the same five-year period.

At 30 September 2025, all Executive KMP (including the CEO & MD) had either achieved, or were on track to achieve, their MSR obligation within the required timeframe.

## Non-executive Directors

The MSR for Non-executive Directors is designed to align the interests of Directors and shareholders by ensuring Directors maintain personal investment in the Company.

Each Non-executive Director is required to hold the equivalent of 100% of their base Board fee in Dyno Nobel shares and/or rights to shares fully sacrificed under the Non-executive Director Fee Sacrifice Plan, within five years of appointment.

As at 30 September 2025, all Non-executive Directors had achieved, or were progressing toward achievement of, their MSR obligations within the required timeframe.

47 DYNO NOBEL

Case 2:25-cv-00789-DBP   Document 21-1   Filed 11/14/25   PageID.127   Page 47 of 100

Directors' Report | Operating and Financial Review | **Remuneration Report** | Financial Report | Independent Auditor's Report

### Table 11 – Movements in rights in the Company

Dyno Nobel's Non-executive Director Fee Sacrifice Plan (the Plan) commenced in 2019. The next tranche of rights is scheduled to vest in November 2025. These rights, as well as those that subsequently convert to shares, combine to form part of the Non-executive Director's holding for the purpose of calculating compliance with their MSR obligation.

The movement during the reporting period in the number of rights for each Non-executive Director, including their related parties, is set out in the table below:

| | Number of Rights[A] | | | |
|---|---|---|---|---|
| | Opening balance | Rights acquired | Vested [B] | Closing balance |
| G Robinson | 28,751 | 53,671 | (54,608) | 27,814 |
| B Brook | 6,390 | 12,421 | (12,136) | 6,675 |
| M Carroll | – | – | – | – |
| T Dwyer | 6,389 | 12,422 | (12,135) | 6,676 |
| F Hick | – | 6,675 | – | 6,675 |
| J Ho | – | – | – | – |

(A)  Includes movements of rights acquired under the Plan.

(B)  For the 2025 financial year, this represents the number of rights vested during the reporting period under the Plan.

### Table 12 – Movements in shares in the Company

The movement during the reporting period in the number of shares in the Company held directly, indirectly or beneficially, by each KMP, including their related parties, is set out in the table below:

| | Number of Shares[A] | | | | |
|---|---|---|---|---|---|
| | Opening balance | Shares acquired | Shares disposed | Closing balance[B] | % minimum shareholding achieved[C] |
| **Current Non-executive Directors** | | | | | |
| G Robinson[1] | 83,073 | 159,946 | – | 243,019 | 162% |
| B Brook | 100,064 | 12,474 | – | 112,538 | 198% |
| M Carroll | 58,758 | – | – | 58,758 | 98% |
| T Dwyer | 37,526 | 12,473 | – | 49,999 | 94% |
| F Hick[2] | – | – | – | – | 11% |
| J Ho[3] | 173,065,979 | 2,638,982 | (18,215,486) | 157,489,475 | N/A |
| **Current Executive KMP** | | | | | |
| M Neves | – | 124,173 | – | 124,173 | 14% |
| N Naidoo | – | – | – | – | 0% |
| G Hayne | 452,408 | 95,020 | – | 547,428 | 182% |
| S Bowman | – | 8,838 | – | 8,838 | 4% |
| **Former Executive KMP** | | | | | |
| P Victor | 134,152 | – | (134,152) | – | – |

(A)  Includes fully paid ordinary shares and shares acquired under Dyno Nobel's incentive plans. Details of these plans are set out in note 19, Share-based payments.

(B)  Where a director or an Executive has ceased to be a KMP during the reporting year, the balance stated in this column represents the number of shares held as at the date the Director or Executive ceased to be a KMP.

(C)  MSR is calculated based on the 20 day VWAP up until and including the 30th of September 2025. For Non-executive Directors the total number of shares and unvested rights granted under the NED Share Plan is counted towards the MSR. For Executive KMP, other than the CEO & MD, the % of minimum shareholding received is shown as a percentage of 100% of their FAR.

(1)  Mr Robinson was appointed as Chair of the Board with effect from 11 November 2023. Following his fee increase as Chair, the Board determined that Mr Robinson be permitted an additional 5-year period from appointment of Chair to satisfy his increased MSR. Mr. Robinson's balance was updated to 83,073 following a review of prior-year records.

(2)  Ms Hick was appointed as an Independent Non-executive Director with effect from 1 September 2024.

(3)  Mr Ho is the founder and Chief Industrialist Investor of Janchor Partners which has indirectly (through Janchor Partners' investment funds) a 13.61% interest in Dyno Nobel (including a relevant interest of 8.77% in Dyno Nobel's voting shares and a non-voting economic interest in a further 4.84% through cash-settled equity derivatives in 86,870,544 ordinary shares). The change in shareholding during the financial year reflects a reduction of voting shares and an increase of non-voting interests. For further details, see Mr Ho's Appendix 3Y dated 12 August 2025 and Janchor Partners' substantial holder notices dated 23 May 2025 and 7 November 2025.

## 8. Other KMP Disclosures

### Loans to KMP

In the year ended 30 September 2025, there were no loans to key management personnel and their related parties (2024: nil).

### Other KMP transactions

In the year ended 30 September 2025, there were no transactions entered into during the year with key management personnel (including their related parties).

# Deloitte.

Deloitte Touche Tohmatsu
A.B.N. 74 490 121 060

477 Collins Street
Melbourne VIC 3000

Tel:  +61 3 9671 7000
www.deloitte.com.au

10 November 2025

The Board of Directors
Dyno Nobel Limited
Level 8, 28 Freshwater Place
Southbank Victoria 3006

Dear Board Members

### Auditor's Independence Declaration to Dyno Nobel Limited

In accordance with section 307C of the *Corporations Act 2001*, I am pleased to provide the following declaration of independence to the directors of Dyno Nobel Limited.

As lead audit partner for the audit of the financial report of Dyno Nobel Limited for the financial year ended 30 September 2025, I declare that to the best of my knowledge and belief, there have been no contraventions of:

- the auditor independence requirements of the *Corporations Act 2001* in relation to the audit; and

- any applicable code of professional conduct in relation to the audit.

Yours faithfully

*Deloitte Touche Tohmatsu*

DELOITTE TOUCHE TOHMATSU

*Suzana Vlahovic*

Suzana Vlahovic
Partner
Chartered Accountants

Liability limited by a scheme approved under Professional Standards Legislation.
Member of Deloitte Asia Pacific Limited and the Deloitte organisation.

49  DYNO NOBEL

Directors'
Report

Operating and
Financial Review

Remuneration
Report

**Financial
Report**

Independent
Auditor's Report

Case 2:25-cv-00709-DBP    Document 21-1    Filed 11/14/25    PageID.129    Page 49 of

# Financial Report

**Introduction** ......................................................... **50**

**Content and Structure of the Financial Report** ......... **50**

**Consolidated Statement of Profit or
Loss and Other Comprehensive Income** ................. **51**

**Consolidated Statement of Financial Position** ......... **53**

**Consolidated Statement of Cash Flows** ................. **54**

**Consolidated Statement of Changes in Equity** ......... **55**

**Notes to the Consolidated Financial Statements** ...... **56**

**Consolidated Entity Disclosure Statement** ............. **93**

**Directors' Declaration on the Consolidated
Financial Statements set out on pages 49 to 94** ....... **95**

**Independent Auditor's Report** ............................ **96**

# Introduction

This is the consolidated financial report of Dyno Nobel Limited (the Company, or Dyno Nobel) a company domiciled in Australia, and its subsidiaries including its interests in joint ventures and associates (collectively referred to as the Group) for the financial year ended 30 September 2025.

# Content and Structure of the Financial Report

The notes to the financial statements and the related accounting policies are grouped into the following distinct sections in the 2025 financial report. The accounting policies have been consistently applied to all years presented, unless otherwise stated.

| Section | Description |
| --- | --- |
| Financial performance | Provides detail on the Group's Consolidated Statement of Profit or Loss and Other Comprehensive Income and Consolidated Statement of Financial Position that are most relevant in forming an understanding of the Group's financial performance for the year. |
| Shareholder returns | Provides information on the performance of the Group in generating shareholder returns. |
| Capital structure | Provides information about the Group's capital and funding structures. |
| Capital investment | Provides information on the Group's investment in tangible and intangible assets, and the Group's future capital commitments. |
| Risk management | Provides information about the Group's risk exposures, risk management practices, provisions and contingent liabilities. |
| Other | Provides information on items that require disclosure to comply with Australian Accounting Standards and the requirements under the *Corporations Act 2001*. |

Information is included in the notes to the financial report only to the extent it is considered material and relevant to the understanding of the financial report. A disclosure is considered material and relevant if, for example:

» the dollar amount is material in size (quantitative factor)

» the item is material by nature (qualitative factor)

» the Group's result cannot be understood without the specific disclosure (qualitative factor)

» it relates to an aspect of the Group's operations that is important to its future performance.

51    DYNO NOBEL    Directors'    Operating and    Remuneration    Financial    Independent
                    Report       Financial Review   Report          Report       Auditor's Report

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.131    Page 51 of 100

# Consolidated Statement of Profit or Loss and Other Comprehensive Income

For the year ended 30 September 2025

|  | Notes | 2025 $mill | 2024 $mill |
|---|---|---|---|
| **Continuing operations** | | | |
| Revenue | (2) | 3,710.1 | 3,537.9 |
| Financial and other income | (2) | 83.7 | 130.2 |
| Share of profit of equity accounted investments | (15) | 80.3 | 62.2 |
| **Operating expenses** | | | |
| Changes in inventories of finished goods and work in progress | | 91.9 | (56.1) |
| Raw materials and consumables used and finished goods purchased for resale | | (1,320.2) | (1,154.7) |
| Employee expenses | | (934.3) | (889.0) |
| Depreciation and amortisation | (2) | (284.1) | (317.2) |
| Financial expenses | (2) | (164.0) | (156.8) |
| Purchased services | | (241.6) | (237.8) |
| Repairs and maintenance | | (147.6) | (184.4) |
| Outgoing freight | | (295.7) | (308.7) |
| Lease expenses | | (23.4) | (27.7) |
| Asset impairment, asset disposal and site exit costs | | (297.7) | (832.4) |
| Other expenses | | (71.2) | (61.6) |
| **Profit/(loss) before income tax** | | **186.2** | **(496.1)** |
| Income tax (expense)/benefit | (3) | (37.9) | 210.4 |
| **Profit/(loss) for the year from continuing operations** | | **148.3** | **(285.7)** |
| **Discontinued operations** | | | |
| Loss for the period from discontinued operations | (14) | (1.7) | (149.9) |
| (Loss)/gain on disposal of discontinued operations | (14) | (198.7) | 123.8 |
| **Loss for the year from discontinued operations** | | **(200.4)** | **(26.1)** |
| **Loss for the year** | | **(52.1)** | **(311.8)** |
| | | | |
| **Other comprehensive income/(loss), net of income tax** | | | |
| *Items that will not be reclassified subsequently to profit or loss* | | | |
| Actuarial (loss)/gain on defined benefit plans | (21) | (1.2) | 2.1 |
| Gross fair value gain on assets at fair value through other comprehensive income | | – | 0.3 |
| Income tax relating to items that will not be reclassified subsequently to profit or loss | | 0.3 | (0.6) |
| | | (0.9) | 1.8 |
| *Items that may be reclassified subsequently to profit or loss* | | | |
| **Continuing operations** | | | |
| Fair value loss on cash flow hedges | (18) | (1.3) | (0.5) |
| Cash flow hedge loss transferred to profit or loss | (18) | 6.7 | 14.7 |
| Exchange differences on translating foreign operations | | 124.3 | (206.9) |
| Net (loss)/gain on hedge of net investment | (18) | (37.7) | 55.4 |
| Income tax relating to items that may be reclassified subsequently to profit or loss | | (8.7) | 1.6 |
| **Continuing operations other comprehensive income/(loss) for the year** | | **83.3** | **(135.7)** |
| **Discontinued operations** | | | |
| Fair value (loss)/gain on cash flow hedges | (18) | (10.1) | 6.6 |
| Cash flow hedge loss/(gain) transferred to profit or loss | (18) | 7.3 | (3.6) |
| Exchange differences on translating foreign operations | | – | (48.2) |
| Foreign currency translation reserve released to profit or loss on disposal of discontinued operations | (14) | – | (254.1) |
| Non-controlling interests released to profit or loss on disposal of discontinued operations | | 8.1 | – |
| Income tax relating to items that may be reclassified subsequently to profit or loss | | 0.8 | (0.9) |
| **Discontinued operations other comprehensive income/(loss) for the year** | | **6.1** | **(300.2)** |
| **Total other comprehensive income/(loss) for the year, net of income tax** | | **88.5** | **(434.1)** |
| **Total comprehensive income/(loss) for the year** | | **36.4** | **(745.9)** |

# Consolidated Statement of Profit or Loss and Other Comprehensive Income

**For the year ended 30 September 2025**

|  | Notes | 2025 $mill | 2024 $mill |
|---|---|---|---|
| **Profit/(loss) attributable to:** | | | |
| Members of Dyno Nobel Limited from continuing operations | | 147.2 | (284.8) |
| Members of Dyno Nobel Limited from discontinued operations | | (200.4) | (26.1) |
| Non-controlling interest | | 1.1 | (0.9) |
| **Loss for the year** | | **(52.1)** | **(311.8)** |
| **Total comprehensive income/(loss) attributable to:** | | | |
| Members of Dyno Nobel Limited from continuing operations | | 229.6 | (418.7) |
| Members of Dyno Nobel Limited from discontinued operations | | (194.3) | (326.3) |
| Non-controlling interest | | 1.1 | (0.9) |
| **Total comprehensive income/(loss) for the year** | | **36.4** | **(745.9)** |
| **Earnings per share** | | | |
| Basic (cents per share) | (5) | (2.9) | (16.1) |
| Diluted (cents per share) | (5) | (2.9) | (16.1) |
| **Earnings per share from continuing operations** | | | |
| Basic (cents per share) | (5) | 7.9 | (14.7) |
| Diluted (cents per share) | (5) | 7.9 | (14.7) |

53 DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.133    Page 53 of 100

Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | Independent Auditor's Report

# Consolidated Statement of Financial Position

**As at 30 September 2025**

| | Notes | 2025 $mill | 2024 $mill |
|---|---|---|---|
| **Current assets** | | | |
| Cash and cash equivalents | (8) | 647.2 | 1,068.9 |
| Trade and other receivables | (4) | 719.6 | 647.1 |
| Inventories | (4) | 519.1 | 785.3 |
| Other assets | | 107.4 | 98.6 |
| Other financial assets | (18) | 8.5 | 2.4 |
| Current tax asset | | 120.9 | 70.0 |
| **Total current assets** | | **2,122.7** | **2,672.3** |
| **Non-current assets** | | | |
| Trade and other receivables | (4) | 152.0 | 23.0 |
| Other assets | | 73.3 | 34.2 |
| Other financial assets | (18) | – | 3.3 |
| Equity accounted investments | (15) | 457.7 | 417.9 |
| Property, plant and equipment | (9) | 2,203.7 | 2,435.9 |
| Right-of-use lease assets | (10) | 149.2 | 243.4 |
| Intangible assets | (11) | 2,626.2 | 2,545.7 |
| Deferred tax assets | (3) | 32.4 | 6.7 |
| Exploration and evaluation assets | | 12.7 | 16.0 |
| **Total non-current assets** | | **5,707.2** | **5,726.1** |
| **Total assets** | | **7,829.9** | **8,398.4** |
| **Current liabilities** | | | |
| Trade and other payables | (4) | 733.7 | 883.0 |
| Lease liabilities | (10) | 59.7 | 48.9 |
| Interest bearing liabilities | (8) | 566.6 | 19.5 |
| Other financial liabilities | (18) | 0.3 | 2.2 |
| Provisions | (17) | 222.3 | 140.0 |
| Current tax liabilities | | 8.7 | 238.3 |
| **Total current liabilities** | | **1,591.3** | **1,331.9** |
| **Non-current liabilities** | | | |
| Trade and other payables | (4) | 22.4 | 12.4 |
| Lease liabilities | (10) | 151.8 | 222.4 |
| Interest bearing liabilities | (8) | 1,238.9 | 1,664.6 |
| Other financial liabilities | (18) | 30.5 | 39.7 |
| Provisions | (17) | 231.0 | 155.9 |
| Deferred tax liabilities | (3) | 111.3 | 108.4 |
| Retirement benefit obligation | (21) | 19.8 | 18.2 |
| **Total non-current liabilities** | | **1,805.7** | **2,221.6** |
| **Total liabilities** | | **3,397.0** | **3,553.5** |
| **Net assets** | | **4,432.9** | **4,844.9** |
| **Equity** | | | |
| Issued capital | (7) | 3,072.6 | 3,354.7 |
| Reserves | | (213.4) | (297.1) |
| Retained earnings | | 1,571.9 | 1,788.3 |
| Non-controlling interest | | 1.8 | (1.0) |
| **Total equity** | | **4,432.9** | **4,844.9** |

# Consolidated Statement of Cash Flows

### For the year ended 30 September 2025

| | Notes | 2025 $mill Inflows (Outflows) | 2024 $mill Inflows (Outflows) |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Loss after tax for the year | | (52.1) | (311.8) |
| *Adjusted for non-cash items* | | | |
| Net finance cost | | 136.1 | 104.4 |
| Depreciation and amortisation | (2) | 298.3 | 345.0 |
| Asset impairment, asset disposal and site exit costs | (2) | 362.8 | 1,072.7 |
| Loss/(gain) on sale of discontinued operations before tax | (14) | 143.5 | (356.4) |
| Share of profit on equity accounted investments | (15) | (80.3) | (62.2) |
| Net loss/(gain) on sale of property, plant and equipment | (2) | 6.9 | (14.7) |
| Non-cash share-based payment transactions | (19) | 5.0 | 3.8 |
| Income tax expense | (3) | 92.3 | 38.6 |
| *Changes in assets and liabilities* | | | |
| Increase in receivables and other operating assets | | (164.7) | (133.2) |
| Increase in inventories | | (22.0) | (2.1) |
| Decrease in payables, provisions and other operating liabilities | | (72.8) | (217.0) |
| | | 653.0 | 467.1 |
| *Adjusted for cash items* | | | |
| Dividends received | (15) | 52.9 | 32.8 |
| Interest received | | 28.1 | 57.5 |
| Interest paid | | (132.7) | (140.6) |
| Income tax paid | | (26.6) | (122.1) |
| Settlement for Dyno Nobel employees entitlement | | – | (4.5) |
| **Net cash flows from operating activities** | | **574.7** | **290.2** |
| **Cash flows from investing activities** | | | |
| Payments for property, plant and equipment and intangibles | | (474.2) | (378.7) |
| Proceeds from sale of property, plant and equipment | | 9.8 | 30.4 |
| (Payments for)/proceeds from sale of discontinued operations, net of transaction costs and tax[1] | | (55.8) | 1,639.7 |
| Payments for acquisition of subsidiaries and non-controlling interests and equity investments | | – | (4.3) |
| **Net cash flows from investing activities** | | **(520.2)** | **1,287.1** |
| **Cash flows from financing activities** | | | |
| Repayments of borrowings | (8) | (474.5) | (8.1) |
| Proceeds from borrowings | (8) | 498.5 | 0.8 |
| Dividends paid to members of Dyno Nobel Limited | (6) | (162.3) | (378.2) |
| Lease liability payments | | (54.2) | (53.0) |
| Purchased shares for Dyno Nobel employees | | (2.6) | (5.5) |
| Share buyback | | (286.2) | (140.6) |
| Capital returned to non-controlling interests | | (6.4) | – |
| Capital returned to members of Dyno Nobel Limited | | – | (302.5) |
| **Net cash flows from financing activities** | | **(487.7)** | **(887.1)** |
| Net (decrease)/increase in cash and cash equivalents held | | (433.2) | 690.2 |
| Cash and cash equivalents at the beginning of the year | | 1,068.9 | 399.4 |
| Effect of exchange rate fluctuations on cash and cash equivalents held | | 11.5 | (20.7) |
| **Cash and cash equivalents at the end of the year** | (8) | **647.2** | **1,068.9** |

(1)  FY25 includes a tax payment of $415.9m, partly offset by the upfront proceeds from the IPF Distribution sale net of transaction costs of $360.1m.

The above Consolidated Statement of Cash Flows includes cash flows from both continuing and discontinued operations. Refer to note 14 for the cash flows relating to discontinued operations.

# Consolidated Statement of Changes in Equity

**For the year ended 30 September 2025**

| | Notes | Issued capital $mill | Cash flow hedging reserve $mill | Share-based payments reserve $mill | Foreign currency translation reserve $mill | Fair value reserve $mill | Retained earnings[1] $mill | Non-controlling interest $mill | Total equity $mill |
|---|---|---|---|---|---|---|---|---|---|
| **Balance at 1 October 2023** | | **3,806.2** | **(21.9)** | **26.3** | **160.0** | **(19.7)** | **2,475.9** | **(0.1)** | **6,426.7** |
| Loss for the year | | – | – | – | – | – | (310.9) | (0.9) | (311.8) |
| Total other comprehensive loss for the year | | – | 12.0 | – | (447.9) | 0.3 | 1.5 | – | (434.1) |
| Dividends paid | (6) | – | – | – | – | – | (378.2) | – | (378.2) |
| Capital returned to members of Dyno Nobel Limited | | (302.5) | – | – | – | – | – | – | (302.5) |
| Share buyback | (7) | (149.0) | – | – | – | – | – | – | (149.0) |
| Settlement for Dyno Nobel employees entitlement | | – | – | (4.5) | – | – | – | – | (4.5) |
| Purchased shares for Dyno Nobel employees | | – | – | (5.5) | – | – | – | – | (5.5) |
| Share-based payment transactions | (19) | – | – | 3.8 | – | – | – | – | 3.8 |
| **Balance at 30 September 2024** | | **3,354.7** | **(9.9)** | **20.1** | **(287.9)** | **(19.4)** | **1,788.3** | **(1.0)** | **4,844.9** |
| **Balance at 1 October 2024** | | **3,354.7** | **(9.9)** | **20.1** | **(287.9)** | **(19.4)** | **1,788.3** | **(1.0)** | **4,844.9** |
| Loss for the year | | – | – | – | – | – | (53.2) | 1.1 | (52.1) |
| Total other comprehensive income for the year | | – | 1.7 | – | 79.6 | – | (0.9) | 8.1[2] | 88.5 |
| Dividends paid | (6) | – | – | – | – | – | (162.3) | – | (162.3) |
| Capital returned to non-controlling interests[3] | | – | – | – | – | – | – | (6.4) | (6.4) |
| Share buyback[4] | (7) | (282.1) | – | – | – | – | – | – | (282.1) |
| Purchased shares for Dyno Nobel employees | | – | – | (2.6) | – | – | – | – | (2.6) |
| Share-based payment transactions | (19) | – | – | 5.0 | – | – | – | – | 5.0 |
| **Balance at 30 September 2025** | | **3,072.6** | **(8.2)** | **22.5** | **(208.3)** | **(19.4)** | **1,571.9** | **1.8** | **4,432.9** |

(1) Includes a legal reserve of $7.0m and $7.1m as required by the French law as at 30 September 2025 and 2024 respectively. Such reserve cannot be distributed to the shareholders other than upon liquidation but can be used to offset losses.

(2) Represents the release of non-controlling interests in Australian Bio Fert Pty Ltd which was divested as part of the IPF Distribution sale.

(3) During the year, the Group returned capital of $6.4m to non-controlling interests of Australian Bio Fert Pty Ltd prior to divestment of the IPF Distribution business.

(4) The $282.1m share buyback includes $281.6m worth of shares purchased by the Group as part of the on-market buyback program, and $0.5m of related transaction costs. This differs to the cash flow impact of $286.2m due to the timing of settlement.

## Cash flow hedging reserve

This reserve comprises the cumulative net change in the fair value of the effective portion of cash flow hedging instruments related to hedged transactions that have not yet occurred.

## Share-based payments reserve

This reserve comprises the fair value of rights recognised as an employee expense under the terms of the Long Term Incentive Plans.

## Foreign currency translation reserve

Exchange differences arising on translation of foreign controlled operations are taken to the foreign currency translation reserve. The relevant portion of the reserve is recognised in the profit or loss when the foreign operation is disposed of.

The foreign currency translation reserve is also used to record gains and losses on hedges of net investments in foreign operations.

## Fair value reserve

This reserve represents the cumulative net change in the fair value of equity instruments. The annual net change in the fair value of investments in equity securities (including both realised and unrealised gains and losses) is recognised in other comprehensive income.

## Non-controlling interest

This represents equity interest outside the Dyno Nobel Limited Group. Refer to note 16 for the list of subsidiaries that are not 100% owned by the Group.

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEAR ENDED 30 SEPTEMBER 2025

Basis of preparation and consolidation                                                57

**Financial performance**
1 Segment report                                                                       58
2 Revenue and expenses                                                                 61
3 Taxation                                                                             63
4 Trade and other receivables and payables                                            65

**Shareholder returns**
5 Earnings per share                                                                   66
6 Dividends                                                                            66

**Capital structure**
7 Capital management                                                                   67
8 Net debt                                                                             68

**Capital investment**
9 Property, plant and equipment                                                        70
10 Leases                                                                              71
11 Intangibles                                                                         72
12 Impairment of goodwill and non-current assets                                       73
13 Commitments                                                                         75
14 Discontinued operations                                                             76
15 Equity accounted investments                                                        77
16 Investments in subsidiaries, joint arrangements and associates                      78

**Risk management**
17 Provisions and contingencies                                                        80
18 Financial risk management                                                           81

**Other**
19 Share-based payments                                                                89
20 Key management personnel disclosures                                                89
21 Retirement benefit obligation                                                       89
22 Deed of cross guarantee                                                             91
23 Parent entity disclosure                                                            91
24 Auditor's remuneration                                                              92
25 Events subsequent to reporting date                                                 92
Consolidated Entity Disclosure Statement                                               93

57 DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.137    Page 57 of 100

Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | Independent Auditor's Report

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: BASIS OF PREPARATION

FOR THE YEAR ENDED 30 SEPTEMBER 2025

# Basis of preparation and consolidation

The consolidated financial statements of the Group have been prepared under the historical cost convention, except for certain financial instruments that have been measured at fair value.

The financial results and financial position of the Group are expressed in Australian dollars, which is the functional currency of the Company and the presentation currency for the consolidated financial statements. Where applicable, comparative disclosures have been reclassified for consistency with the current period if material.

As a result of the IPF Distribution sale agreement, the earnings attributable to IPF Distribution for the twelve months ended 30 September 2025 and the resultant loss on sale have been presented as discontinued operations. The Waggaman facility was also classified as a discontinued operation in the prior year. Refer to note 14 of the financial statements for the earnings and cash flow of the IPF Distribution business.

The Organisation for Economic Co-operation and Development (OECD)/G20 Inclusive Framework on Base Erosion and Profit Shifting (BEPS) published the Pillar Two Model Rules in December 2021, which are designed to ensure large multinational enterprises are subject to a minimum taxation at a 15 percent rate in each jurisdiction where they operate. Pillar Two legislation has been enacted in Australia and other jurisdictions in which the Group operates and is effective for the financial year beginning 1 October 2024. The Group is in scope of the enacted legislation given its annual turnover exceeds the EUR 750 million threshold. The Group has adopted the provisions for the purpose of preparing the full year consolidated financial statements.

The consolidated financial statements were authorised for issue by the directors on 10 November 2025.

### Subsidiaries

Subsidiaries are entities that are controlled by the Group. The financial results and financial position of the subsidiaries are included in the consolidated financial statements from the date control commences until the date control ceases.

A list of the Group's subsidiaries is included in note 16.

### Joint arrangements and associates

A joint venture is an arrangement where the parties have rights to the net assets of the venture.

A joint operation is an arrangement where the parties each have rights to the assets and liabilities relating to the arrangement.

Associates are those entities in respect of which the Group has significant influence, but not control, over the financial and operating policies of the entities.

Investments in joint ventures and associates are accounted for using the equity method. They are initially recognised at cost, and subsequent to initial recognition, the consolidated financial statements include the Group's share of the profit or loss and other comprehensive income of the investees.

The interests in joint operations are brought to account recognising the Group's share of jointly controlled assets, liabilities, expenses, and income from the joint operation.

A list of the Group's joint arrangements and associates is included in note 16.

# Statement of compliance

The consolidated financial statements are general purpose financial statements which have been prepared in accordance with Australian Accounting Standards (including Australian Interpretations) and the *Corporations Act 2001*. The consolidated financial statements of the Group comply with International Financial Reporting Standards (**IFRS**) and interpretations. The Company is a for-profit entity.

# Key estimates and judgements

Key accounting estimates and judgements are continually evaluated and are based on historical experience and other factors, including expectation of future events that may have a financial impact on the Group and that are believed to be reasonable under the circumstances.

The resulting accounting estimates will, by definition, seldom equal the subsequent related actual result. The estimates and judgements that have a significant risk of causing a material adjustment to the carrying amounts of the assets and liabilities within the next financial year are set out in the notes.

# Rounding of amounts

The Company is of a kind referred to in ASIC Legislative Instrument, *ASIC Corporations (Rounding in Financial/ Directors' Reports) Instrument 2016/191*, issued by the Australian Securities and Investments Commission dated 24 March 2016 and, in accordance with that Legislative Instrument, the amounts shown in this report and in the financial statements have been rounded, except where otherwise stated, to the nearest one hundred thousand dollars.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: BASIS OF PREPARATION**
FOR THE YEAR ENDED 30 SEPTEMBER 2025

## Accounting standards issued

The Group adopted any amendments to Standards and Interpretations issued by the Australian Accounting Standards Board (**AASB**) that are relevant to its operations and effective for the current year. The adoption of these revised Standards and Interpretations did not have a material impact on the Group's result.

Certain new accounting Standards and Interpretations have been issued that are not mandatory for the 30 September 2025 reporting period and have not been early adopted by the Group. These Standards and Interpretations are not expected to have a material impact on the Group in the current or future reporting periods or on foreseeable future transactions.

---

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: FINANCIAL PERFORMANCE**
FOR THE YEAR ENDED 30 SEPTEMBER 2025

## 1. Segment report

The Group operates a number of strategic divisions that offer different products and services and operate in different markets. For reporting purposes, these divisions are known as reportable segments. The results of each segment are reviewed monthly by the executive management team (the chief operating decision makers) to assess performance and make decisions about the allocation of resources.

Effective from 1 October 2024, Dyno Nobel made changes to its segment reporting to reflect the Group's strategy to expand in Latin America, Europe and Africa.

The new Dyno Nobel EMEA & LATAM (**DNEL**) segment includes the following operations:

» Titanobel: a leading industrial explosives manufacturer and drilling, blasting and technical services provider based in France;
» Nitromak: supplier of explosives products and services based in Türkiye;
» LATAM business: targeting growth across Latin America using traded ammonium nitrate and flexible assets; and
» South African joint ventures: includes DetNet and Sasol.

Titanobel and Nitromak were previously reported in the Dyno Nobel Asia Pacific (DNAP) segment, while the LATAM business and South African joint ventures were previously reported in the Dyno Nobel Americas (DNA) segment. The 2024 full year financial results for the segments have been restated to reflect the new segment reporting structure.

### Description of reportable segments

*Dyno Nobel*

Dyno Nobel Asia Pacific (**DNAP**): manufactures and sells industrial explosives and related products and services to the mining industry mainly in the Asia Pacific region.

Dyno Nobel Americas (**DNA**): manufactures and sells industrial explosives and related products and services to the mining, quarrying and construction industries in North America (US, Canada and Mexico) and initiating systems to businesses in Australia, Türkiye and South Africa.

Dyno Nobel EMEA & LATAM (**DNEL**): manufactures and sells industrial explosives and related products and services to the mining, quarrying and construction industries in the EMEA and LATAM regions (including Türkiye, France, South Africa and Chile).

Corporate (**Corp**): costs include all head office expenses that cannot be directly or reasonably attributed to the operation of any of the Group's businesses.

Dyno Nobel Eliminations (**Dyno Elim**): represents elimination of sales and profit in stock arising from intersegment sales.

*Fertilisers*

Fertilisers (**Ferts**): manufactures and sells fertilisers in Eastern Australia and to the export market. The Fertilisers segment represents the Phosphate Hill facility. The IPF Distribution business was classified as discontinued operations in FY25. Refer to note 14 for further disclosure on discontinued operations.

*Group eliminations*

Group Eliminations (**Group Elim**): represent elimination of sales and profit in stock arising from intersegment sales between Dyno Nobel and Fertilisers.

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: FINANCIAL PERFORMANCE

FOR THE YEAR ENDED 30 SEPTEMBER 2025

| 30 September 2025 | Notes | DNAP $mill | DNA $mill | DNEL $mill | Corp[i] $mill | Dyno Elim $mill | Total $mill | Ferts[vi] $mill | Group Elim $mill | Total Continuing Operations $mill | Dis. Operations[vii] $mill | Consol. Group $mill |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | (2) | 1,155.3 | 1,776.8 | 324.5 | – | (44.3) | 3,212.3 | 507.6 | (9.8) | 3,710.1 | 1,635.1 | 5,345.2 |
| Share of profit of equity accounted investments | (15) | 29.0 | 40.1 | 11.2 | – | – | 80.3 | – | – | 80.3 | – | 80.3 |
| EBITDA[ii] | (2) | 320.7 | 360.2 | 47.2 | (44.3) | (1.4) | 682.4 | 248.2 | – | 930.6 | 81.8 | 1,012.4 |
| Depreciation and amortisation | (2) | (97.1) | (147.6) | (16.7) | (8.5) | 0.8 | (269.1) | (15.0) | – | (284.1) | (14.2) | (298.3) |
| EBIT[iii] | | 223.6 | 212.6 | 30.5 | (52.8) | (0.6) | 413.3 | 233.2 | – | 646.5 | 67.6 | 714.1 |
| Net interest expense | | | | | | | | | | | | (136.1) |
| Income tax expense (excluding IMIs) | | | | | | | | | | | | (153.5) |
| Profit after tax[iv] | | | | | | | | | | | | 424.5 |
| Non-controlling interest | | | | | | | | | | | | (1.1) |
| Individually material items (net of tax) | (2) | | | | | | | | | | | (476.6) |
| **Loss attributable to members of Dyno Nobel** | | | | | | | | | | | | (53.2) |
| Segment assets | | 2,791.6 | 3,325.2 | 381.7 | 1,199.2 | – | 7,697.7 | 99.8 | – | 7,797.5 | – | 7,797.5 |
| Segment liabilities | | (209.1) | (802.3) | (94.5) | (1,886.8) | – | (2,992.7) | (293.0) | – | (3,285.7) | – | (3,285.7) |
| Net segment assets[v] | | 2,582.5 | 2,522.9 | 287.2 | (687.6) | – | 4,705.0 | (193.2) | – | 4,511.8 | – | 4,511.8 |
| Deferred tax balances | (3) | | | | | | | | | | | (78.9) |
| **Net assets** | | | | | | | | | | | | **4,432.9** |

(i) Corporate assets and liabilities include the Group's interest bearing liabilities and derivative assets and liabilities.
(ii) Earnings before interest, related income tax expense, depreciation and amortisation and individually material items.
(iii) Earnings before interest, related income tax expense and individually material items.
(iv) Profit after tax (excluding individually material items).
(v) Net segment assets exclude deferred tax balances.
(vi) Ferts reflects earnings and net segment assets for Phosphate Hill.
(vii) The IPF Distribution business was classified as discontinued operations in FY25. Refer to note 14 for further disclosure on discontinued operations.

| 30 September 2024 | Notes | DNAP $mill | DNA $mill | DNEL $mill | Corp[i] $mill | Dyno Elim $mill | Total $mill | Ferts $mill | Group Elim $mill | Total Continuing Operations $mill | Dis. Operations[vii] $mill | Consol. Group $mill |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | (2) | 1,240.1 | 1,715.4 | 288.6 | – | (50.0) | 3,194.1 | 357.4 | (13.6) | 3,537.9 | 1,827.0 | 5,364.9 |
| Share of profit of equity accounted investments | (15) | 17.0 | 38.7 | 6.5 | – | – | 62.2 | – | – | 62.2 | – | 62.2 |
| EBITDA[ii] | | 323.0 | 344.8 | 40.4 | (46.7) | (1.3) | 660.2 | 127.4 | – | 787.6 | 137.2 | 924.8 |
| Depreciation and amortisation | (2) | (86.9) | (149.4) | (17.5) | (5.8) | 0.7 | (258.9) | (58.3) | – | (317.2) | (27.8) | (345.0) |
| EBIT[ii] | | 236.1 | 195.4 | 22.9[vi] | (52.5)[vi] | (0.6) | 401.3 | 69.1 | – | 470.4 | 109.4 | 579.8 |
| Net interest expense | | | | | | | | | | | | (104.4) |
| Income tax expense (excluding IMIs) | | | | | | | | | | | | (75.5) |
| Profit after tax[iv] | | | | | | | | | | | | 399.9 |
| Non-controlling interest | | | | | | | | | | | | 0.9 |
| Individually material items (net of tax) | (2) | | | | | | | | | | | (711.7) |
| **Loss attributable to members of Dyno Nobel** | | | | | | | | | | | | (310.9) |
| Segment assets | | 2,674.5 | 3,120.4 | 333.3 | 1,230.1 | – | 7,358.3 | 174.4 | – | 7,532.7 | 859.0 | 8,391.7 |
| Segment liabilities | | (244.1) | (994.7) | (90.4) | (1,496.8) | – | (2,826.0) | (228.6) | – | (3,054.6) | (390.5) | (3,445.1) |
| Net segment assets[v] | | 2,430.4 | 2,125.7 | 242.9 | (266.7) | – | 4,532.3 | (54.2) | – | 4,478.1 | 468.5 | 4,946.6 |
| Deferred tax balances | (3) | | | | | | | | | | | (101.7) |
| **Net assets** | | | | | | | | | | | | **4,844.9** |

(i) Corporate assets and liabilities include the Group's interest bearing liabilities and derivative assets and liabilities.
(ii) Earnings before interest, related income tax expense, depreciation and amortisation and individually material items.
(iii) Earnings before interest, related income tax expense and individually material items.
(iv) Profit after tax (excluding individually material items).
(v) Net segment assets exclude deferred tax balances.
(vi) DNEL and Corporate results have been restated to reflect corporate allocations to the DNEL segment consistent with FY25 allocations.
(vii) The IPF Distribution business was classified as discontinued operations in FY25. In addition, on 1 December 2023, the Group completed the sale of its ammonia manufacturing facility located in Waggaman, Louisiana, USA. The earnings attributable to Waggaman for the period under Dyno Nobel ownership and the resultant gain on sale were presented as discontinued operations in FY24. Refer to note 14 for further disclosure on discontinued operations.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: FINANCIAL PERFORMANCE**
FOR THE YEAR ENDED 30 SEPTEMBER 2025

### Geographical information – secondary reporting segments

The Group operates in two principal countries being Australia and the US.

In presenting information on the basis of geographical information, revenue is based on the geographical location of the entity making the sale. Assets are based on the geographical location of the assets.

| 30 September 2025 | Australia $mill | US $mill | Other/Elim $mill | Continuing Operations $mill | Discontinued Operations[i] $mill | Consolidated Group $mill |
|---|---|---|---|---|---|---|
| Revenue from external customers | 1,602.7 | 1,376.0 | 731.4 | 3,710.1 | 1,635.1 | 5,345.2 |
| **30 September 2024** | | | | | | |
| Revenue from external customers | 1,523.1 | 1,337.4 | 677.4 | 3,537.9 | 1,827.0 | 5,364.9 |

(i)    The IPF Distribution business was classified as discontinued operations in FY25. Refer to note 14 for further disclosure on discontinued operations.

| 30 September 2025 | Australia $mill | US $mill | Other/Elim $mill | Consolidated Group $mill |
|---|---|---|---|---|
| Non-current assets other than financial assets and deferred tax assets | 2,412.2 | 2,665.4 | 597.2 | 5,674.8 |
| Trade and other receivables | 225.4 | 160.7 | 485.5 | 871.6 |
| **30 September 2024** | | | | |
| Non-current assets other than financial assets and deferred tax assets | 2,771.1 | 2,514.3 | 430.7 | 5,716.1 |
| Trade and other receivables | 355.3 | 132.6 | 182.2 | 670.1 |

61 DYNO NOBEL

Case 2:25-cv-00789-DBP   Document 21-1   Filed 11/14/25   PageID.141   Page 61 of 100

Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | Independent Auditor's Report

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: FINANCIAL PERFORMANCE**

FOR THE YEAR ENDED 30 SEPTEMBER 2025

# 2. Revenue and expenses

| | Notes | 2025 $mill | 2024 $mill |
|---|---|---|---|
| **Revenue** | | | |
| External sales from continuing operations | | 3,710.1 | 3,537.9 |
| External sales from discontinued operations | | 1,635.1 | 1,827.0 |
| Total revenue | | 5,345.2 | 5,364.9 |
| **Financial income** | | | |
| Interest income from continuing operations | | 32.9 | 55.0 |
| Interest income from discontinued operations | | 1.6 | 2.3 |
| Total interest income | | 34.5 | 57.3 |
| **Other income** | | | |
| Royalty income and management fees | (15) | 39.0 | 38.7 |
| Net (loss)/gain on sale of property, plant and equipment | | (6.9) | 14.7 |
| Other income from continuing operations | | 18.7 | 21.8 |
| Total other income from continuing operations | | 50.8 | 75.2 |
| Other income from discontinued operations | | 2.1 | 3.5 |
| Total other income | | 52.9 | 78.7 |

*Expenses*

Profit before income tax includes the following specific expenses:

| | Notes | 2025 $mill | 2024 $mill |
|---|---|---|---|
| **Depreciation and amortisation continuing operations** | | | |
| Depreciation | | | |
| property, plant and equipment | (9) | 201.3 | 247.1 |
| leases | (10) | 47.9 | 41.7 |
| Amortisation | (11) | 34.9 | 28.4 |
| Total depreciation and amortisation | | 284.1 | 317.2 |
| **Depreciation and amortisation discontinued operations** | | | |
| Depreciation | | | |
| property, plant and equipment | (9) | 5.8 | 14.4 |
| leases | (10) | 8.1 | 12.9 |
| Amortisation | (11) | 0.3 | 0.5 |
| Total depreciation and amortisation | (14) | 14.2 | 27.8 |
| **Asset impairment, asset disposal and site exit costs for continuing operations and discontinued operations** | | | |
| property, plant and equipment | (9) | 185.4 | 793.9 |
| leases | (10) | 8.6 | – |
| intangible assets | (11) | – | 197.2 |
| inventories | | 48.9 | 32.7 |
| exploration and evaluation assets | | 3.5 | 18.0 |
| asset disposal [1] | | 45.6 | – |
| site exit costs | | 70.8 | 30.9 |
| Total asset impairment, asset disposal and site exit costs | | 362.8 | 1,072.7 |

[1]   Asset disposal includes the loss on sale of the Gibson Island land in September 2025 and loss on sale of the St Helens facility in August 2025.

| | Notes | 2025 $mill | 2024 $mill |
|---|---|---|---|
| **Amounts set aside to provide for continuing operations and discontinued operations:** | | | |
| Impairment losses on trade and other receivables | (4) | 4.3 | 6.7 |
| Inventory losses and obsolescence | (4) | 4.8 | 9.9 |
| Employee entitlements | (17) | 3.7 | 17.6 |
| Environmental liabilities | (17) | 111.2 | 21.0 |
| Legal and other provisions | (17) | 13.6 | 15.3 |
| Restructuring and rationalisation costs | (17) | 106.0 | 29.6 |
| Research and development expense | | 22.6 | 30.2 |
| Defined contribution superannuation expense | | 42.7 | 40.8 |
| Defined benefit superannuation expense | (21) | 1.1 | 1.3 |
| **Financial expenses** | | | |
| Interest on lease liabilities | (10) | 6.0 | 4.4 |
| Unwinding of discount on provisions | (17) | 5.7 | 6.4 |
| Net interest expense on defined benefit obligation | (21) | 1.1 | 1.3 |
| Interest expenses on financial liabilities | | 151.2 | 144.7 |
| Total financial expenses continuing operations | | 164.0 | 156.8 |
| Interest on lease liabilities | (10) | 5.9 | 4.3 |
| Unwinding of discount on provisions | (17) | 0.4 | 0.5 |
| Interest expenses on financial liabilities | | 0.3 | 0.1 |
| Total financial expenses discontinued operations | | 6.6 | 4.9 |

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: FINANCIAL PERFORMANCE

FOR THE YEAR ENDED 30 SEPTEMBER 2025

### Individually material items

Profit after tax includes the following expenses whose disclosure is relevant in explaining the financial performance of the Group:

| | Gross $mill | Tax $mill | Net $mill |
|---|---|---|---|
| **30 September 2025** | | | |
| Loss on sale of IPF Distribution and Gibson Island land[1] | 175.2 | (7.6) | 167.6 |
| Geelong manufacturing site closure[2] | 65.1 | (19.6) | 45.5 |
| Fertilisers separation costs[3] | 13.3 | (4.0) | 9.3 |
| Impairment of Phosphate Hill facility[4] | 213.0 | (63.9) | 149.1 |
| Impairment of US Fertilisers business[5] | 32.4 | (8.4) | 24.0 |
| **Fertiliser related individually material items** | **499.0** | **(103.5)** | **395.5** |
| Business transformation costs[6] | 38.8 | (11.0) | 27.8 |
| Tax on sale of WALA[7] | – | 53.3 | 53.3 |
| **Total individually material items** | **537.8** | **(61.2)** | **476.6** |
| | | | |
| **30 September 2024** | | | |
| Impairment and site exit costs of Australian Fertilisers business[8] | 940.9 | (224.3) | 716.6 |
| Impairment of US Fertilisers business[5] | 100.1 | (26.0) | 74.1 |
| Fertilisers separation costs[3] | 8.5 | (2.5) | 6.0 |
| Gain on sale of WALA[9] | (356.4) | 232.6 | (123.8) |
| Business transformation costs[6] | 31.3 | (9.4) | 21.9 |
| DNAP site closure[10] | 24.2 | (7.3) | 16.9 |
| **Total individually material items** | **748.6** | **(36.9)** | **711.7** |

(1) In September 2025, Dyno Nobel recognised the sale of the IPF Distribution business to Ridley Corporation Limited and the Gibson Island land sale to Goodman Group. The accounting loss on sale includes the provision for remediation at Gibson Island of $157m which was also recognised in September 2025. Refer to note 14 for further detail.

(2) Dyno Nobel has ceased manufacturing at the Geelong manufacturing facility. Costs will be incurred to close the facility, transition to an import model, pay redundancies to impacted employees and remediate the land. Once the site has been remediated, ownership of the land will be transferred to Ridley as part of the sale of the IPF Distribution business.

(3) Separation costs, primarily advisor fees and IT transition costs, were incurred to optimally position IPF for standalone operation, including costs associated with the preparation for sale of Phosphate Hill or as a separately managed business within the Dyno Nobel Group.

(4) Dyno Nobel has fully written down the carrying value of the Phosphate Hill operations due to the increased uncertainty regarding the near-term and long-term cost of gas across the east coast of Australia.

(5) In April 2025, Dyno Nobel made the decision to exit the Fertilisers manufacturing facility located in St Helens as the asset was not core to the strategic direction of the business. As exit would occur through either a sale or plant closure, a full impairment of the facility was recognised at 31 March 2025. In August 2025, the site was sold to a third party with the accounting loss on sale recorded in the DNA segment result.

(6) In FY24, Dyno Nobel initiated a business transformation project for the Dyno Nobel business. The project has identified opportunities for innovation, collaboration and more efficient ways of working and is expected to deliver significant value. The one-off project costs primarily reflect redundancy costs and advisor fees.

(7) During 2024, Dyno Nobel prepaid taxes related to the sale of the Waggaman facility. The payment of Louisiana state tax was deductible for US Federal tax purposes. On lodgement of the FY24 Louisiana state tax return, it was determined that taxes had been overpaid, and the resulting refund was received in October 2025. The refund will be taxable for Federal tax purposes and the provision has been increased accordingly. Furthermore, the unique nature of the WALA sale and the size of the transaction resulted in Dyno Nobel falling into higher tax brackets in states with a graduating tax system. In FY24, when estimating the tax provision, this impact was underestimated. The provision has been adjusted in FY25 to allow for the higher tax liability.

(8) During FY24, Dyno Nobel recognised a partial impairment of its Australian Fertilisers business on a value-in-use basis. Assets relating to the Phosphate Hill operations were partially impaired, reflective of the uncertain gas outlook on the east coast of Australia. Geelong manufacturing assets were fully impaired as a result of movements in the global phosphate market, fluctuations in phosphate rock costs and movements in the domestic SSP sale price. Infrastructure at the Gibson Island distribution centre which could not be relocated to the new facility was also fully written off.

(9) In December 2023, Dyno Nobel completed the sale of its ammonia manufacturing facility located in Waggaman, Louisiana, USA, resulting in a gain on sale. In addition to the net proceeds received and the disposal of net tangible assets, the gain on sale also included a non-cash, non-tax deductible release of goodwill and foreign currency translation reserve. Refer to note 14 for further detail.

(10) In September 2024, Dyno Nobel decided to cease manufacturing at its emulsion plant located in Warkworth, New South Wales. The conclusion of a contract to source Ammonium Nitrate solution to the facility resulted in the operations becoming uneconomical beyond 2024. As a result of the decision, Dyno Nobel incurred costs to demolish the plant, remediate the land, and pay redundancies to impacted employees.

### Key accounting policies

*Revenue*

Revenue is measured at the fair value of the consideration received or receivable by the Group. Amounts disclosed as revenue are net of returns, trade allowances and amounts collected on behalf of third parties. Revenue is recognised for the major business activities on the following basis:

» Sale of goods and services: revenue from the sale of goods and services is recognised at the point in time when the performance obligations under the customer contract are satisfied. This is typically when control of goods or services is transferred to the customer. The fee for the service component is recognised separately from the sale of goods.

» Interest income is recognised as it accrues using the effective interest method.

The Group disaggregates its revenue per reportable segment as presented in note 1, as the revenue within each business unit is affected by economic factors in a similar manner.

*Goods and services tax*

Revenues, expenses, assets and liabilities (other than receivables and payables) are recognised net of the amount of goods and services tax (**GST**). The only exception is where the amount of GST incurred is not recoverable from the relevant taxation authorities. In these circumstances, the GST is recognised as part of the cost of the asset or as part of the item of expenditure.

*Other income*

Other income represents gains that are not revenue. This includes royalty income and management fees from the Group's joint ventures and associates, income from contractual arrangements that are not considered external sales and government grants.

63 | DYNO NOBEL | Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.143    Page 63 of 100

Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | Independent Auditor's Report

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: FINANCIAL PERFORMANCE**

FOR THE YEAR ENDED 30 SEPTEMBER 2025

# 3. Taxation

### Income tax expense for the year

| | 2025 | | | 2024 | | |
|---|---|---|---|---|---|---|
| | Continuing Operations $mill | Discontinued Operations $mill | Consolidated Group $mill | Continuing Operations $mill | Discontinued Operations $mill | Consolidated Group $mill |
| Current tax expense | 39.4 | 89.0 | 128.4 | 45.7 | 527.3 | 573.0 |
| Deferred tax benefit | (1.5) | (34.6) | (36.1) | (256.1) | (278.3) | (534.4) |
| **Total income tax expense/(benefit)** | **37.9** | **54.4** | **92.3** | **(210.4)** | **249.0** | **38.6** |

### Income tax reconciliation to prima facie tax payable

| | 2025 | | | 2024 | | |
|---|---|---|---|---|---|---|
| | Continuing Operations $mill | Discontinued Operations $mill | Consolidated Group $mill | Continuing Operations $mill | Discontinued Operations $mill | Consolidated Group $mill |
| Profit/(loss) before income tax | 186.2 | (146.0) | 40.2 | (496.1) | 222.9 | (273.2) |
| Tax at the Australian tax rate of 30% (2024: 30%) | 55.9 | (43.8) | 12.1 | (148.8) | 66.9 | (81.9) |
| Tax effect of amounts which are not deductible/ (taxable) in calculating taxable income: | | | | | | |
| Joint venture income | (21.0) | – | (21.0) | (13.5) | – | (13.5) |
| Sundry items | (2.8) | 3.5 | 0.7 | (9.5) | (31.7) | (41.2) |
| Reversal of deferred tax liabilities | – | – | – | (24.6) | – | (24.6) |
| Goodwill impairment | – | – | – | – | 295.1 | 295.1 |
| Non assessable gains | – | – | – | – | (68.5) | (68.5) |
| Capital gains tax[1] | – | 41.4 | 41.4 | – | – | – |
| Difference in overseas tax rates | (14.4) | – | (14.4) | (14.0) | (12.8) | (26.8) |
| Adjustments to current tax expense relating to prior years[2] | 20.2 | 53.3 | 73.5 | – | – | – |
| **Total income tax expense/(benefit)** | **37.9** | **54.4** | **92.3** | **(210.4)** | **249.0** | **38.6** |

(1) Primarily represents the capital gain arising from the signing of the Perdaman contract which enabled the utilisation of a substantial portion of the capital loss incurred on the sale of the IPF Distribution business. As the gross proceeds from the Perdaman contract sale have not yet met the recognition criteria under accounting standards, this CGT gain is excluded from the prima facie tax expense.

(2) Current tax expense includes prior period adjustments comprising (a) $20.2m relating to continuing operations, representing the true-up of US tax provisions following the lodgement of tax returns for the financial years FY22 and FY23; and (b) $53.3m relating to discontinued operations, reflecting the true-up of US State and Federal tax liabilities, net of tax on refund received in Louisiana arising from the sale of the Waggaman plant, for the financial year FY24.

### Tax amounts recognised directly in equity

The aggregate current and deferred tax arising in the financial year and not recognised in net profit or loss but directly charged to equity is a loss of $7.6m for the year ended 30 September 2025 (2024: gain of $0.1m).

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: FINANCIAL PERFORMANCE**
FOR THE YEAR ENDED 30 SEPTEMBER 2025

**Net deferred tax assets/(liabilities)**

Deferred tax balances comprise temporary differences attributable to the following:

| | 2025 $mill | 2024 $mill |
|---|---|---|
| Employee entitlements provision | 28.7 | 26.8 |
| Retirement benefit obligations | 3.9 | 3.5 |
| Provisions and accruals | 117.4 | 85.9 |
| Lease liabilities | 54.2 | 72.8 |
| Tax losses | 10.9 | 6.6 |
| Property, plant and equipment | (197.9) | (163.4) |
| Right-of-use lease assets | (34.4) | (68.1) |
| Intangible assets | (84.3) | (86.7) |
| Joint venture income | (21.3) | (18.1) |
| Inventories impairment | 18.1 | 10.6 |
| Share based payments | 6.0 | 7.9 |
| Foreign exchange movement | 3.8 | 7.0 |
| Carry forward interest deductions | 23.7 | – |
| Other | (7.7) | 13.5 |
| **Net deferred tax liabilities** | **(78.9)** | **(101.7)** |

Presented in the Consolidated Statement of Financial Position as follows:

| | 2025 $mill | 2024 $mill |
|---|---|---|
| Deferred tax assets | 32.4 | 6.7 |
| Deferred tax liabilities | (111.3) | (108.4) |
| **Net deferred tax liabilities** | **(78.9)** | **(101.7)** |

**Movements in net deferred tax liabilities**

The table below sets out movements in net deferred tax balances for the period ended 30 September:

| | 2025 $mill | 2024 $mill |
|---|---|---|
| Opening balance at 1 October | (101.7) | (648.1) |
| Credited to the profit or loss | 36.1 | 534.4 |
| Charged to equity | (7.6) | 0.1 |
| Foreign exchange movements | (5.7) | 11.9 |
| **Closing balance at 30 September** | **(78.9)** | **(101.7)** |

**Key accounting policies**

*Income tax expense*

Income tax expense comprises current tax (amounts payable or receivable within 12 months) and deferred tax (amounts payable or receivable after 12 months). Tax expense is recognised in the profit or loss, unless it relates to items that have been recognised in equity (as part of other comprehensive income). In this instance, the related tax expense is also recognised in equity.

*Current tax*

Current tax is the expected tax payable on the taxable income for the year. It is calculated using tax rates applicable at the reporting date, and any adjustments to tax payable in respect of previous years.

30 September 2025 balances include a receivable of $23.6m (September 2024: $nil) in respect of taxes paid on assessment which are under appeal. The Group expects to receive these amounts as a refund from relevant tax authorities or, in the event Dyno Nobel is unsuccessful, use these amounts to satisfy obligation due to the relevant tax authorities.

*Deferred tax*

Deferred tax is recognised for all taxable temporary differences and is calculated based on the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for taxation purposes. Deferred tax is measured at the tax rates that are expected to be applied when the asset is realised or the liability is settled, based on the laws that have been enacted or substantively enacted at the reporting date.

Deferred tax assets are recognised only to the extent that it is probable that future taxable profits will be available against which the assets can be utilised. Deferred tax assets are reviewed at each reporting date and are reduced to the extent that it is no longer probable that the related tax benefits will be realised.

The Group has and will continue to apply the temporary exemption in AASB 112 Income Taxes not to recognise or disclose information about deferred tax assets and liabilities that could arise from OECD Pillar Two model rules.

*Offsetting tax balances*

Tax assets and liabilities are offset when the Group has a legal right to offset and intends either to settle on a net basis or to realise the asset and settle the liability simultaneously.

*Tax consolidation*

For details on the Company's tax consolidated group refer to note 23.

**Key estimates and judgements**

**Uncertain tax matters**

The Group is subject to income taxes in Australia and foreign jurisdictions and as a result, the calculation of the Group's tax charge involves a degree of estimation and judgement in respect of certain items. In addition, there are transactions and calculations relating to the ordinary course of business for which the ultimate tax determination is uncertain. The Group recognises liabilities for potential tax audit issues in deferred tax liabilities based on management's assessment of whether additional taxes may be payable and calculates the provision in accordance with the applicable accounting standards including IFRIC 23 Uncertainty over Income Tax Treatments. Where the final tax outcome of these matters is different from the amounts that were initially recorded, these differences impact the current and deferred tax provisions in the period in which such determination is made.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: FINANCIAL PERFORMANCE**
FOR THE YEAR ENDED 30 SEPTEMBER 2025

# 4. Trade and other receivables and payables

The Group's total trade and other receivables and payables consists of inventory, receivables and payables balances, net of provisions for any impairment losses.

| 30 September 2025 | Trade $mill | Other $mill | Total $mill |
|---|---|---|---|
| Inventories | 519.1 | – | 519.1 |
| Receivables | 488.0 | 383.6[1] | 871.6 |
| Payables | (398.3) | (357.8) | (756.1) |
| | 608.8 | 25.8 | 634.6 |

[1] Other receivables includes a current receivable for the sale of the Gibson Island land of $197.8m (the proceeds were received in October 2025) and non-current receivables relating to deferred consideration of $109.2m for the sale of the IPF Distribution business.

| 30 September 2024 | Trade $mill | Other $mill | Total $mill |
|---|---|---|---|
| Inventories | 785.3 | – | 785.3 |
| Receivables | 615.3 | 54.8 | 670.1 |
| Payables | (558.5) | (336.9) | (895.4) |
| | 842.1 | (282.1) | 560.0 |

**Inventories by category:**

| | 2025 $mill | 2024 $mill |
|---|---|---|
| Raw materials and stores | 214.0 | 221.0 |
| Work-in-progress | 87.9 | 75.4 |
| Finished goods | 234.2 | 512.1 |
| Provisions | (17.0) | (23.2) |
| **Total inventory balance** | **519.1** | **785.3** |

**Provision movement:**

| 30 September 2025 | Trade receivables $mill | Inventories $mill |
|---|---|---|
| Carrying amount at 1 October 2024 | (14.1) | (23.2) |
| Provisions made during the year | (4.3) | (4.8) |
| Provisions written back during the year | 1.9 | 6.3 |
| Amounts written off against provisions | 1.9 | 1.0 |
| Foreign exchange rate movements | (0.2) | (1.2) |
| Reclassification from trade receivables | (4.6) | – |
| Disposal of subsidiaries | – | 4.9 |
| **Carrying amount at 30 September 2025** | **(19.4)** | **(17.0)** |

## Trade receivables ageing and credit loss provision

Included in the following table is an age analysis of the Group's trade and other receivables, along with credit loss provisions against these balances at 30 September:

| 30 September 2025 | Gross $mill | Credit loss provision $mill | Net $mill |
|---|---|---|---|
| Current | 463.6 | (1.8) | 461.8 |
| 30–90 days | 22.3 | (2.2) | 20.1 |
| Over 90 days | 21.5 | (15.4) | 6.1 |
| **Total** | **507.4** | **(19.4)** | **488.0** |

| 30 September 2024 | Gross $mill | Credit loss provision $mill | Net $mill |
|---|---|---|---|
| Current | 584.3 | (0.8) | 583.5 |
| 30–90 days | 29.2 | (1.2) | 28.0 |
| Over 90 days | 15.9 | (12.1) | 3.8 |
| **Total** | **629.4** | **(14.1)** | **615.3** |

The graph below shows the Group's trade working capital (trade assets and liabilities) performance over a five year period.



**13 month rolling average trade working capital[1] annual net revenue from continuing operations**

Legend: Explosives (DNA, DNAP & DNEL) · Fertilisers · Group

[1] Trade working capital is reported gross of debtor factoring and supply chain financing arrangements.

## Key accounting policies

*Inventories*

Inventories are valued at the lower of cost and net realisable value. The cost of manufactured goods is based on a weighted average costing method. For third party sourced goods, cost is net cost into warehouse.

*Trade and other receivables*

Trade and other receivables are initially recognised at fair value plus any directly attributable transaction costs. Subsequent to initial measurement they are measured at amortised cost less any provisions for expected impairment losses or actual impairment losses. Credit losses and recoveries of items previously written off are recognised in the profit or loss.

Where substantially all risks and rewards relating to a receivable are transferred to a third party, the receivable is derecognised.

To manage cash inflows which are impacted by seasonality and demand and supply variability, the Group has a nonrecourse receivable purchasing agreement to sell certain receivables to an unrelated entity in exchange for cash. These receivables are derecognised upon sale as substantially all risks and rewards associated with the receivables are passed to the purchaser. As at 30 September 2025, there were no receivables sold under this arrangement (2024: $nil).

*Trade and other payables*

Trade and other payables are stated at cost and represent liabilities for goods and services provided to the Group prior to the end of financial year, which are unpaid at the reporting date.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: SHAREHOLDER RETURNS**
FOR THE YEAR ENDED 30 SEPTEMBER 2025

To manage the cash flow conversion cycle on some products procured by the Group, and to ensure that suppliers receive payment in a time period that suits their business model, the Group offers some suppliers the opportunity to use supply chain financing. The Group evaluates supplier arrangements against a number of indicators to assess if the payable continues to have the characteristics of a trade payable or should be classified as borrowings. These indicators include whether the payment terms exceed customary payment terms in the industry. At 30 September 2025, the balance of the supply chain finance program was $nil (2024: $nil).

| | 2025 Cents per share | 2024 Cents per share |
|---|---|---|
| **Basic earnings per share** | | |
| Continuing operations including individually material items | 7.9 | (14.7) |
| Discontinued operations | (10.8) | (1.4) |
| Total basic earnings per share | (2.9) | (16.1) |
| **Diluted earnings per share** | | |
| Continuing operations including individually material items | 7.9 | (14.7) |
| Discontinued operations | (10.8) | (1.4) |
| Total diluted earnings per share | (2.9) | (16.1) |
| **Excluding individually material items** | | |
| Basic earnings per share | 22.8 | 20.7 |
| Diluted earnings per share | 22.6 | 20.7 |

The graph below shows the Group's earnings per share and dividend payout over the last five years.



**Company performance and dividends declared**

> ## Key estimates and judgements
>
> The expected impairment loss calculation for trade receivables considers the impact of past events, and exercises judgement over the impact of current and future economic conditions when considering the recoverability of outstanding trade receivable balances at the reporting date. In establishing the expected credit loss provision, the Group also assessed the impact of the global economic challenges and its potential to affect customers' repayment ability. Subsequent changes in economic and market conditions may result in the provision for impairment losses increasing or decreasing in future periods.

## 5. Earnings per share

| | 2025 $mill | 2024 $mill |
|---|---|---|
| **Earnings used in the calculation of earnings per share attributable to ordinary shareholders** | | |
| Profit/(loss) from continuing operations attributable to ordinary shareholders | 147.2 | (284.8) |
| Loss from discontinued operations attributable to ordinary shareholders | (200.4) | (26.1) |
| Individually material items after tax | 476.6 | 711.7 |
| **Profit attributable to ordinary shareholders excluding individually material items** | **423.4** | **400.8** |
| | Number | Number |
| Weighted average number of ordinary shares used in the calculation of basic earnings per share | 1,855,343,829 | 1,935,814,215 |
| Weighted average number of ordinary shares used in the calculation of diluted earnings per share | 1,875,912,826 | 1,935,814,215 |

## 6. Dividends

Dividends paid by the Company in the year ended 30 September were:

| | 2025 $mill | 2024 $mill |
|---|---|---|
| **Ordinary shares** | | |
| Final dividend of 5.0 cents per share, unfranked, paid 19 December 2023 | – | 97.1 |
| Special dividend of 10.2 cents per share, unfranked, paid 8 February 2024 | – | 197.5 |
| Interim dividend of 4.3 cents per share, unfranked, paid 4 July 2024 | – | 83.6 |
| Final dividend of 6.3 cents per share, unfranked, paid 18 December 2024 | 118.0 | – |
| Interim dividend of 2.4 cents per share, unfranked, paid 3 July 2025 | 44.3 | – |
| **Total ordinary share dividends** | **162.3** | **378.2** |

Since the end of the financial year, the directors have determined to pay a final dividend of 9.5 cents per share, unfranked. The record date for entitlement to this dividend is 2 December 2025. Based on the number of shares on issue at 30 September 2025, the total dividend payment will be $170.6m.

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: SHAREHOLDER RETURNS
FOR THE YEAR ENDED 30 SEPTEMBER 2025

The financial effect of this dividend has not been recognised in the 2025 Consolidated Financial Statements and will be recognised in subsequent Financial Reports.

The dividend reflects a payout ratio of approximately 51 percent of net profit after tax (before individually material items).

### Franking credits

Franking credits as at 30 September 2025 were $7.7m (2024: $13.9m).

### Key accounting policies

A provision for dividends payable is recognised in the reporting period in which the dividends are paid. The provision is for the total undistributed dividend amount, regardless of the extent to which the dividend will be paid in cash.

---

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: CAPITAL STRUCTURE
FOR THE YEAR ENDED 30 SEPTEMBER 2025

# 7. Capital management

Capital is defined as the amount subscribed by shareholders to the Company's ordinary shares and amounts advanced by debt providers to any Group entity. The Group's objectives when managing capital are to safeguard its ability to continue as a going concern and invest in business growth, while providing returns to shareholders and benefits to other stakeholders.

The Group's key strategies for maintenance of an optimal capital structure include:

» Aiming to maintain an investment grade credit profile and the requisite financial metrics;

» Securing access to diversified sources of debt funding with a spread of maturity dates and sufficient undrawn committed facility capacity; and

» Optimising over the long-term, to the extent practicable, the Group's Weighted Average Cost of Capital (WACC), while maintaining financial flexibility.

In order to optimise its capital structure, the Group may undertake one or a combination of the following actions:

» change the amount of dividends paid to shareholders and/or offer a dividend reinvestment plan with or without a discount and/or with or without an underwriting facility when appropriate;

» return capital or issue new shares to shareholders;

» vary discretionary capital expenditure;

» raise new debt funding or repay existing debt balances; and

» draw down additional debt or sell non-core assets to reduce debt.

*Key financial metrics*

The Group uses a range of financial metrics to monitor the efficiency of its capital structure, including EBITDA, interest cover and Net debt/EBITDA before individually material items. Financial metric targets are maintained inside debt covenant restrictions. At 30 September the Group's position in relation to these metrics was:

| | Policy range | 2025 | 2024 |
|---|---|---|---|
| Net debt/EBITDA (times) | equal or less than 2.0 | 1.4 | 0.8 |
| Interest cover (times) | equal or more than 6.0 | 10.7 | 12.5 |

These ratios are impacted by a number of factors, including the level of cash retained from operating cash flows generated by the Group after paying all of its commitments (including dividends or other returns of capital), movements in foreign exchange rates, changes to market interest rates and the fair value of hedges economically hedging the Group's net debt.

*Self-insurance*

The Group also self-insures for certain insurance risks under the Singapore Insurance Act. Under this Act, authorised general insurer, Coltivi Insurance Pte Limited (the Group's self-insurance company), is required to maintain a minimum amount of capital. For the financial year ended 30 September 2025, Coltivi Insurance Pte Limited maintained capital in excess of the minimum requirements prescribed under this Act.

### Issued capital

*Ordinary shares*

Ordinary shares issued are classified as equity and are fully paid, have no par value and carry one vote per share and the right to dividends. Incremental costs directly attributable to the issue of new shares are recognised as a deduction from equity, net of any related income tax benefit.

Issued capital as at 30 September 2025 amounted to $3,072.6m (2024: $3,354.7m) and ordinary shares of 1,795,372,022 (2024: 1,892,101,721).

### Capital returns

During the year, the Group bought back shares valued at $281.6m (2024: $149.0m) as part of a planned $900.0m on-market share buyback program. The Group has now bought back a total of $430.6m worth of shares since the program commenced in July 2024.

The Group remains committed to executing the remainder of the program and has sufficient cash reserves and committed bank facilities to complete the buyback.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: CAPITAL STRUCTURE
FOR THE YEAR ENDED 30 SEPTEMBER 2025

# 8. Net debt

The Group's net debt comprises the net of interest bearing liabilities, cash and cash equivalents, and the fair value of derivative instruments economically hedging the foreign exchange rate and interest rate exposures of the Group's interest bearing liabilities at the reporting date. The Group's net debt at 30 September is analysed as follows:

|  | Notes | 2025 $mill | 2024 $mill |
|---|---|---|---|
| Interest bearing liabilities |  | 1,805.5 | 1,684.1 |
| Cash and cash equivalents |  | (647.2) | (1,068.9) |
| Fair value of derivatives | (18) | 22.2 | 36.4 |
| **Net debt** |  | **1,180.5** | **651.6** |

At 30 September 2025, the Group's Net debt/EBITDA before individually material items was 1.4 times (2024: 0.8 times). Refer to note 7 for detail on the key financial metrics related to the Group's capital structure.

## Interest bearing liabilities

The Group's interest bearing liabilities are unsecured and expose it to various market and liquidity risks. Details of these risks and their mitigation are included in note 18.

The following table details the interest bearing liabilities of the Group at 30 September:

|  | 2025 $mill | 2024 $mill |
|---|---|---|
| **Current** |  |  |
| Other current loans | 5.6 | – |
| Loans from joint ventures | 20.8 | 19.5 |
| Fixed interest rate bonds | 540.2 | – |
|  | 566.6 | 19.5 |
| **Non-current** |  |  |
| Other non-current loans | 0.7 | 13.3 |
| Fixed interest rate bonds | 1,238.2 | 1,651.3 |
|  | 1,238.9 | 1,664.6 |
| **Total interest bearing liabilities** | **1,805.5** | **1,684.1** |

*Fixed interest rate bonds*

The Group has on issue the following fixed interest rate bonds:

*Current*

» HKD560.0m 7 year bond as a private placement in the Regulation S debt capital market. The bond has a fixed rate annual coupon of 4.13 percent and matures in February 2026.

» AUD431.3m 7 year bond on issue in the Australian debt capital market. The bond was issued in March 2019 for AUD450.0m and reduced by AUD18.7m as a result of the buyback in November 2020. The bond has a fixed rate semi-annual coupon of 4.30 percent and matures in March 2026.

*Non-current*

» USD500.0m of Notes as a private placement in the US market. USD250.0m has a fixed rate semi-annual coupon of 4.03 percent and matures in October 2028 and USD250.0m has a fixed rate semi-annual coupon of 4.13 percent and matures in October 2030.

» AUD500.0m bonds on issue in the Australian debt capital market. The bonds were issued in August 2025 and were priced across two tranches of AUD250.0m each. AUD250.0m has a fixed rate semi-annual coupon of 5.40 percent maturing in November 2032 and AUD250.0m has a fixed rate semi-annual coupon of 5.82 percent maturing in August 2035.

In September 2025, the Group redeemed the USD305.7m 10 year bond on issue in the Regulation S capital market at par (without any premium) which was due to mature in August 2027. This was to reduce USD debt given the Group's exposure to USD earnings is expected to decrease following the Fertiliser business separation and to extend the tenor of the Group's debt profile.

The two current fixed rate bonds are expected to be repaid on maturity using the proceeds from the IPF Distribution sale and surplus liquidity.

*Bank facilities*

In March 2025, the Group entered a new Syndicated Term Facility for AUD800.0m. The new facility is domiciled in Australia and consists of two tranches: Tranche A has a limit of AUD550.0m maturing in April 2028 and Tranche B has a limit of AUD250.0m maturing in April 2029. The new facility replaced the Syndicated Term Facility domiciled in Australia (AUD490.0m and USD200.0m) which was due to mature in October 2025.

*Tenor of interest bearing liabilities*

The Group's average tenor of its drawn interest bearing liabilities at 30 September 2025 is 4.2 years (2024: 3.4 years) and the average tenor of its total debt facilities is 3.8 years (2024: 2.6 years).

The table below includes detail on the movements in the Group's interest bearing liabilities.

|  | Cash flow | | | Non-cash changes | | | |
|---|---|---|---|---|---|---|---|
| 30 September 2025 | 1 October 2024 $mill | Proceeds from borrowings $mill | Repayments of borrowings $mill | Foreign exchange movement $mill | Funding costs & fair value adjustments $mill | Reclassification $mill | 30 September 2025 $mill |
| **Current** |  |  |  |  |  |  |  |
| Other loans | – | – | – | – | – | 5.6 | 5.6 |
| Loans from joint ventures | 19.5 | – | – | 1.3 | – | – | 20.8 |
| Fixed interest rate bonds | – | – | – | – | – | 540.2 | 540.2 |
| **Non-current** |  |  |  |  |  |  |  |
| Other loans | 13.3 | – | (8.0) | 1.0 | – | (5.6) | 0.7 |
| Fixed interest rate bonds | 1,651.3 | 498.5 | (466.5) | 63.0 | 32.1 | (540.2) | 1,238.2 |
| **Total liabilities from financing activities** | **1,684.1** | **498.5** | **(474.5)** | **65.3** | **32.1** | **–** | **1,805.5** |
| Derivatives held to hedge interest bearing liabilities | 36.4 | – | – | (5.3) | (8.9) | – | 22.2 |
| **Debt after hedging** | **1,720.5** | **498.5** | **(474.5)** | **60.0** | **23.2** | **–** | **1,827.7** |

69 DYNO NOBEL

Case 2:25-cv-00789-DBP   Document 21-1   Filed 11/14/25   PageID.149   Page 69 of 100

Directors'
Report

Operating and
Financial Review

Remuneration
Report

**Financial
Report**

Independent
Auditor's Report

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: CAPITAL STRUCTURE
FOR THE YEAR ENDED 30 SEPTEMBER 2025

| 30 September 2024 | 1 October 2023 $mill | Proceeds from borrowings $mill | Repayments of borrowings $mill | Foreign exchange movement $mill | Funding costs & fair value adjustments $mill | 30 September 2024 $mill |
|---|---|---|---|---|---|---|
| | | Cash flow | | Non-cash changes | | |
| **Current** | | | | | | |
| Loans from joint ventures | 21.1 | – | (0.1) | (1.5) | | 19.5 |
| **Non-current** | | | | | | |
| Other loans | 20.7 | 0.8 | (8.0) | (0.2) | – | 13.3 |
| Fixed interest rate bonds | 1,689.9 | – | – | (94.0) | 55.4 | 1,651.3 |
| **Total liabilities from financing activities** | **1,731.7** | **0.8** | **(8.1)** | **(95.7)** | **55.4** | **1,684.1** |
| Derivatives held to hedge interest bearing liabilities | 82.7 | – | – | 7.2 | (53.5) | 36.4 |
| **Debt after hedging** | **1,814.4** | **0.8** | **(8.1)** | **(88.5)** | **1.9** | **1,720.5** |

*Interest rate profile*

The table below summarises the Group's interest rate profile of its interest bearing liabilities, net of hedging, at 30 September:

| | 2025 $mill | 2024 $mill |
|---|---|---|
| Fixed interest rate financial instruments | 1,078.4 | 1,025.1 |
| Variable interest rate financial instruments | 727.1 | 659.0 |
| | **1,805.5** | **1,684.1** |

Detail on the Group's interest hedging profile and duration is included in note 18.

*Funding profile*

The graph below details the Group's available funding limits, its maturity dates and drawn funds at 30 September 2025.

The Group has undrawn financing facilities of $800.0m at 30 September 2025 (2024: $779.0m).



### Cash and cash equivalents

Cash and cash equivalents at 30 September 2025 were $647.2m (2024: $1,068.9m) and consisted of cash at bank of $207.2m (2024: $166.7m) and short term investments of $440.0m (2024: $902.2m).

### Key accounting policies

*Interest bearing liabilities*

Interest bearing liabilities are initially recognised at fair value less any directly attributable borrowing costs. Subsequent to initial recognition, interest bearing liabilities are measured at amortised cost using the effective interest method, with any difference between cost and redemption value recognised in the profit or loss over the period of the borrowings.

The Group derecognises interest bearing liabilities when its obligation is discharged, cancelled or expires. Any gains and losses arising on derecognition are recognised in the profit or loss.

Interest bearing liabilities are classified as current liabilities, except for those liabilities where the Group has an unconditional right to defer settlement for at least 12 months after the year end, which are classified as non-current.

*Cash and cash equivalents*

Cash includes cash at bank, cash on hand and short term investments, net of bank overdrafts.

*Borrowing costs*

Borrowing costs include interest on borrowings and the amortisation of premiums relating to borrowings.

Borrowing costs are expensed as incurred, unless they relate to qualifying assets (refer note 9). In this instance, the borrowing costs are capitalised and depreciated over the asset's expected useful life.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: CAPITAL STRUCTURE
FOR THE YEAR ENDED 30 SEPTEMBER 2025

# 9. Property, plant and equipment

| | Notes | Freehold land and buildings $mill | Machinery, plant and equipment $mill | Work in progress $mill | Total $mill |
|---|---|---|---|---|---|
| **At 30 September 2023** | | | | | |
| Cost | | 1,034.0 | 4,429.4 | 362.8 | 5,826.2 |
| Accumulated depreciation | | (434.0) | (2,209.5) | – | (2,643.5) |
| Net book amount | | 600.0 | 2,219.9 | 362.8 | 3,182.7 |
| **Year ended 30 September 2024** | | | | | |
| Opening net book amount | | 600.0 | 2,219.9 | 362.8 | 3,182.7 |
| Adjustment due to change in discount rates[1] | | 4.9 | – | – | 4.9 |
| Additions | | 28.7 | 11.6 | 354.6 | 394.9 |
| Disposals | | (4.6) | (11.1) | – | (15.7) |
| Depreciation | (2) | (30.1) | (231.4) | – | (261.5) |
| Impairment of assets | (2) | (117.9) | (596.2) | (79.8) | (793.9) |
| Reclassification from work in progress | | 57.2 | 240.0 | (297.2) | – |
| Foreign exchange movement | | (16.4) | (47.9) | (11.2) | (75.5) |
| Closing net book amount | | 521.8 | 1,584.9 | 329.2 | 2,435.9 |
| **At 30 September 2024** | | | | | |
| Cost | | 1,083.6 | 4,400.2 | 329.2 | 5,813.0 |
| Accumulated depreciation | | (561.8) | (2,815.3) | – | (3,377.1) |
| Net book amount | | 521.8 | 1,584.9 | 329.2 | 2,435.9 |
| **Year ended 30 September 2025** | | | | | |
| Opening net book amount | | 521.8 | 1,584.9 | 329.2 | 2,435.9 |
| Adjustment due to change in discount rates[1] | | (11.1) | – | – | (11.1) |
| Additions | | 0.4 | – | 425.3 | 425.7 |
| Disposals | | (38.5) | (36.8) | (1.2) | (76.5) |
| Disposal of subsidiaries | (14) | (89.7) | (90.0) | (18.5) | (198.2) |
| Depreciation | (2) | (24.9) | (182.2) | – | (207.1) |
| Impairment of assets | (2) | (26.0) | (106.4) | (53.0) | (185.4) |
| Reclassification from work in progress | | 89.9 | 371.7 | (461.6) | – |
| Reclassification to intangibles | (11) | – | – | (25.1) | (25.1) |
| Foreign exchange movement | | 9.4 | 27.0 | 9.1 | 45.5 |
| Closing net book amount | | 431.3 | 1,568.2 | 204.2 | 2,203.7 |
| **At 30 September 2025** | | | | | |
| Cost | | 857.1 | 4,261.6 | 204.2 | 5,322.9 |
| Accumulated depreciation | | (425.8) | (2,693.4) | – | (3,119.2) |
| Net book amount | | 431.3 | 1,568.2 | 204.2 | 2,203.7 |

(1) Movement in site retirement obligation assets is driven by changes in long-term Government bond rates. The net present value of these assets are adjusted at each reporting period to reflect current rates.

## Key accounting policies

Property, plant and equipment is measured at cost, less accumulated depreciation and any impairment losses. Subsequent costs are included in the asset's carrying amount or recognised as a separate asset, only when it is probable that future economic benefits associated with the item will flow to the Group and the cost of the item can be measured reliably.

Borrowing costs in relation to the funding of qualifying assets are capitalised and included in the cost of the asset. Qualifying assets are assets that take more than 12 months to get ready for their intended use or sale. Where funds are borrowed, generally a weighted average interest rate is used for the capitalisation of interest.

During 2025, Dyno Nobel received Government grants of $3.1m for capital projects in the DNAP business. The grants were recognised as a reduction in the carrying amount of property, plant and equipment.

Property, plant and equipment is subject to impairment testing. For details of impairment of assets, refer note 12.

## Depreciation

Property, plant and equipment, other than freehold land, is depreciated on a straight-line basis. Freehold land is not depreciated. Depreciation rates are calculated to spread the cost of the asset (less any residual value), over its estimated useful life. Residual value is the estimated value of the asset at the end of its useful life.

71   DYNO NOBEL

Case 2:25-cv-00789-DBP   Document 21-1   Filed 11/14/25   PageID.151   Page 71 of 100

Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | Independent Auditor's Report

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: CAPITAL INVESTMENT
FOR THE YEAR ENDED 30 SEPTEMBER 2025

Estimated useful lives for each class of asset are as follows:

» Buildings and improvements     20 – 50 years
» Machinery, plant and equipment    3 – 50 years

Residual values and useful lives are reviewed and adjusted where relevant when changes in circumstances impact the use of the asset.

# 10. Leases

The Group has lease contracts for various items of property, plant and equipment used within its operations and office premises. These assets have lease terms ranging from 1 to 48 years for land and buildings, and 1 to 8 years for machinery, plant and equipment.

The carrying value of right-of-use lease assets and lease liabilities is presented below:

### Right-of-use lease assets

| | Notes | Land and buildings $mill | Machinery, plant and equipment $mill | Total $mill |
|---|---|---|---|---|
| **Year ended 30 September 2024** | | | | |
| Opening net book amount | | 144.9 | 64.4 | 209.3 |
| Reclassification to held for sale | | (9.5) | 9.5 | – |
| Additions | | 34.8 | 66.1 | 100.9 |
| Disposals | | (1.1) | (3.2) | (4.3) |
| Depreciation | (2) | (19.4) | (35.2) | (54.6) |
| Foreign exchange movement | | (2.9) | (5.0) | (7.9) |
| Closing net book amount | | 146.8 | 96.6 | 243.4 |
| **At 30 September 2024** | | | | |
| Cost | | 214.6 | 172.2 | 386.8 |
| Accumulated depreciation | | (67.8) | (75.6) | (143.4) |
| Net book amount | | 146.8 | 96.6 | 243.4 |
| | | | | |
| **Year ended 30 September 2025** | | | | |
| Opening net book amount | | 146.8 | 96.6 | 243.4 |
| Reclassification | | (16.6) | 16.6 | – |
| Additions | | 63.1 | 52.2 | 115.3 |
| Disposals | | (5.2) | (1.0) | (6.2) |
| Disposal of subsidiaries | (14) | (139.4) | (5.9) | (145.3) |
| Depreciation | (2) | (16.9) | (39.1) | (56.0) |
| Impairment of assets | (2) | (6.3) | (2.3) | (8.6) |
| Foreign exchange movement | | 0.2 | 6.4 | 6.6 |
| Closing net book amount | | 25.7 | 123.5 | 149.2 |
| **At 30 September 2025** | | | | |
| Cost | | 68.0 | 234.4 | 302.4 |
| Accumulated depreciation | | (42.3) | (110.9) | (153.2) |
| Net book amount | | 25.7 | 123.5 | 149.2 |

### Lease liabilities

| | Notes | 2025 $mill | 2024 $mill |
|---|---|---|---|
| Opening carrying amount at 1 October | | 271.3 | 234.7 |
| Additions | | 158.3 | 100.7 |
| Disposals | | (0.9) | (3.2) |
| Payments | | (66.0) | (61.7) |
| Interest unwind | (2) | 11.9 | 8.7 |
| Disposal of subsidiaries | (14) | (169.8) | – |
| Foreign exchange movement | | 6.7 | (7.9) |
| **Carrying amount at 30 September** | | **211.5** | **271.3** |
| Current | | 59.7 | 48.9 |
| Non-current | | 151.8 | 222.4 |

Refer to note 18 for the maturity profile of the Group's committed lease liabilities before discounting.

### Amounts recognised in the income statement

Amounts recognised in the income statement relating to the Group's lease arrangements are as follows:

| | Notes | 2025 $mill | 2024 $mill |
|---|---|---|---|
| Depreciation | (2) | 56.0 | 54.6 |
| Interest | (2) | 11.9 | 8.7 |
| **Total** | | **67.9** | **63.3** |

### Key accounting policies

All leases except for short term or low value leases are recognised on the balance sheet as a right-of-use asset and a corresponding lease liability. Short term (12 months or less) and low value leases are recognised in the profit or loss as a lease expense.

Right-of-use assets are measured at cost, less any accumulated depreciation and impairment losses, and adjusted for any remeasurement of lease liabilities. The cost of right-of-use assets includes the amount of lease liabilities recognised, initial direct costs incurred, and lease payments made at or before the commencement date less any lease incentive received. Right-of-use assets are depreciated on a straight line basis in the profit or loss over the lease term.

Lease liabilities are recognised by the Group at the commencement date of the lease and are measured at the present value of lease payments to be made over the lease term. Lease payments include fixed payments and variable lease payments that depend on an index or rate.

## Key estimates and judgements

**Extension options** – The Group considers whether an option to extend a lease is reasonably certain on a lease-by-lease basis, which considers the importance of the lease to the Group's operations and its economic incentive to extend the lease. The lease term is reassessed upon the occurrence of a significant event or change in circumstance.

**Incremental borrowing rate** – To calculate the present value of lease payments, the Group uses an incremental borrowing rate at the commencement date of the lease. The incremental borrowing rate reflects the duration and the financing characteristics of the lease. Where the interest rate implicit in the lease is not readily available, the Group uses its incremental borrowing rate applicable to a portfolio of leases with reasonably similar characteristics.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: CAPITAL INVESTMENT**
FOR THE YEAR ENDED 30 SEPTEMBER 2025

# 11. Intangibles

| | Notes | Software $mill | Goodwill $mill | Patents, trademarks, customer contracts and supplier contracts $mill | Brand names $mill | Total $mill |
|---|---|---|---|---|---|---|
| **At 30 September 2023** | | | | | | |
| Cost | | 119.7 | 1,985.2 | 342.8 | 333.0 | 2,780.7 |
| Accumulated amortisation | | (67.7) | – | (318.6) | – | (386.3) |
| Net book amount | | 52.0 | 1,985.2 | 24.2 | 333.0 | 2,394.4 |
| **Year ended 30 September 2024** | | | | | | |
| Opening net book amount | | 52.0 | 1,985.2 | 24.2 | 333.0 | 2,394.4 |
| Additions[1] | | 19.2 | – | 454.3 | – | 473.5 |
| Subsidiaries acquired | | – | 2.9 | – | – | 2.9 |
| Impairment of assets | (2) | (1.4) | (195.8) | – | – | (197.2) |
| Amortisation | (2) | (9.3) | – | (19.6) | – | (28.9) |
| Foreign exchange movement | | (2.4) | (59.5) | (16.2) | (20.9) | (99.0) |
| Closing net book amount | | 58.1 | 1,732.8 | 442.7 | 312.1 | 2,545.7 |
| **At 30 September 2024** | | | | | | |
| Cost | | 132.6 | 1,732.8 | 762.4 | 312.1 | 2,939.9 |
| Accumulated amortisation | | (74.5) | – | (319.7) | – | (394.2) |
| Net book amount | | 58.1 | 1,732.8 | 442.7 | 312.1 | 2,545.7 |
| **Year ended 30 September 2025** | | | | | | |
| Opening net book amount | | 58.1 | 1,732.8 | 442.7 | 312.1 | 2,545.7 |
| Additions | | 24.2 | – | – | – | 24.2 |
| Disposals | | (2.3) | – | – | – | (2.3) |
| Disposal of subsidiaries | (14) | (17.7) | – | – | – | (17.7) |
| Amortisation | (2) | (11.5) | – | (23.7) | – | (35.2) |
| Reclassification from property, plant and equipment | (9) | 25.1 | – | – | – | 25.1 |
| Foreign exchange movement | | 1.4 | 45.7 | 25.1 | 14.2 | 86.4 |
| Closing net book amount | | 77.3 | 1,778.5 | 444.1 | 326.3 | 2,626.2 |
| **At 30 September 2025** | | | | | | |
| Cost | | 145.2 | 1,778.5 | 797.3 | 326.3 | 3,047.3 |
| Accumulated amortisation | | (67.9) | – | (353.2) | – | (421.1) |
| Net book amount | | 77.3 | 1,778.5 | 444.1 | 326.3 | 2,626.2 |

(1) Includes the recognition of the 25-year ammonia supplier contract which was entered into as a part of the Waggaman sale agreement. This supply contract was valued at $454.3m.

### Allocation of indefinite life intangible assets

The Group's indefinite life intangible assets are allocated to groups of cash generating units (**CGU**s) as follows:

| 30 September 2025 | Goodwill $mill | Brand names $mill | Total $mill | 30 September 2024 | Goodwill $mill | Brand names $mill | Total $mill |
|---|---|---|---|---|---|---|---|
| Titanobel | 78.6 | – | 78.6 | Titanobel | 71.7 | – | 71.7 |
| Dyno Nobel Asia Pacific | 908.5 | 40.3 | 948.8 | Dyno Nobel Asia Pacific | 908.5 | 40.3 | 948.8 |
| Dyno Nobel Americas | 791.4 | 286.0 | 1,077.4 | Dyno Nobel Americas | 752.6 | 271.8 | 1,024.4 |
| | 1,778.5 | 326.3 | 2,104.8 | | 1,732.8 | 312.1 | 2,044.9 |

73 DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.153    Page 73 of 100

Directors'
Report

Operating and
Financial Review

Remuneration
Report

**Financial
Report**

Independent
Auditor's Report

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: CAPITAL INVESTMENT

FOR THE YEAR ENDED 30 SEPTEMBER 2025

### Key accounting policies

*Goodwill*

Goodwill on acquisition of subsidiaries is measured at cost less any accumulated impairment losses. Goodwill is tested for impairment annually, or more frequently if events or circumstances indicate that it might be impaired.

*Brand names*

Brand names acquired by the Group have indefinite useful lives and are measured at cost less accumulated impairment. They are tested annually for impairment, or more frequently if events or circumstances indicate that they might be impaired.

*Other intangible assets*

Other intangible assets acquired by the Group have finite lives.

They are stated at cost less accumulated amortisation and impairment losses.

*Subsequent expenditure*

Subsequent expenditure on intangible assets is capitalised only when it increases the future economic benefits of the asset to which it relates. All other such expenditure is expensed as incurred.

*Amortisation*

Goodwill and brand names are not amortised.

For intangible assets with finite lives, amortisation is recognised in the profit or loss on a straight-line basis over their estimated useful life. The estimated useful lives of intangible assets in this category are as follows:

» Software                3 – 10 years
» Product trademarks    4 – 10 years
» Patents               13 – 15 years
» Customer contracts    10 – 17 years

Useful lives are reviewed at each reporting date and adjusted where relevant.

# 12. Impairment of goodwill and non-current assets

## Impairment testing

The Group performs annual impairment testing as at 30 September for intangible assets with indefinite useful lives. More frequent reviews are performed for indicators of impairment of all the Group's assets, including operating assets. The 30 September impairment testing resulted in no impairment of DNAP, Titanobel or DNA (excluding St Helens Fertilisers manufacturing facility as noted below) as the recoverable amounts exceeded their carrying amounts.

Indicators of impairment were noted with regards to a number of Fertiliser assets across the Group as noted below:

*Impairment of Phosphate Hill facility*

Due to a range of factors, including the continuation of the Phosphate Hill sale process and the increased uncertainty regarding the near-term and long-term cost of gas on the east coast of Australia, the Group has recognised a full impairment of the Phosphate Hill assets on a value-in-use basis. A gross impairment charge of $213.0m was recognised against property, plant and equipment, right-of-use assets, and inventories.

*Impairment of St Helens Fertilisers manufacturing facility*

During April 2025, Dyno Nobel made the decision to close the Fertilisers manufacturing facility located in St Helens, Oregon, US. The decision to close the facility was in line with Dyno Nobel's strategy to exit assets which are not core to the strategic direction of the business. The closure triggered an impairment review, and the assets related to the manufacturing facility of A$32.4m were fully impaired. The St Helens Fertilisers manufacturing facility is part of the DNA segment. In August 2025, the St Helens facility was sold to the Columbia River Nitrogen consortium.

## Key assumptions

Details of the key assumptions used in the recoverable amount calculations at 30 September are set out below:

| Key assumptions | 1 – 5 years | | Terminal value (after 5 years) | |
| --- | --- | --- | --- | --- |
| | 2025 US$ | 2024 US$ | 2025 US$ | 2024 US$ |
| DAP[1] | 525 to 626 | 535 to 562 | 613 | 668 |
| AUD:USD[2] | 0.67 to 0.72 | 0.70 to 0.72 | 0.72 | 0.72 |

(1)  Di-Ammonium Phosphate price (FOB China/Saudi – USD per tonne).
(2)  AUD:USD exchange rate.

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: CAPITAL INVESTMENT
FOR THE YEAR ENDED 30 SEPTEMBER 2025

The delivered gas price assumption to Phosphate Hill for the outlook period is based on management's best estimate of the short-term and long-term cost of gas on the east coast of Australia. This outlook incorporates external forecasts and ranges from $10.80 – $23.50 per gigajoule in nominal terms.

Fertiliser prices and foreign exchange rates are estimated by reference to external market publications and market analyst estimates where available, and are updated at each reporting date.

*Discount and growth rates*

The post-tax discount rate used in the calculations was 9% for the Phosphate Hill assets and the Titanobel CGU (2024: 9%), and 8.5% for the DNA, St Helens Fertilisers manufacturing facility and DNAP CGUs (2024: 8.5%). The rates reflect the underlying cost of capital adjusted for market and asset specific risks.

The terminal value growth rate represents the forecast consumer price index (CPI) of 2.5% (2024: 2.5%) for all CGUs. Sensitivity analyses on the discount and growth rates, considering the current volatile market conditions, are provided below.

*Climate related risks*

Dyno Nobel considers climate change and other sustainability risks when determining the recoverable amount of each CGU. The Group has greenhouse gas emission reduction targets for its manufacturing facilities which are disclosed in the annual Sustainability and Climate Change Reports. Capital forecasts in the cash flows used in the impairment models include investment in sustainability related projects that have either commenced or are committed, including the earnings attributable to these capital projects.

The commodity forecast assumptions used in the impairment models were obtained from external sources which include the impacts of sustainability and carbon costs.

For both DNAP and the Phosphate Hill facility, the estimated impact of the Safeguard Mechanism (SGM) 2.0 policy was included in the recoverable amount assessment of each CGU.

*Sensitivity analyses*

Included in the table below is a sensitivity analysis of the recoverable amounts of the CGUs and, where applicable, the impairment charge considering reasonable change scenarios relating to key assumptions at 30 September 2025.

Each of the sensitivities below assumes that a specific assumption moves in isolation, while all other assumptions are held constant. A change in one assumption could be accompanied by a change in another assumption, which may increase or decrease the net impact.

| | Post-tax discount rate | Terminal value growth rate | Natural gas price |
|---|---|---|---|
| | +0.5% | -1.0% | +AU$1 per gigajoule |
| **DNAP** | **AU$mill** | **AU$mill** | **AU$mill** |
| Change in recoverable amount | (232.0) | (329.1) | (80.6) |
| Impairment charge | – | – | – |

| | Post-tax discount rate | Terminal value growth rate |
|---|---|---|
| | +0.5% | -1.0% |
| **DNA** | **US$mill** | **US$mill** |
| Change in recoverable amount | (144.0) | (204.0) |
| Impairment charge | – | – |

| | Post-tax discount rate | Terminal value growth rate |
|---|---|---|
| | +0.5% | -1.0% |
| **Titanobel** | **EUR €mill** | **EUR €mill** |
| Change in recoverable amount | (14.9) | (21.0) |
| Impairment charge | – | – |

| | Post-tax discount rate | AUD:USD exchange rate | DAP price | Natural gas price |
|---|---|---|---|---|
| | -0.5% | -5c | +US$50 per tonne | -AUD$1 per gigajoule |
| **Phosphate Hill** | **AU$mill** | **AU$mill** | **AU$mill** | **AU$mill** |
| Change in recoverable amount | 7.2 | 385.0 | 408.2 | 52.4 |
| Reversal of current year impairment | – | 213.0 | 213.0 | – |

**75** DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.155    Page 75 of 100

Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | Independent Auditor's Report

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: CAPITAL INVESTMENT
FOR THE YEAR ENDED 30 SEPTEMBER 2025

### Key accounting policies

*Impairment testing*

The identification of impairment indicators involves management judgement. Where an indicator of impairment is identified, a formal impairment assessment is performed. The Group's annual impairment testing determines whether the recoverable amount of a CGU or group of CGUs, to which goodwill and/or indefinite life intangible assets are allocated, exceeds its carrying amount.

A CGU is the smallest identifiable group of assets that generate cash flows largely independent of cash flows of other groups of assets. Goodwill and other indefinite life intangible assets are allocated to CGUs or groups of CGUs which are no larger than one of the Group's reportable segments.

*Determining the recoverable amount*

The recoverable amount of an asset is determined as the higher of its fair value less cost of disposal and its value-in-use. Value-in-use is a term that means an asset's value based on the expected future cash flows arising from its continued use in its current condition, discounted to present value. For discounting purposes, a post-tax rate is used that reflects current market assessments of the risks specific to the asset. The Group has prepared value-in-use models for the purpose of impairment testing as at 30 September 2025, using five year discounted cash flow models based on Board approved forecasts. Cash flows beyond the five year period are extrapolated using a terminal value growth rate for all CGUs, except for Phosphate Hill which includes cash flows through to the end of its life of mine of 2046.

Transition of the world's energy systems and sustainability forms part of the Group's strategy and these have been considered in the market data utilised to assess growth rates for each CGU.

*Impairment losses*

An impairment loss is recognised whenever the carrying amount of an asset (or its CGU) exceeds its recoverable amount. Impairment losses are recognised in the profit or loss.

Impairment losses recognised in respect of CGUs are allocated against assets in the following order:

» Firstly, against the carrying amount of any goodwill allocated to the CGU.
» Secondly, against the carrying amount of any remaining assets in the CGU.

An impairment loss recognised in a prior period for an asset (or its CGU) other than goodwill may be reversed only if there has been a change in the estimates used to determine the recoverable amount of the asset (or its CGU) since the last impairment loss was recognised. When this is the case, the carrying amount of the asset (or its CGU) is increased to its recoverable amount.

### Key estimates and judgements

The Group is required to make significant estimates and judgements in determining whether the carrying amount of its assets and/or CGUs has any indication of impairment, in particular in relation to:

» key assumptions used in forecasting future cash flows;
» discount rates applied to those cash flows; and
» the expected long-term growth in cash flows.

Such estimates and judgements are subject to change as a result of changing economic, operational, environmental and weather conditions. Actual cash flows may therefore differ from forecasts and could result in changes in the recognition of impairment charges in future periods.

## 13. Commitments

*Capital expenditure commitments*

Capital expenditure contracted but not provided for or payable at 30 September:

| | 2025 $mill | 2024 $mill |
|---|---|---|
| No later than one year | 36.2 | 78.1 |
| | 36.2 | 78.1 |

*Other commitments*

In May 2023, Dyno Nobel entered into a long-term gas supply agreement with Queensland Pacific Metals (QPM) commencing in April 2026 upon expiry of the existing gas supply agreement. As part of the arrangement, Dyno Nobel provided an initial development funding facility of up to $80.0m. This facility is intended to accelerate development of the Moranbah Gas Project by funding the capital costs of new infill production wells.

As at 30 September 2025, Dyno Nobel has provided $38.2m of funding for field development (2024: $28.0m) with further contributions expected in the 2026 financial year. Dyno Nobel has recognised the cash outflow as a prepayment which will be amortised over the duration of the gas supply agreement with QPM.

In May 2025, Dyno Nobel entered into a prepayment facility agreement with QPM. Dyno Nobel has agreed to pre-purchase gas from QPM between April 2025 and March 2026 of up to $40.0m, with $23.4m of funding provided to QPM under this facility at 30 September 2025 (2024: nil). Dyno Nobel has recognised the cash outflow as a non-current prepayment which will be amortised based on the volume of gas consumed by Dyno Nobel between April 2027 and March 2033.

In May 2025, Dyno Nobel also entered into a lending facility with QPM of up to $30.0m. As at 30 September 2025, QPM has drawn down $21.8m funds under this facility (2024: nil). Dyno Nobel has recognised the cash outflow as a non-current receivable, with repayments expected to commence in April 2027.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: CAPITAL INVESTMENT
FOR THE YEAR ENDED 30 SEPTEMBER 2025

# 14. Discontinued operations

### 2025 financial year

*IPF Distribution business (IPF Distribution)*

On 30 September 2025, Dyno Nobel completed the sale of the IPF Distribution assets to Ridley Corporation Limited. As at 30 September 2025, the Group recorded a loss on sale after tax of $145.4m.

The earnings attributable to IPF Distribution for the twelve months ended 30 September 2025 and the resultant loss on sale have been presented as discontinued operations.

| | 2025 $mill |
|---|---|
| Consideration[1] | 455.7 |
| Transaction costs | (28.1) |
| **Net consideration** | **427.6** |
| *Carrying value of net assets of business disposed* | |
| Trade and other receivables | 244.2 |
| Inventories | 302.7 |
| Property, plant and equipment | 198.2 |
| Right-of-use asset | 145.3 |
| Intangible assets | 17.7 |
| Other assets | 18.5 |
| Trade and other payables | (167.8) |
| Lease liabilities | (169.8) |
| Provisions | (25.8) |
| | 563.0 |
| Non-controlling interest | (8.1) |
| **Loss on sale of discontinued operations before tax** | **(143.5)** |
| Income tax expense | (1.9) |
| **Net loss on sale of discontinued operations** | **(145.4)** |

(1)  Consideration includes upfront proceeds received of $381.1m, and the present value of net deferred consideration of $74.6m.

*Tax on sale of WALA*

During 2024, Dyno Nobel prepaid taxes related to the sale of the Waggaman facility. The payment of Louisiana state tax was deductible for US Federal tax purposes. On lodgement of the FY24 Louisiana state tax return, it was determined that taxes had been overpaid, and the resulting refund was received in October 2025. The refund will be taxable for Federal tax purposes and the provision has been increased accordingly.

Furthermore, the unique nature of the WALA sale and the size of the transaction resulted in Dyno Nobel falling into higher tax brackets in states with a graduating tax system. In FY24, when estimating the tax provision, this impact was underestimated. The provision has been increased in FY25 by $53.3m to allow for the higher tax liability.

### 2024 financial year

*Waggaman facility (WALA)*

On 1 December 2023, the Group completed the sale of its ammonia manufacturing facility located in Waggaman, Louisiana, US. As at 30 September 2024, the Group recorded a gain on sale after tax of $123.8m which included a gain of $254.1m relating to the release of the foreign currency translation reserve (FCTR) as required by Australian Accounting Standards.

The Group also secured a 25-year ammonia supply agreement with CF Industries Holdings Inc for up to 200,000 short tonnes of ammonia per annum at estimated producer cost to support the Dyno Nobel Americas explosives business. The supply agreement has been assigned a value of $454.3m which offset part of the proceeds.

| | 2024 $mill |
|---|---|
| Cash consideration | 1,830.2 |
| Transaction costs | (33.7) |
| Offtake supply agreement[2] | 454.3 |
| **Net consideration** | **2,250.8** |
| *Carrying value of net assets of business disposed* | |
| Trade and other receivables | 50.7 |
| Inventories | 3.4 |
| Property, plant and equipment | 1,252.9 |
| Right-of-use asset | 9.3 |
| Intangible assets | 881.6 |
| Other assets | 0.1 |
| Trade and other payables | (28.3) |
| Lease liabilities | (10.0) |
| Provisions | (11.2) |
| | 2,148.5 |
| **Gain on sale of discontinued operations before FCTR release** | **102.3** |
| Foreign currency translation reserve release to profit or loss | 254.1 |
| **Gain on sale of discontinued operations before tax** | **356.4** |
| Income tax expense | (232.6) |
| **Net gain on sale of discontinued operations** | **123.8** |

(2)  The offtake supply agreement has been recognised as an intangible asset.

| | 2025 | | | 2024 | | |
|---|---|---|---|---|---|---|
| | IPF Distribution $mill | WALA $mill | Total $mill | IPF Distribution $mill | WALA $mill | Total $mill |
| Revenue | 1,635.1 | – | 1,635.1 | 1,740.6 | 86.4 | 1,827.0 |
| Other income | 2.1 | – | 2.1 | 3.5 | – | 3.5 |
| Depreciation and amortisation | (14.2) | – | (14.2) | (27.8) | – | (27.8) |
| Expenses ex IMIs | (1,555.4) | – | (1,555.4) | (1,665.6) | (27.7) | (1,693.3) |
| **Earnings before interest, related income tax expense and IMIs** | **67.6** | **–** | **67.6** | **50.7** | **58.7** | **109.4** |
| Net interest expense | (5.1) | – | (5.1) | (2.0) | (0.6) | (2.6) |
| IMIs excluding (loss)/gain on sale of discontinued operations | (65.1) | – | (65.1) | (240.3)[3] | – | (240.3) |
| Income tax benefit/(expense) excluding disposal of discontinued operations | 0.9 | – | 0.9 | (1.3) | (15.1) | (16.4) |
| **(Loss)/profit for the period from discontinued operations** | **(1.7)** | **–** | **(1.7)** | **(192.9)** | **43.0** | **(149.9)** |
| (Loss)/gain on sale of discontinued operations | (143.5) | – | (143.5) | – | 356.4 | 356.4 |
| Income tax expense on disposal of discontinued operations | (1.9) | (53.3) | (55.2) | – | (232.6) | (232.6) |
| **(Loss)/gain on disposal of discontinued operations** | **(145.4)** | **(53.3)** | **(198.7)** | **–** | **123.8** | **123.8** |

(3)  Includes impairment of $195.8m and $44.5m for goodwill and property, plant and equipment respectively.

77 DYNO NOBEL

Case 2:25-cv-00789-DBP   Document 21-1   Filed 11/14/25   PageID.157   Page 77 of 100

| Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | Independent Auditor's Report |

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: CAPITAL INVESTMENT**

FOR THE YEAR ENDED 30 SEPTEMBER 2025

|  | 2025 | | 2024 | | |
|---|---|---|---|---|---|
|  | IPF Distribution $mill | Total $mill | IPF Distribution $mill | WALA $mill | Total $mill |
| **Cash inflows/(outflows) from discontinued operations** |  |  |  |  |  |
| Net cash flows from operating activities[1] | (44.7) | (44.7) | 31.4 | 19.8 | 51.2 |
| Net cash flows from investing activities | (49.2) | (49.2) | (63.0) | (6.3) | (69.3) |
| Net cash flows from financing activities | (15.6) | (15.6) | (12.1) | (0.1) | (12.2) |
| **Total cash flows from discontinued operations[2]** | **(109.5)** | **(109.5)** | **(43.7)** | **13.4** | **(30.3)** |

(1)   The operating cash flow for IPF Distribution did not include trade working capital facilities usage during the year ended 30 September 2024.

(2)   Excludes cash flows from sale of discontinued operations.

A discontinued operation represents a separate major line of operations within the Group where the cash flows can be clearly identified and there is a plan to dispose. Classification as a discontinued operation occurs at the earlier of disposal date or when the operation meets the criteria to be classified as held for sale.

Once classified as held for sale, the disposal group is measured at the lower of carrying amount and fair value less costs to sell and intangible assets and property, plant and equipment are no longer amortised or depreciated.

The Gibson Island land and the Fertilisers manufacturing facility located in St Helens were not considered major operations for Dyno Nobel and therefore were not classified as discontinued operations at 30 September 2025.

## 15. Equity accounted investments

The Group has performed an analysis of the statements of financial position and the results of each of its joint ventures and associates (as listed in note 16) at 30 September 2025 and considers them to be individually immaterial to the Group. As a result, no individual disclosures are included for the Group's investments in joint ventures and associates.

Included in the table below is the summarised financial information of the Group's joint ventures and associates at 30 September:

**Carrying amount of joint ventures and associates**

|  | 2025 $mill | 2024 $mill |
|---|---|---|
| Carrying amount at 1 October | 417.9 | 404.8 |
| Share of net profit | 80.3 | 62.2 |
| Dividends received | (52.9) | (32.8) |
| Foreign exchange movement | 12.4 | (16.3) |
| **Carrying amount at 30 September** | **457.7** | **417.9** |
| **Carrying amount of investments in:** |  |  |
| Joint ventures | 326.3 | 306.8 |
| Associates | 131.4 | 111.1 |
| **Carrying amount of investments in joint ventures and associates** | **457.7** | **417.9** |

**Transactions between subsidiaries of the Group and joint ventures and associates**

|  | 2025 $mill | 2024 $mill |
|---|---|---|
| Sales of goods/services | 407.7 | 429.1 |
| Purchase of goods/services | (88.0) | (84.4) |
| Royalty income and management fees | 39.0 | 38.7 |
| Interest expense | 1.5 | 1.2 |
| Dividend income | 52.9 | 32.8 |

Joint ventures and associates transactions represent amounts that do not eliminate on consolidation.

**Outstanding balances arising from transactions with joint ventures and associates**

|  | 2025 $mill | 2024 $mill |
|---|---|---|
| Amounts owing to related parties | 6.4 | 9.2 |
| Amounts owing from related parties | 66.7 | 67.0 |
| **Loans with joint ventures and associates** |  |  |
| Amounts owing to related parties | 1.8 | – |
| Loans from joint ventures and associates | 20.8 | 19.5 |

Outstanding balances arising from transactions with joint ventures and associates are on standard market terms.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: CAPITAL INVESTMENT
FOR THE YEAR ENDED 30 SEPTEMBER 2025

# 16. Investments in subsidiaries, joint arrangements and associates

The following list includes the Group's principal operating subsidiaries. Other than as noted below, there were no changes in the Group's existing shareholdings in its subsidiaries, joint ventures and associates in the financial year.

## Subsidiaries

| Name of entity | Ownership interest |
|---|---|
| **Company** | |
| Dyno Nobel Limited[1][3] | |
| **Controlled Entities – operating** | |
| **Incorporated in Australia** | |
| Project Ceres Pty Ltd[1][3] | 100% |
| Southern Cross Operations Limited[1][3] | 100% |
| Dyno Nobel LTI Plan Company Pty Ltd | 100% |
| Dyno Nobel Explosives Holdings Pty Ltd[1] | 100% |
| Queensland Operations Pty Limited[1] | 100% |
| Dyno Nobel Investments 1 Pty Ltd[1] | 100% |
| Dyno Nobel Investments 2 Pty Ltd[1] | 100% |
| Dyno Nobel US Holdings Pty Ltd[3] | 100% |
| Dyno Nobel Finance Australia Pty Ltd[1] | 100% |
| Dyno Nobel Aust Pty Ltd[3] | 100% |
| Dyno Nobel Europe Pty Ltd | 100% |
| Dyno Nobel Management Pty Limited[1] | 100% |
| Industrial Investments Australia Finance Pty Limited[1] | 100% |
| Dyno Nobel Asia Pacific Pty Limited[1] | 100% |
| Dampier Nitrogen Pty Ltd | 100% |
| DNX Australia Pty Ltd[1] | 100% |
| Dyno Nobel Moranbah Pty Ltd[1] | 100% |
| Dyno Nobel Moura Pty Limited[1] | 100% |
| PH Queensland Gas Pty Ltd[3] | 100% |
| **Incorporated in USA** | |
| Dyno Nobel US Investments | 100% |
| Dyno Nobel Management LLC | 100% |
| Dyno Nobel Finance LLC | 100% |
| Dyno Nobel Australia LLC | 100% |
| Dyno Nobel SPS LLC | 100% |
| Dyno Nobel Holdings IV LLC | 100% |
| Dyno Nobel Holdings USA III, Inc. | 100% |
| Dyno Nobel Holdings USA II | 100% |
| Dyno Nobel Holdings USA II, Inc. | 100% |
| Dyno Nobel Holdings USA, Inc. | 100% |
| Dyno Nobel Inc. | 100% |
| Dyno Nobel Transportation, Inc | 100% |
| Simsbury Hopmeadow Street LLC | 100% |
| Dyno Nobel Holdings V LLC | 100% |
| Tradestar Corporation | 100% |
| CMMPM, LLC | 100% |
| CMMPM Holdings, L.P. | 100% |
| Dyno Nobel Louisiana Ammonia, LLC | 100% |
| Nobel Labs, LLC | 100% |
| Mine Equipment & Mill Supply Company | 100% |
| Controlled Explosives, Inc. | 100% |
| Drisk Insurance Inc. | 100% |
| Falconi Construction, Inc. | 100% |
| Alpha Dyno Nobel | 100% |
| **Incorporated in Canada** | |
| Dyno Nobel Canada Inc. | 100% |
| Dyno Nobel Transportation Canada Inc. | 100% |
| Dyno Nobel Nunavut Inc. | 100% |
| Dyno Nobel Finance Canada Inc. | 100% |
| Polar Explosives 2000 Inc. | 100% |
| Dene Dyno Nobel (Polar) Inc. | 100% |
| Dyno Nobel Waggaman Inc. | 100% |
| **Incorporated in Hong Kong** | |
| Incitec Pivot Holdings (Hong Kong) Limited | 100% |

| Name of entity | Ownership interest |
|---|---|
| **Controlled Entities – operating (continued)** | |
| **Incorporated in Singapore** | |
| Coltivi Insurance Pte Ltd | 100% |
| **Incorporated in Chile** | |
| Dyno Nobel Explosivos Chile Limitada | 100% |
| **Incorporated in Peru** | |
| Dyno Nobel Peru S.A. | 100% |
| **Incorporated in Mexico** | |
| Dyno Nobel Mexico, S.A. de C.V.[2] | 99.98% |
| **Incorporated in Papua New Guinea** | |
| DNX Papua New Guinea Ltd[2] | 100% |
| **Incorporated in Indonesia** | |
| PT DNX Indonesia | 100% |
| **Incorporated in Türkiye** | |
| Nitromak Dnx Kimya Sanayii Anonim Sirketi | 100% |
| **Incorporated in Romania** | |
| RomNitro Explosives SRL | 100% |
| **Incorporated in Switzerland** | |
| Dyno Nobel Holdings Europe SA | 100% |
| **Incorporated in France** | |
| Dyno Nobel Holdings France Sas | 100% |
| Explinvest SASU | 100% |
| Titanobel SASU | 100% |
| Société d'Explosifs du Centre-Est  SA | 99.9% |
| Groupement Forestier Minez Clegueric | 66% |
| Titanobel-NPGM Equipment SAS[2] | 51% |
| **Incorporated in New Caledonia** | |
| Nord-Sud Dynamitage-Sofiter SARL[2] | 51% |
| **Incorporated in Benin** | |
| Titanobel Benin SASU[2] | 100% |
| **Incorporated in Cameroon** | |
| Titanobel Cameroun SASU[2] | 100% |
| **Incorporated in Senegal** | |
| Afrique Ouest Drilling Sofiter SARL[2] | 100% |
| **Incorporated in Malaysia** | |
| DNX Malaysia Sdn. Bhd.[4] | 100% |
| **Incorporated in Ghana** | |
| Dyno Nobel Ghana Ltd[4] | 100% |
| **Incorporated in Guinee** | |
| Dyno Nobel Guinee[4] | 100% |
| **Incorporated in Tanzania** | |
| Dyno Nobel Explosives Limited[4] | 80% |

(1) A party to the Deed of Cross Guarantee dated 25 September 2024, as amended by the Deed of retirement and appointment of Alternative Trustee dated 25 August 2025, and the Notices of Disposal dated 30 September 2025.
(2) This entity has a 31 December financial year end.
(3) This entity had its name changed during FY25.
(4) New entity incorporated in FY25.

The following entities were sold to Ridley Corporation Limited (ASX:RIC) on 30 September 2025:

» Australian Bio Fert Pty Ltd;
» Easy Liquids Pty Ltd;
» Incitec Pivot Pty Ltd (formerly TOP Australia Pty Limited);
» Incitec Pivot Trading Pty Ltd (formerly Southern Cross International Pty Ltd);
» Incitec Pivot Fertiliser (Singapore) Pte. Ltd.; and
» OZBIOFERT Pty Ltd.

Nitro Industria Kimike Shpk has been sold to a third party during FY25.

Enviro Blasting Services (Pty) Limited has been put into voluntary liquidation during FY25.

Titanobel Southern Africa (Pty) Ltd was deregistered during FY25.

Société Financière de Terrassement SAS has been merged into Titanobel SASU during FY25.

79 DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.159    Page 79 of 100

| Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | Independent Auditor's Report |

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: CAPITAL INVESTMENT
FOR THE YEAR ENDED 30 SEPTEMBER 2025

### Joint arrangements and associates

| Name of entity | Ownership interest |
|---|---|
| **Joint ventures** | |
| **Incorporated in USA** | |
| Buckley Powder Co. | 50% |
| IRECO Midwest Inc. | 50% |
| Wampum Hardware Co. | 50% |
| Western Explosives Systems Company | 50% |
| Warex Corporation | 50% |
| Warex, LLC | 50% |
| Warex Transportation, LLC | 50% |
| Vedco Holdings, Inc. | 50% |
| Virginia Explosives & Drilling Company, Inc. | 50% |
| Austin Sales, LLC | 50% |
| Virginia Drilling Company, LLC | 50% |
| DetNet Americas, Inc. | 50% |
| **Incorporated in Canada** | |
| Qaaqtuq Dyno Nobel Inc.[2] | 49% |
| Dene Dyno Nobel (DWEI) Inc.[3] | 49% |
| **Incorporated in Australia** | |
| Queensland Nitrates Pty Ltd | 50% |
| Queensland Nitrates Management Pty Ltd | 50% |
| **Incorporated in South Africa** | |
| DetNet South Africa (Pty) Ltd | 50% |
| Sasol Dyno Nobel (Pty) Ltd | 50% |
| **Incorporated in Mexico** | |
| DNEX Mexico, S. de R.L. de C.V. | 49% |
| Explosivos de la Region Lagunera, S.A. de C.V. | 49% |
| Explosivos de la Region Central, S.A. de C.V. | 49% |
| Nitro Explosivos de Ciudad Guzmán, S.A. de C.V. | 49% |
| Explosivos y Servicios Para la Construcción, S.A. de C.V. | 49% |
| Nitro Chihuahua, S.A. de C.V. | 49% |
| **Incorporated in France** | |
| Newcomat SARL[1] | 10% |
| **Incorporated in New Caledonia** | |
| Katiramona Explosifs SAS[1] | 50% |
| **Incorporated in Mongolia** | |
| Titanobel Mongolia LLC[1] | 49% |
| Nitrosibir Mongolia LLC[1] | 49% |
| **Incorporated in Nigeria** | |
| Titanobel & Dynatrac Limited[1] | 55% |

| Name of entity | Ownership interest |
|---|---|
| **Associates** | |
| **Incorporated in USA** | |
| Maine Drilling and Blasting Group | 49% |
| Independent Explosives | 49% |
| Maine Drilling and Blasting, Inc. | 49% |
| MD Drilling and Blasting, Inc. | 49% |
| **Incorporated in Canada** | |
| Labrador Maskuau Ashini Ltd | 49% |
| Innu Namesu Ltd | 49% |
| **Incorporated in French Guiana** | |
| Guyanexplo Société en Nom collectif[1] | 35% |
| Guyaminage[4] | 35% |

(1) This entity has a 31 December year end.

(2) Due to legal requirements in the Canadian Northwest Territories, the Group cannot own more than 49 percent of shares in Qaaqtuq Dyno Nobel Inc. However, under the joint venture agreement, the Group is entitled to 75 percent of the profit of Qaaqtuq Dyno Nobel Inc.

(3) Due to legal requirements in the Canadian Northwest Territories, the Group cannot own more than 49 percent of shares in Dene Dyno Nobel (DWEI) Inc. However, under the joint venture agreement, the Group is entitled to 100 percent of the profit of Dene Dyno Nobel (DWEI) Inc.

(4) New entity incorporated in FY25.

Dyno Nobel's 22% ownership stake in Precision Agriculture Pty Ltd was sold to Ridley Corporation Limited (ASX:RIC) on 30 September 2025.

**Joint operations**

Dyno Nobel has a 50% interest in an unincorporated joint operation with Senex Energy Pty Ltd (previously with Central Petroleum Limited) for the development of gas acreage in Queensland, Australia, which commenced in the 2018 financial year.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: RISK MANAGEMENT

FOR THE YEAR ENDED 30 SEPTEMBER 2025

# 17. Provisions and contingencies

Provisions at 30 September 2025 are analysed as follows:

| 30 September 2025 | Employee entitlements $mill | Restructuring and rationalisation $mill | Environmental $mill | Asset retirement obligations $mill | Legal and other $mill | Total provisions $mill |
|---|---|---|---|---|---|---|
| Carrying amount at 1 October 2024 | 70.4 | 35.5 | 54.9 | 122.4 | 12.7 | 295.9 |
| Adjustment due to change in discount rates | – | – | – | (11.1) | – | (11.1) |
| Provisions made during the year | 3.7 | 106.0[1] | 111.2[2] | – | 13.6[3] | 234.5 |
| Provisions written back during the year | (0.9) | – | – | – | – | (0.9) |
| Payments made during the year | (8.9) | (23.9) | (8.9) | (1.3) | (4.4) | (47.4) |
| Transfers | – | (5.5) | – | 5.5 | – | – |
| Interest unwind | 0.7 | – | – | 5.4 | – | 6.1 |
| Disposal of subsidiaries | (9.4) | – | (7.6) | (8.8) | – | (25.8) |
| Foreign exchange movement | 0.5 | (0.1) | 0.4 | 0.5 | 0.7 | 2.0 |
| **Carrying amount at 30 September 2025** | **56.1** | **112.0** | **150.0** | **112.6** | **22.6** | **453.3** |
| Current | 52.6 | 91.0 | 68.2 | 2.3 | 8.2 | 222.3 |
| Non-current | 3.5 | 21.0 | 81.8 | 110.3 | 14.4 | 231.0 |

(1)  Provisions made during the year includes the closure costs associated with the Geelong manufacturing facility of $65.5m, the transition of the Gibson Island PDC to a new facility of $17.8m and redundancy costs of $15.5m.

(2)  Provisions made during the year relates to the remediation activities associated with the Gibson Island land of $111.2m.

(3)  Provisions made during the year includes costs associated with patent legal disputes.

## Key accounting policies

Provisions are measured at management's estimate of the expenditure required to settle the obligation. This estimate is based on a "present value" calculation, which involves the application of a discount rate to the expected future cash flows associated with settlement. The discount rate takes into account factors such as risks specific to the liability and the time value of money.

*Employee entitlements*

Provisions are made for liabilities to employees for annual leave, long service leave and other employee entitlements. Where the payment to employees is expected to take place in 12 months time or later, a present value calculation is performed. In this instance, the corporate bond rate is used to discount the liability to its present value.

*Restructuring and rationalisation*

Provisions for restructuring or rationalisation are only recognised when a detailed plan has been approved and the restructuring or rationalisation has either commenced or been publicly announced. The closure costs associated with the Geelong manufacturing facility have been recognised in restructuring and rationalisation.

*Environmental*

Provisions relating to the remediation of soil, groundwater, untreated waste and other environmental contamination are made when the Group has an obligation to carry out the clean-up operation as a result of a past event. In addition, a provision will only be made where it is possible to reliably estimate the costs involved.

*Asset retirement*

In certain circumstances, the Group has an obligation to dismantle and remove an asset and to restore the site on which it is located. The present value of the estimated costs of this process is recognised as part of the asset that is depreciated and also as a provision.

At each reporting date, the provision is remeasured in line with changes in discount rates and the timing and amount of future estimated cash flows. Any changes in the provision are added to or deducted from the related asset, other than changes associated with the passage of time which is recognised as a borrowing cost in the profit or loss.

*Legal and other*

There are a number of legal claims and other exposures, including claims for damages arising from products and services supplied by the Group, that arise from the ordinary course of business.

A provision is only made where it is probable that a payment or restitution will be required and the costs involved can be reliably estimated.

## Key estimates and judgements

Provisions are based on the Group's estimate of the timing and value of outflows of resources required to settle or satisfy commitments and liabilities known to the Group at the reporting date.

## Contingencies

The following contingent liabilities are considered unlikely. However the directors consider they should be disclosed:

» The Group is regularly subject to investigations and audit activities by the revenue authorities of jurisdictions in which the Group operates. The outcome of these investigations and audits depends upon several factors which may result in further tax payments or refunds of tax payments already made by the Group over and above existing provisions.

81  DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.161    Page 81 of 100

Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | Independent Auditor's Report

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: RISK MANAGEMENT**
FOR THE YEAR ENDED 30 SEPTEMBER 2025

» Contingent liabilities arise in the normal course of business and include a number of legal claims, environmental cleanup requirements and bank guarantees.

The Directors are of the opinion that no additional provisions are required in respect of these matters, as it is either not probable that a future sacrifice of economic benefits will be required or the amount is not capable of reliable measurement.

# 18. Financial risk management

The Group is exposed to financial risks including liquidity risk, market risk and credit risk. This note explains the Group's financial risk exposures and its objectives, policies and processes for measuring and managing these risks.

The Board of Directors (the **Board**) has overall responsibility for the establishment and oversight of the Group's risk management framework. The Board established the Audit and Risk Management Committee (**ARMC**) which is responsible for, amongst other things, the monitoring of the Group's risk management plans. The ARMC is assisted in its oversight role by the Group's Risk Management function. The Risk Management function performs reviews of the Group's risk management controls and procedures, the results of which are reported to the ARMC. The ARMC reports regularly to the Board on its activities.

The Group's financial risk management framework includes policies to identify, analyse and manage the Group's financial risks. These policies set appropriate financial risk limits and controls, identify permitted derivative instruments and provide guidance on how to monitor and report financial risks and adherence to set limits. Financial risk management policies, procedures and systems are reviewed regularly to ensure they remain appropriate given changes in market conditions and/or the Group's activities.

## Financial risks

> **Liquidity risk:** The risk that the Group is not able to refinance its debt obligations or meet other cash outflow obligations when required.

*Source of risk*

Exposure to liquidity risk derives from the Group's operations and from the external interest bearing liabilities that it holds.

*Risk mitigation*

Liquidity risk is managed by ensuring there are sufficient committed funding facilities available to meet the Group's financial commitments in a timely manner.

The Group's forecast liquidity requirements are continually reassessed based on regular forecasting of earnings and capital requirements.

This includes stress testing of critical assumptions such as input costs, sales prices, production volumes, exchange rates and capital expenditure.

The Group aims to hold a minimum liquidity buffer of at least $500.0m in undrawn non-current committed funding to meet any unforeseen cash flow requirements. Details on the Group's committed finance facilities, including the maturity dates of these facilities, are included in note 8.

> **Outstanding financial instruments**

The Group's exposures to liquidity risk are set out in the tables below:

| 30 September 2025 | Contractual cash flows[1] $mill | 0 – 12 months $mill | 1 – 5 years $mill | More than 5 years $mill |
|---|---|---|---|---|
| **Non-derivative financial liabilities** | | | | |
| Interest bearing liabilities | 1,805.5 | 566.6 | 740.1 | 498.8 |
| Interest payments | 386.7 | 52.4 | 220.0 | 114.3 |
| Trade and other payables | 756.1 | 733.7 | 22.0 | 0.4 |
| Lease liabilities | 422.2 | 69.7 | 163.6 | 188.9 |
| Bank guarantees | 67.6 | 33.9 | 33.3 | 0.4 |
| **Total non-derivative cash outflows** | **3,438.1** | **1,456.3** | **1,179.0** | **802.8** |
| **Derivative financial (assets)/liabilities** | | | | |
| Cross currency interest rate swaps[2] | (8.5) | (8.5) | – | – |
| Interest rate swaps | 32.0 | 15.1 | 16.9 | – |
| **Net derivative cash outflows** | **23.5** | **6.6** | **16.9** | **–** |

[1] Contractual cash flows are not discounted, and are based on foreign exchange rates at year end. Any subsequent movements in foreign exchange rates could impact the actual cash flows on settlement of these assets and liabilities.

[2] The cross currency interest rate swap asset position has been added for completeness and there is no material liability position associated with this instrument.

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: RISK MANAGEMENT
FOR THE YEAR ENDED 30 SEPTEMBER 2025

| 30 September 2024 | Contractual cash flows[1] $mill | 0 – 12 months $mill | 1 – 5 years $mill | More than 5 years $mill |
|---|---|---|---|---|
| **Non-derivative financial liabilities** | | | | |
| Interest bearing liabilities | 1,684.1 | 19.5 | 1,664.6 | – |
| Interest payments | 235.9 | 54.1 | 159.4 | 22.4 |
| Trade and other payables | 895.4 | 883.0 | 12.4 | – |
| Lease liabilities | 327.8 | 54.7 | 131.4 | 141.7 |
| Bank guarantees | 95.2 | 65.3 | 29.5 | 0.4 |
| **Total non-derivative cash outflows** | **3,238.4** | **1,076.6** | **1,997.3** | **164.5** |
| **Derivative financial (assets)/liabilities** | | | | |
| Forward exchange contracts[2] | (0.2) | (0.2) | – | – |
| Cross currency interest rate swaps[2] | (2.5) | 0.6 | (3.1) | – |
| Interest rate swaps | 41.9 | 18.5 | 23.4 | – |
| Commodity swaps | 0.1 | 0.1 | – | – |
| **Net derivative cash outflows/(inflows)** | **39.3** | **19.0** | **20.3** | **–** |

(1) Contractual cash flows are not discounted, and are based on foreign exchange rates at year end. Any subsequent movements in foreign exchange rates could impact the actual cash flows on settlement of these assets and liabilities.

(2) The forward exchange contracts and cross currency interest rate swaps asset positions have been added for completeness and there is no material liability positions associated with these instruments.

> **Market risk:** The risk that changes in foreign exchange rates, interest rates and commodity prices will affect the Group's earnings, cash flows and the carrying values of its financial instruments.

The Group only considers hedging to prevent unacceptable balance sheet events such as potential impacts on the Group's credit ratings and/or the possibility for debt covenant breaches. Any hedging performed in these circumstances would be executed using instruments that allow as much participation in favourable movements while limiting downside risk to an acceptable level. An exception to this principle is related to foreign exchange exposures on specific or bespoke transactions where managing the exposure is important for margin management.

### Foreign exchange risk

*Source of risk*

The Group is exposed to changes in foreign exchange rates (primarily in USD) on the following transactions and balances:

» Sales and purchases

» Trade receivables and trade payables

» Interest bearing liabilities

The Group is also exposed to foreign exchange movements (primarily in USD) on the translation of the earnings, assets and liabilities of its foreign operations.

*Risk mitigation*

Foreign exchange exposure to sales and purchases is managed by entering into formal hedging arrangements.

The Group hedges both specific transactions and net exposures by entering into foreign exchange rate derivative contracts.

> **Outstanding financial instruments and sensitivity analysis**

The table below summarises the Group's exposure to movements in the AUD:USD exchange rate and the derivative financial instruments that are in place to hedge these exposures at 30 September:

| | 2025 USD mill | 2024 USD mill |
|---|---|---|
| **Transactional exposures** | | |
| Cash[1] | – | 244.1 |
| Trade and other receivables | – | 1.1 |
| Trade and other payables[1] | (4.4) | (339.9) |
| **Gross exposure (before hedging)** | **(4.4)** | **(94.7)** |
| **Hedge of transactional exposures** | | |
| *Trade and other payables* | | |
| Forward exchange contracts | 4.1 | 84.4 |
| **Total hedge contract values** | **4.1** | **84.4** |
| **Net exposure (after hedging)** | **(0.3)** | **(10.3)** |

| | 2025 USD mill | 2024 USD mill |
|---|---|---|
| **Hedge of forecast sales and purchases** | | |
| Forward exchange contracts | 1.6 | (63.7) |
| **Total hedge contract values** | **1.6** | **(63.7)** |

| | 2025 USD mill | 2024 USD mill |
|---|---|---|
| **Translational exposures** | | |
| Net investment in foreign operations[2] | 1,559.1 | 1,014.0 |
| **Gross exposure (before hedging)** | **1,559.1** | **1,014.0** |
| **Hedge of translational exposures** | | |
| Interest bearing liabilities | (500.0) | (500.0) |
| **Total hedge contract values** | **(500.0)** | **(500.0)** |
| **Net exposure (after hedging)** | **1,059.1** | **514.0** |

(1) The cash balance at 30 September 2024 was held to pay USD obligations including the outstanding tax liability relating to the Waggaman sale.

(2) The net investment in foreign operations has increased in FY25 largely due to the repayment of the Regulation S capital market bond (USD305.7m) and the tax payment relating to the WALA sale (USD259.5m).

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.163    Page 83 of 100

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: RISK MANAGEMENT

FOR THE YEAR ENDED 30 SEPTEMBER 2025

### Foreign exchange rates

The AUD:USD foreign exchange rates used by the Group to translate its foreign denominated earnings, assets and liabilities are set out below:

|  | 2025 AUD:USD | 2024 AUD:USD |
| --- | --- | --- |
| 30 September foreign exchange rate | 0.6577 | 0.6920 |
| Average foreign exchange rate for the year | 0.6438 | 0.6593 |

*Foreign exchange rate sensitivity on outstanding financial instruments*

The table below shows the impact of a 1 cent movement (net of hedging) in the AUD:USD exchange rate on the Group's profit and equity before tax in relation to foreign denominated assets and liabilities at 30 September:

|  | + 1c AUD:USD AUD mill 2025 | - 1c AUD:USD AUD mill 2025 | + 1c AUD:USD AUD mill 2024 | - 1c AUD:USD AUD mill 2024 |
| --- | --- | --- | --- | --- |
| **Foreign exchange sensitivity – (net of hedging)** | | | | |
| Trade and other receivables and payables – (profit or loss) | (0.1) | 0.1 | (0.1) | 0.1 |
| Hedge of forecast transactions – (equity) | – | – | 1.3 | (1.3) |
| Investments in foreign operations – (equity) | (24.1) | 24.9 | (10.6) | 10.9 |

*Sensitivity to foreign exchange rate movements during the year (unhedged)*

The table below shows the impact of a 1 cent movement in the AUD:USD foreign exchange rate on the Group's profit before tax, in relation to sales and earnings during the year that were denominated in USD.

|  | + 1c AUD:USD AUD mill 2025 | - 1c AUD:USD AUD mill 2025 | + 1c AUD:USD AUD mill 2024 | - 1c AUD:USD AUD mill 2024 |
| --- | --- | --- | --- | --- |
| USD Fertiliser sales from Australian plants | (12.6) | 13.0 | (9.5) | 9.8 |
| North American USD earnings | (3.2) | 3.3 | (3.9) | 4.0 |

The fertiliser sales sensitivity calculation is based on actual tonnes manufactured by the Australian fertiliser plants and sold during the year, the average AUD:USD exchange rate for the year, and the average USD fertiliser price.

The North American earnings translation sensitivity calculation is based on the earnings before interest and tax from the North American business for the year and the average AUD:USD exchange rate for the year.

### Interest rate risk

*Source of risk*

Exposure to interest rate risk is a result of the effect of changes in interest rates on the Group's outstanding interest bearing liabilities and derivative instruments.

*Risk mitigation*

The exposure to interest rate risk is mitigated by maintaining a mix of fixed and variable interest rate borrowings and by entering into interest rate derivative instruments.

### Outstanding financial instruments and sensitivity analysis

The tables below include the Group's derivative contracts that are exposed to changes in interest rates at 30 September:

| Interest rate swaps | Average pay/(rec) fixed rate SOFR | Average pay/(rec) fixed rate HIBOR | Duration (years) | Net contract amounts mill |
| --- | --- | --- | --- | --- |
| **2025** | | | | |
| Less than 1 year | – | (4.13%) | 0.4 | HKD 560 |
| 1 to 5 years | (1.53%) | – | 2.5 | USD 400 |
| **2024** | | | | |
| 1 to 5 years | (1.48%) | – | 3.5 | USD 400 |
| 1 to 5 years | – | (4.13%) | 1.4 | HKD 560 |

*Interest rate sensitivity on outstanding financial instruments*

The following table shows the sensitivity of the Group's profit before tax to a 1 per cent change in interest rates. The sensitivity is calculated based on the Group's interest bearing liabilities and derivative financial instruments that are exposed to interest rate movements and the AUD:USD exchange rate at 30 September:

| Interest rate sensitivity | + 1% AUD mill 2025 | - 1% AUD mill 2025 | + 1% AUD mill 2024 | - 1% AUD mill 2024 |
| --- | --- | --- | --- | --- |
| SOFR | (6.3) | 6.3 | (6.0) | 6.0 |
| BBSW | (1.0) | 1.0 | (1.0) | 1.0 |

The sensitivity above is also representative of the Group's interest rate exposures during the year.

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: RISK MANAGEMENT
FOR THE YEAR ENDED 30 SEPTEMBER 2025

### Commodity price risk

*Source of risk*

Exposure to changes in commodity prices is by virtue of the products that the Group sells and purchases in its manufacturing operations, and can be categorised into five main commodities, namely: Ammonia, Ammonium Nitrate, Ammonium Phosphate, Urea and Natural Gas.

*Risk mitigation*

Where possible, commodity price risk exposure is managed by entering into long-term contracts with customers and suppliers (i.e Ammonium Nitrate and Ammonia) or derivative contracts for input cost (i.e US natural gas). However, in some instances price risk exposure cannot be economically mitigated by either contractual arrangements or derivative contracts by virtue of the products that the Group sells.

The table below includes the Group's derivative contracts that are exposed to changes in natural gas prices at 30 September:

**Outstanding financial instruments and sensitivity analysis**

| Natural gas | Total volume (MMBTU) 2025 | Price/ Strike USD 2025 | Total volume (MMBTU)[1] 2024 | Price/ Strike USD[2] 2024 |
|---|---|---|---|---|
| *Contracts maturing within 1 year* | | | | |
| Natural gas swaps fixed payer | – | – | 80,000 | 3.80 |

(1)  Million Metric British Thermal Units
(2)  Nymex Henry Hub gas price

*Sensitivity to natural gas price movements during the year*

The table below shows the sensitivity of the Group's profit before tax to a change of US 10c per MMBTU in the Henry Hub natural gas price. The sensitivity is based on the average natural gas price, the average AUD:USD exchange rate (excluding the impact of hedging) and the current annual natural gas consumption of the Group's manufacturing operations in the Americas that are exposed to changes in natural gas prices:

| Natural gas price sensitivity | +US 10c per 1 MMBTU AUD mill 2025 | -US 10c per 1 MMBTU AUD mill 2025 | +US 10c per 1 MMBTU AUD mill 2024 | -US 10c per 1 MMBTU AUD mill 2024 |
|---|---|---|---|---|
| Henry Hub[1] | – | – | (0.7) | 0.7 |

(1)  The price sensitivity to Henry Hub relates to the Waggaman operations which was sold in FY24.

*Sensitivity to fertiliser price and ammonia movements during the year*

The table below shows the sensitivity of the Group's profit before tax to a US$10 per tonne change in Ammonium Phosphates, Urea and Ammonia prices. The sensitivity is based on actual tonnes manufactured and sold by the Group that is sensitive to commodity price changes and the average AUD:USD exchange rate (excluding the impact of hedging) for the year:

| Price sensitivity | + US$10 per tonne AUD mill | - US$10 per tonne AUD mill |
|---|---|---|
| **2025** | | |
| DAP/MAP (FOB China/Saudi) | 11.9 | (11.9) |
| Urea (FOB NOLA)[1] | 2.1 | (2.1) |
| **2024** | | |
| DAP/MAP (FOB China/Saudi) | 11.2 | (11.2) |
| Urea (FOB NOLA) | 1.8 | (1.8) |
| Ammonia (FOB Tampa)[2] | 2.2 | (2.2) |

(1)  The price sensitivity to Urea (FOB NOLA) relates to St Helens facility, which was sold in FY25.
(2)  The Group's price sensitivity to Ammonia (FOB Tampa) is nil in FY25 due to the sale of Waggaman in FY24.

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.165    Page 85 of 100

85  DYNO NOBEL

| Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | Independent Auditor's Report |

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: RISK MANAGEMENT**
FOR THE YEAR ENDED 30 SEPTEMBER 2025

Included in the table below are details of the Group's derivative instruments at 30 September 2025, classified by hedge accounting type and market risk category:

| 30 September 2025 | Note | Carrying amount of hedging instrument asset $mill | Carrying amount of hedging instrument liability $mill | Fair value hedge adjustment of hedged item $mill | Balance of gains/ (losses) in reserves before tax $mill | Gains/ (losses) recognised in reserves[1] $mill | Reclassification of (gains)/ losses from reserves to profit or loss[1,4] $mill |
|---|---|---|---|---|---|---|---|
| | | Balance at 30 September 2025 | | | | During the period | |
| **Cash flow hedges** | | | | | | | |
| Foreign exchange risk on forecast sales & purchases | | | | | | | |
| Forward exchange contracts | | 0.1 | (0.1) | – | – | (1.5) | – |
| Discontinued hedge[2] | | – | – | – | – | (9.3) | 8.0 |
| Commodity price risk on forecast purchases | | | | | | | |
| Commodity swaps | | – | – | – | – | 0.1 | – |
| Discontinued hedge[2] | | – | – | – | – | (0.7) | 0.7 |
| Interest rate risk on highly probable debt | | | | | | | |
| Discontinued hedge[2] | | – | – | – | (8.1) | – | 5.3 |
| **Total cash flow hedges** | | **0.1** | **(0.1)** | **–** | **(8.1)** | **(11.4)** | **14.0** |
| **Net investment hedges** | | | | | | | |
| Foreign exchange risk on foreign operation | | | | | | | |
| Interest bearing liabilities | | – | – | – | (113.3) | (37.7) | – |
| Discontinued hedge[2] | | – | – | – | (187.0) | – | – |
| **Total net investment hedges** | | **–** | **–** | **–** | **(300.3)** | **(37.7)** | **–** |
| **Fair value hedges** | | | | | | | |
| Foreign exchange risk on HKD borrowings | | | | | | | |
| Cross currency interest rate swaps | | 8.4 | – | (8.8) | – | – | – |
| Interest rate risk on fixed USD and HKD bonds[3] | | | | | | | |
| Interest rate swaps | | – | (30.7) | 16.9 | – | – | – |
| Discontinued hedge | | – | – | 0.4 | – | – | – |
| **Total fair value hedges** | (8) | **8.4** | **(30.7)** | **8.5** | **–** | **–** | **–** |
| **Equity instruments** | | **–** | **–** | **–** | **(17.0)** | **–** | **–** |
| **Total net** | | **8.5** | **(30.8)** | **8.5** | **(325.4)** | **(49.1)** | **14.0** |

(1) Gains or losses recognised in the reserves will be reclassified to the same line item in the profit or loss as the underlying hedged item when the underlying forecast transaction occurs.

(2) Gains or losses on discontinued hedges that were in cash flow hedge or net investment hedge relationships remain in the reserves until the underlying transactions occur or upon disposal of the underlying net investment. Any changes in the market value of the discontinued hedges are recognised in the profit or loss from discontinuation.

(3) Interest rate swap contracts effectively convert USD400m and HKD560m of the Group's fixed interest rate borrowings to floating interest rates. The fair value hedge adjustment of a hedged item where the hedging instrument is discontinued remains in the carrying amount of the hedged item and is amortised to the profit or loss over the life of the hedged item.

(4) At 30 September 2025, there were no gains/losses that were transferred from reserves to profit or loss in relation to ineffective hedges.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: RISK MANAGEMENT**
FOR THE YEAR ENDED 30 SEPTEMBER 2025

Included in the table below are details of the Group's derivative instruments at 30 September 2024, classified by hedge accounting type and market risk category:

| 30 September 2024 | Note | Carrying amount of hedging instrument asset $mill | Carrying amount of hedging instrument liability $mill | Fair value hedge adjustment of hedged item $mill | Balance of gains/ (losses) in reserves before tax $mill | Gains/ (losses) recognised in reserves[1] $mill | Reclassification of (gains)/ losses from reserves to profit or loss[1,4] $mill |
|---|---|---|---|---|---|---|---|
| | | Balance at 30 September 2024 | | | | During the period | |
| **Cash flow hedges** | | | | | | | |
| Foreign exchange risk on forecast sales & purchases | | | | | | | |
| Forward exchange contracts | | 2.1 | (1.9) | – | 1.5 | 2.1 | – |
| Foreign exchange options | | – | – | – | – | 0.8 | – |
| Discontinued hedge[2] | | – | – | – | 1.3 | 4.2 | (3.6) |
| Commodity price risk on forecast purchases | | | | | | | |
| Commodity swaps | | 0.3 | (0.3) | – | (0.1) | 0.3 | – |
| Discontinued hedge[2] | | – | – | – | – | (1.3) | 1.1 |
| Interest rate risk on highly probable debt | | | | | | | |
| Discontinued hedge[2] | | – | – | – | (13.4) | – | 13.6 |
| **Total cash flow hedges** | | **2.4** | **(2.2)** | **–** | **(10.7)** | **6.1** | **11.1** |
| **Net investment hedges** | | | | | | | |
| Foreign exchange risk on foreign operation | | | | | | | |
| Interest bearing liabilities | | – | – | – | (75.6) | 55.4 | – |
| Discontinued hedge[2] | | – | – | – | (187.0) | – | 344.7 |
| **Total net investment hedges** | | **–** | **–** | **–** | **(262.6)** | **55.4** | **344.7** |
| **Fair value hedges** | | | | | | | |
| Foreign exchange risk on HKD borrowings | | | | | | | |
| Cross currency interest rate swaps | | 3.3 | – | (3.5) | – | – | – |
| Interest rate risk on fixed USD and HKD bonds[3] | | | | | | | |
| Interest rate swaps | | – | (39.7) | 43.0 | – | – | – |
| Discontinued hedge | | – | – | 1.9 | – | – | – |
| **Total fair value hedges** | (8) | **3.3** | **(39.7)** | **41.4** | **–** | **–** | **–** |
| **Equity instruments** | | – | – | – | (17.0) | – | – |
| **Total net** | | 5.7 | (41.9) | 41.4 | (290.3) | 61.5 | 355.8 |

(1) Gains or losses recognised in the reserves will be reclassified to the same line item in the profit or loss as the underlying hedged item when the underlying forecast transaction occurs.

(2) Gains or losses on discontinued hedges that were in cash flow hedge or net investment hedge relationships remain in the reserves until the underlying transactions occur or upon disposal of the underlying net investment. Any changes in the market value of the discontinued hedges are recognised in the profit or loss from discontinuation. Gains or losses on net investment hedges offset the gains or losses on translation of foreign owned subsidiaries into AUD. A portion of the discontinued net investment hedges was released to the profit or loss with the completion of the sale of Waggaman.

(3) Interest rate swap contracts effectively convert USD400m and HKD560m of the Group's fixed interest rate borrowings to floating interest rates. The fair value hedge adjustment of a hedged item where the hedging instrument is discontinued remains in the carrying amount of the hedged item and is amortised to the profit or loss over the life of the hedged item.

(4) At 30 September 2024, there were no gains/losses that were transferred from reserves to profit or loss in relation to ineffective hedges.

87 DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.167    Page 87 of 100

Directors'
Report

Operating and
Financial Review

Remuneration
Report

**Financial
Report**

Independent
Auditor's Report

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: RISK MANAGEMENT
FOR THE YEAR ENDED 30 SEPTEMBER 2025

> **Credit risk:** The risk of financial loss to the Group as a result of customers or counterparties to financial assets failing to meet their contractual obligations.

*Source of risk*

The Group is exposed to counterparty credit risk from trade and other receivables and financial instrument contracts that are outstanding at the reporting date.

*Risk mitigation*

The Group minimises the credit risk associated with trade and other receivables balances by undertaking transactions with a large number of customers in various countries.

The creditworthiness of customers is reviewed prior to granting credit, using trade references and credit reference agencies. Credit limits are established and monitored for each customer, and these limits represent the highest level of exposure that a customer can reach. Trade credit insurance is purchased when required.

The Group mitigates credit risk from financial instrument contracts by only entering into transactions with counterparties that have sound credit ratings and, where applicable, with whom the Group has a signed netting agreement. Given their high credit ratings, the Group does not expect any counterparty to fail to meet its obligations.

*Credit risk exposure*

The Group's maximum exposure to credit risk at 30 September is the carrying amount, net of any provision for impairment, of the financial assets as detailed in the table below:

|  | 2025 $mill | 2024 $mill |
|---|---|---|
| Trade and other receivables | 871.6 | 670.1 |
| Cash and cash equivalents | 647.2 | 1,068.9 |
| Derivative assets | 8.5 | 5.7 |
|  | 1,527.3 | 1,744.7 |

Financial assets and financial liabilities that are subject to enforceable master netting arrangements and are intended to be settled on a net basis are offset in the Statement of Financial Position. At 30 September 2025, the amount netted in other financial assets and other financial liabilities is nil (2024: nil).

### Fair value

Fair value of the Group's financial assets and liabilities is calculated using a variety of techniques depending on the type of financial instrument as follows:

» The fair value of financial assets and financial liabilities traded in active markets (such as equity securities and fixed interest rate bonds) is the quoted market price at the reporting date.

» The fair value of financial assets and financial liabilities not traded in active markets is calculated using discounted cash flows. Future cash flows are calculated based on observable forward interest rates and foreign exchange rates.

» The fair value of forward exchange contracts, interest rate swaps, cross currency interest rate swaps, commodity swaps and forward contracts is calculated using discounted cash flows, reflecting the credit risk of various counterparties. Future cash flows are calculated based on the contract rate, observable forward interest rates and foreign exchange rates.

» The fair value of option contracts is calculated using the contract rates and observable market rates at the end of the reporting period, reflecting the credit risk of various counterparties. The valuation technique is consistent with the Black-Scholes methodology and utilises Monte Carlo simulations.

» The fair value of commodity swaps and commodity forward contracts is calculated using their quoted market price, where available. If a quoted market price is not available, then fair value is calculated using discounted cash flows. Future cash flows are estimated based on the difference between the contractual price and the current observable market price, reflecting the credit risk of various counterparties. These future cash flows are then discounted to present value.

» The nominal value less expected credit losses of trade receivables and payables are assumed to approximate their fair values due to their short term maturity.

*Fair value hierarchy*

The table below analyses financial instruments carried at fair value by valuation method. The different levels have been defined as follows:

» Level 1: quoted prices (unadjusted) in active markets for identical assets or liabilities.

» Level 2: inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly (i.e. as prices) or indirectly (i.e. derived from prices).

» Level 3: inputs for the asset or liability that are not based on observable market data (unobservable inputs).

| 2025 | Level 1 $mill | Level 2 $mill | Level 3 $mill |
|---|---|---|---|
| Derivative financial assets | – | 8.5 | – |
| Derivative financial liabilities | – | (30.8) | – |

| 2024 | Level 1 $mill | Level 2 $mill | Level 3 $mill |
|---|---|---|---|
| Derivative financial assets | – | 5.7 | – |
| Derivative financial liabilities | – | (41.9) | – |

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: RISK MANAGEMENT
FOR THE YEAR ENDED 30 SEPTEMBER 2025

*Fair value of financial assets and liabilities carried at amortised cost*

Cash and cash equivalents, trade and other receivables, and trade and other payables are carried at amortised cost which equals their fair value.

Interest bearing liabilities are carried at amortised cost and have a carrying value of $1,805.5m (2024: $1,684.1m) – refer to note 8. The fair value of the interest bearing financial liabilities at 30 September 2025 was $1,811.6m (2024: $1,694.3m) and was based on the level 2 valuation methodology.

### Key accounting policies

*Foreign currency transactions and balances*

The Group presents its accounts in Australian dollars. Foreign currency transactions are translated into Australian dollars using the exchange rates at the date the transaction occurs.

Monetary assets (such as trade receivables) and liabilities (such as trade payables) denominated in foreign currencies are translated into Australian dollars using the exchange rate at 30 September. Non-monetary items (for example, plant and machinery) that are measured at historical cost in a foreign currency are not re-translated.

Foreign exchange gains and losses relating to transactions are recognised in the profit or loss with the exception of gains and losses arising from cash flow hedges and net investment hedges that are recognised in other comprehensive income.

*Foreign operations*

The assets and liabilities of the Group's foreign operations are translated at applicable exchange rates at 30 September. Income and expense items are translated at the average exchange rates for the period.

Foreign exchange gains and losses arising on translation are recognised in the foreign currency translation reserve (FCTR). If and when the Group disposes of the foreign operation, these gains and losses are transferred from the FCTR to the profit or loss.

*Derivatives and hedging*

The Group uses contracts known as derivative financial instruments to hedge its financial risk exposures.

On entering into a hedging relationship, the Group formally designates and documents details of the hedge, risk management objective and strategy for entering into the arrangement. The Group applies hedge accounting to hedging relationships that are expected to be highly effective in offsetting changes in fair value, i.e. where the cash flows arising from the hedge instrument closely match the cash flows arising from the hedged item.

Hedge accounting is discontinued when:
- » The hedging relationship no longer meets the risk management objective.
- » The hedging instrument expires or is sold, terminated or exercised.

- » The hedge no longer qualifies for hedge accounting.

Derivatives are measured at fair value. The accounting treatment applied to specific types of hedges is set out below.

*Cash flow hedges*

Changes in the fair value of effective cash flow hedges are recognised in equity, in the cash flow hedge reserve. To the extent that the hedge is ineffective, changes in fair value are recognised in the profit or loss.

Fair value gains or losses accumulated in the reserve are taken to profit or loss when the hedged item affects profit or loss. When the hedged item is a non-financial asset, the amount recognised in the reserve is transferred to the carrying amount of the asset when the asset is purchased.

*Net investment hedges*

Hedges of a net investment in a foreign operation are accounted for in a similar way as cash flow hedges. Gains or losses on the effective portion of the hedge are recognised directly in equity (in the FCTR) while any gains or losses relating to the ineffective portion are recognised in the profit or loss.

On disposal of the foreign operation, the cumulative value of gains or losses recognised in the FCTR are transferred to profit or loss.

*Fair value hedges*

The change in the fair value of the hedging instrument and the change in the hedged item are recognised in the profit or loss.

*Hedge ineffectiveness*

The Group aims to transact only highly effective hedge relationships, and in most cases the hedging instruments have a 1:1 hedge ratio with the hedged items. However, at times, some hedge ineffectiveness can arise and is recognised in profit or loss in the period in which it occurs. Key sources of hedge ineffectiveness for the Group are as follows:
- » Maturity dates of hedging instruments not matching the maturity dates of the hedged items.
- » Credit risk inherent within the hedging instrument not matching the movement in the hedged item.
- » Interest rates of the Group's financing facilities not matching the interest rates of the hedging instrument.
- » Forecast transactions not occurring.

*Classification of financial instruments*

Financial instruments are classified into the following categories:
- » Amortised cost (cash and cash equivalents, interest bearing liabilities and trade and other receivables and payables).
- » Fair value through other comprehensive income (listed equity securities).
- » Fair value through profit or loss (derivative financial instruments except those that are in a designated hedge relationship).

**89** DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.169    Page 89 of 100

Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | Independent Auditor's Report

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: OTHER**
FOR THE YEAR ENDED 30 SEPTEMBER 2025

# 19. Share-based payments

### Incentive plans

The Long Term Incentive Plans (LTIs) are designed to link reward with the key performance drivers that underpin sustainable growth in shareholder value. With regard to the 2022/25 LTI, the performance conditions comprise relative total shareholder return, the delivery of certain long term value metrics, return on invested capital and sustainability metrics. The 2023/26 LTI plan consists of two components being performance rights and share options, the performance measures attached to the performance rights comprise of relative total shareholder return and return on invested capital. The 2023/26 LTI share options are subject to an absolute total shareholder return measure. The performance measures attached to the 2024/27 LTI plan comprise of relative total shareholder return and absolute total shareholder return.

Certain Executives have been awarded performance rights under Short Term Incentive Plans (STIs) based on financial, safety and strategic outcomes.

These arrangements support the Company's strategy for retention and motivation of its executives.

### Expenses arising from share-based payment transactions

Total expenses arising from share-based payment transactions recognised during the period as part of employee benefit expense were as follows:

| | 2025 $mill | 2024 $mill |
|---|---|---|
| Accounting value of performance rights and share options issued under the LTI and STI performance plans | 5.0 | 3.8 |

| | 2025 Number | 2024 Number |
|---|---|---|
| Number of performance rights outstanding under the LTI and STI performance plans | 5,683,638 | 4,262,265 |
| Number of performance share options outstanding under the LTI and STI performance plans | 16,402,391 | 12,312,761 |

Details of the movements in LTI and STI performance rights are disclosed in the Remuneration Report for key management personnel.

### Key accounting policies

The rights to shares granted to employees under the terms of the plans are measured at fair value. The fair value is recognised as an employee expense over the period that employees become unconditionally entitled to the rights. There is a corresponding increase in equity, which is reflected in the share based payments reserve.

The amount recognised as an expense is adjusted to reflect the actual number of rights taken up, once related service and other non-market conditions are met.

# 20. Key management personnel disclosures

### Key management personnel remuneration

| | 2025 $000 | 2024 $000 |
|---|---|---|
| Short-term employee benefits | 7,388 | 8,844 |
| Post-employment benefits | 219 | 212 |
| Other long-term benefits | 90 | 132 |
| Termination benefits | 550 | – |
| Share-based payments | 2,356 | 1,200 |
| | 10,603 | 10,388 |

Determination of key management personnel and detailed remuneration disclosures are provided in the Remuneration Report.

### Loans to key management personnel

In the year ended 30 September 2025, there were no loans to key management personnel and their related parties (2024: nil).

### Other key management personnel transactions

In the year ended 30 September 2025, there were no material transactions entered into during the year with key management personnel (including their related parties).

# 21. Retirement benefit obligation

The Group operates a number of defined benefit plans in the Americas and Asia Pacific to provide benefits for employees and their dependants on retirement, disability or death.

The Group also makes contributions to defined contribution schemes.

### Financial position and performance

**Net defined benefit obligation at 30 September**

| | 2025 $mil | 2024 $mill |
|---|---|---|
| Present value of obligations | 71.2 | 78.4 |
| Fair value of plan assets | (51.4) | (60.2) |
| **Net defined benefit obligation** | **19.8** | **18.2** |

**Maturity profile of the defined benefit obligation**

The expected maturity analysis of the undiscounted defined benefit obligation is as follows:

| | 2025 $mill | 2024 $mill |
|---|---|---|
| Within next 10 years | 56.9 | 62.5 |
| Within 10 to 20 years | 55.7 | 57.4 |
| In excess of 20 years | 36.4 | 41.9 |

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: OTHER
FOR THE YEAR ENDED 30 SEPTEMBER 2025

**Return on plan assets for the year ended 30 September**

|  | 2025 $mill | 2024 $mill |
|---|---|---|
| Actual return on plan assets | 6.1 | 5.9 |

**Composition of plan assets at 30 September**

|  | 2025 | 2024 |
|---|---|---|
| The percentage invested in each asset class: | | |
| Equities | 43% | 40% |
| Fixed interest securities | 32% | 32% |
| Property | 20% | 17% |
| Other | 5% | 11% |

### Movements in plan assets/liabilities

**Amounts recognised in Other Comprehensive Income**

|  | Notes | 2025 $mill | 2024 $mill |
|---|---|---|---|
| Loss arising from changes in actuarial assumptions | | (4.1) | (0.6) |
| Return on plan assets greater than discount rate | | 2.9 | 2.7 |
| Total (loss)/profit recognised in other comprehensive income | | (1.2) | 2.1 |
| Amounts recognised in Profit or Loss | | | |
| Net interest expense | (2) | (1.1) | (1.3) |
| Defined benefit superannuation expense | (2) | (1.1) | (1.3) |

### Key assumptions and sensitivities

**Principal actuarial assumptions**

|  | 2025 | 2024 |
|---|---|---|
| Discount rate (gross of tax) | 3.8% - 9.4% | 3.5% - 9.4% |
| Future salary increases | 2.5% - 5.0% | 2.5% - 5.0% |

**Sensitivity analysis**

The sensitivity analysis is based on a change in a significant actuarial assumption while holding all other assumptions constant. The following table summarises how the defined benefit obligation as at 30 September 2025 would have increased/(decreased) as a result of a change in the respective assumption by 1 percentage point:

|  | 1 percent increase | 1 percent decrease |
|---|---|---|
| Discount rate | (7.0) | 8.3 |
| Rate of salary increase | 0.9 | (0.8) |

### Key accounting policies

All employees of the Group are entitled to benefits from the Group's superannuation plan on retirement, disability or death or can direct the Group to make contributions to a defined contribution plan of their choice. The Group's superannuation plan has a defined benefit section and a defined contribution section. The defined benefit section provides defined lump sum benefits based on years of service and final average salary. The defined contribution section receives fixed contributions from group companies and the Group's legal or constructive obligation is limited to these contributions.

The liability or asset recognised in the Consolidated Statement of Financial Position in respect of defined benefit superannuation plans is the present value of the defined benefit obligation at the end of the reporting period less the fair value of plan assets.

Remeasurement gains and losses arising from experience adjustments and changes in actuarial assumptions are recognised in the period in which they occur, directly in other comprehensive income. They are included in retained earnings in the Consolidated Statement of Changes in Equity and in the Consolidated Statement of Financial Position.

Changes in the present value of the defined benefit obligation resulting from plan amendments or curtailments are recognised immediately in profit or loss as past service costs.

Contributions to the defined contribution section of the Group's superannuation fund and other independent defined contribution superannuation funds are recognised as an expense as they become payable.

### Key estimates and judgements

The present value of the defined benefit obligation at the reporting date is based on expected future payments arising from membership of the fund. This is calculated annually by independent actuaries considering the expected future wage and salary levels of employees, experience of employee departures and employee periods of service.

Expected future payments are discounted using market yields on corporate bonds at the reporting date, which have terms to maturity and currency that match, as closely as possible, the estimated future cash outflows.

91 **DYNO NOBEL**

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.171    Page 91 of 100

Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | Independent Auditor's Report

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: OTHER

FOR THE YEAR ENDED 30 SEPTEMBER 2025

## 22. Deed of cross guarantee

Entities that are party to a Deed of Cross Guarantee are included in note 16. The Statement of Profit or Loss and Other Comprehensive Income and the Statement of Financial Position for this closed group are shown below:

### Statement of Profit or Loss and Other Comprehensive Income

| | 2025 $mill | 2024[1] $mill |
|---|---|---|
| Profit/(loss) before income tax | 90.1 | (775.5) |
| Income tax (expense)/benefit | (0.4) | 215.6 |
| **Profit/(loss) for the year** | **89.7** | **(559.9)** |
| | | |
| Retained profits at 1 October | 423.7 | 1,453.5 |
| New entities added to the Deed | – | (92.4) |
| Profit/(loss) for the year | 89.7 | (559.9) |
| Other movements in retained earnings | 0.3 | 0.7 |
| Dividend paid | (162.3) | (378.2) |
| **Retained profits at 30 September** | **351.4** | **423.7** |

### Statement of Financial Position

| | 2025 $mill | 2024[1] $mill |
|---|---|---|
| **Current assets** | | |
| Cash and cash equivalents | 469.0 | 917.9 |
| Trade and other receivables | 482.5 | – |
| Inventories | 188.9 | 487.2 |
| Other assets | 36.2 | 42.3 |
| Other financial assets | 8.5 | 2.1 |
| Current tax assets | 25.7 | 68.3 |
| **Total current assets** | **1,210.8** | **1,517.6** |
| **Non-current assets** | | |
| Trade and other receivables | 752.8 | – |
| Other assets | 61.4 | – |
| Other financial assets | 2,892.2 | 2,993.8 |
| Property, plant and equipment | 1,284.8 | 1,574.0 |
| Right-of-use lease assets | 11.4 | 123.5 |
| Exploration and evaluation assets | – | 3.5 |
| Intangible assets | 73.3 | 67.6 |
| Deferred tax assets | 537.8 | 230.3 |
| **Total non-current assets** | **5,613.7** | **4,992.7** |
| **Total assets** | **6,824.5** | **6,510.3** |
| **Current liabilities** | | |
| Trade and other payables | 374.8 | 598.7 |
| Lease liabilities | 21.9 | 18.6 |
| Interest bearing liabilities | 540.2 | – |
| Other financial liabilities | 0.3 | 1.9 |
| Provisions | 195.7 | 115.3 |
| **Total current liabilities** | **1,132.9** | **734.5** |
| **Non-current liabilities** | | |
| Trade and other payables | 152.6 | 123.9 |
| Lease liabilities | 46.7 | 129.8 |
| Interest bearing liabilities | 1,238.2 | 1,233.5 |
| Other financial liabilities | 30.5 | 39.7 |
| Provisions | 204.1 | 123.5 |
| Deferred tax liabilities | 516.8 | 226.6 |
| Retirement benefit obligation | (1.7) | (1.1) |
| **Total non-current liabilities** | **2,187.2** | **1,876.0** |
| **Total liabilities** | **3,320.1** | **2,610.5** |
| **Net assets** | **3,504.4** | **3,899.9** |
| **Equity** | | |
| Issued capital | 3,072.6 | 3,354.7 |
| Reserves | 80.4 | 121.5 |
| Retained earnings | 351.4 | 423.7 |
| **Total equity** | **3,504.4** | **3,899.9** |

(1) FY24 has not been restated for entities that were sold to Ridley Corporation Limited (ASX: RIC) during FY25.

## 23. Parent entity disclosure

Throughout the financial year ended 30 September 2025 the parent company of the Group was Dyno Nobel Limited.

### Parent entity guarantees in respect of debts of its subsidiaries

The parent entity is part of a Deed of Cross Guarantee, under which each entity guarantees the debt of the others.

### Statement of Profit or Loss and Other Comprehensive Income

| Results of the parent entity | 2025 $mill | 2024 $mill |
|---|---|---|
| Profit for the year | 105.7 | 23.8 |
| Other comprehensive income | 4.3 | 6.5 |
| **Total comprehensive profit for the year** | **110.0** | **30.3** |

### Statement of Financial Position

| | 2025 $mill | 2024 $mill |
|---|---|---|
| Current assets | 825.2 | 1,604.3 |
| Total assets | 8,633.4 | 8,492.9 |
| Current liabilities | 1,288.9 | 847.1 |
| Total liabilities | 5,435.7 | 4,960.2 |
| **Net assets** | **3,197.7** | **3,532.7** |
| Share capital | 3,072.6 | 3,354.7 |
| Reserves | 3.5 | (0.6) |
| Retained earnings | 121.6 | 178.6 |
| **Total equity** | **3,197.7** | **3,532.7** |

### Parent entity contingencies and commitments

Contingent liabilities of Dyno Nobel Limited are disclosed in note 17.

| Capital expenditure – commitments | 2025 $mill | 2024 $mill |
|---|---|---|
| Contracted but not yet provided for and payable: | | |
| Within one year | 4.8 | 3.8 |

### Tax consolidation

The Company and its wholly-owned Australian resident entities have formed a tax consolidated group. As a result it is taxed as a single entity. The head entity of the tax consolidated group is Dyno Nobel Limited.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS: OTHER**
FOR THE YEAR ENDED 30 SEPTEMBER 2025

## 24. Auditor's remuneration

|  | 2025 $000 | 2024 $000 |
|---|---|---|
| **Deloitte and related network firms** | | |
| **Audit or review of financial reports** | | |
| Group | 1,759.5 | 1,571.0 |
| Subsidiaries and joint operations | 695.0 | 698.5 |
| | 2,454.5 | 2,269.5 |
| Other assurance and agreed-upon procedures under other legislation or contractual arrangements not required to be provided by the auditor | 169.0 | 488.0 |
| **Other services:** | | |
| Other consulting services | – | 80.0 |
| **Total remuneration** | 2,623.5 | 2,837.5 |
| **Non-Deloitte audit firms** | | |
| Audit services | 429.6 | 285.0 |
| **Total remuneration of non-Deloitte audit firms** | 429.6 | 285.0 |

From time to time, the auditors provide other services to the Group. These services are subject to strict corporate governance procedures which encompass the selection of service providers and the setting of their remuneration. The Audit and Risk Management Committee must approve individual non audit assurance engagements provided by the Group's auditor above a value of $100,000, as well as where the aggregate amount exceeds $250,000 per annum.

## 25. Events subsequent to reporting date

On 10 November 2025, Dyno Nobel announced a final dividend of 9.5 cents per share, unfranked, to be paid on 16 December 2025.

The record date for entitlement to this dividend is 2 December 2025. Based on the number of shares on issue at 30 September 2025, the total dividend payment will be $170.6m.

Other than the matters reported on above, the directors have not become aware of any other significant matter or circumstance that has arisen since the end of the financial year, that has affected or may affect the operations of the Group, the results of those operations, or the state of affairs of the Group in subsequent years, which has not been covered in this report.

93 DYNO NOBEL

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.173    Page 93 of 100

Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | Independent Auditor's Report

# Consolidated Entity Disclosure Statement

The Consolidated Entity Disclosure Statement has been prepared in accordance with s.295(3A)(a) of the *Corporations Act 2001* and includes information for Dyno Nobel Limited and each subsidiary of the Dyno Nobel Limited Group as at 30 September 2025.[1]

| Entity name | Entity type | Trustee, partner of participant in JV | Country of incorporation | % of share capital held | Australian tax resident | Foreign tax jurisdiction (if applicable) |
|---|---|---|---|---|---|---|
| Dyno Nobel Limited[2] | Body Corporate | N/A | Australia | N/A | Yes | N/A |
| Project Ceres Pty Ltd[2] | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Southern Cross Operations Limited[2] | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Dyno Nobel LTI Plan Company Pty Ltd | Body Corporate | Trustee | Australia | 100% | Yes | N/A |
| Dyno Nobel Explosives Holdings Pty Ltd | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Queensland Operations Pty Limited | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Dyno Nobel Investments 1 Pty Ltd | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Dyno Nobel Investments 2 Pty Ltd | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Dyno Nobel US Holdings Pty Ltd[2] | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Dyno Nobel Finance Australia Pty Ltd | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Dyno Nobel Aust Pty Ltd[2] | Body Corporate | N/A | Australia | 100% | Yes | USA |
| Dyno Nobel Europe Pty Ltd | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Dyno Nobel Management Pty Limited | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Industrial Investments Australia Finance Pty Limited | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Dyno Nobel Asia Pacific Pty Limited | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Dampier Nitrogen Pty Ltd | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| DNX Australia Pty Ltd | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Dyno Nobel Moranbah Pty Ltd | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Dyno Nobel Moura Pty Limited | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| PH Queensland Gas Pty Ltd[2] | Body Corporate | N/A | Australia | 100% | Yes | N/A |
| Dyno Nobel US Investments | Partnership | N/A | N/A | N/A | Yes | USA |
| Dyno Nobel Management LLC | Body Corporate | N/A | USA | 100% | No | USA |
| Dyno Nobel Finance LLC | Body Corporate | N/A | USA | 100% | Yes | N/A[3] |
| Dyno Nobel Australia LLC | Body Corporate | N/A | USA | 100% | Yes | N/A[3] |
| Dyno Nobel SPS LLC | Body Corporate | N/A | USA | 100% | Yes | N/A[3] |
| Dyno Nobel Holdings IV LLC | Body Corporate | N/A | USA | 100% | No | N/A[4] |
| Dyno Nobel Holdings USA III, Inc. | Body Corporate | N/A | USA | 100% | No | USA |
| Dyno Nobel Holdings USA II | Partnership | N/A | N/A | N/A | Yes | USA |
| Dyno Nobel Holdings USA II, Inc. | Body Corporate | N/A | USA | 100% | No | USA |
| Dyno Nobel Holdings USA, Inc. | Body Corporate | N/A | USA | 100% | No | USA |
| Dyno Nobel Inc. | Body Corporate | N/A | USA | 100% | No | USA |
| Dyno Nobel Transportation, Inc | Body Corporate | N/A | USA | 100% | No | USA |
| Simsbury Hopmeadow Street LLC | Body Corporate | N/A | USA | 100% | No | N/A[4] |
| Dyno Nobel Holdings V LLC | Body Corporate | N/A | USA | 100% | No | N/A[4] |
| Tradestar Corporation | Body Corporate | N/A | USA | 100% | No | USA |
| CMMPM, LLC | Body Corporate | N/A | USA | 100% | Yes | N/A |
| CMMPM Holdings, L.P. | Partnership | N/A | N/A | N/A | Yes | N/A |
| Dyno Nobel Louisiana Ammonia, LLC | Body Corporate | N/A | USA | 100% | No | N/A[4] |
| Nobel Labs, LLC | Body Corporate | N/A | USA | 100% | No | N/A[4] |
| Mine Equipment & Mill Supply Company | Body Corporate | N/A | USA | 100% | No | USA |
| Controlled Explosives, Inc. | Body Corporate | N/A | USA | 100% | No | USA |
| Drisk Insurance Inc. | Body Corporate | N/A | USA | 100% | No | USA |
| Falconi Construction, Inc. | Body Corporate | N/A | USA | 100% | No | USA |
| Alpha Dyno Nobel | Body Corporate | N/A | USA | 100% | No | USA |
| Dyno Nobel Canada Inc. | Body Corporate | N/A | Canada | 100% | No | Canada |
| Dyno Nobel Transportation Canada Inc. | Body Corporate | N/A | Canada | 100% | No | Canada |
| Dyno Nobel Nunavut Inc. | Body Corporate | N/A | Canada | 100% | No | Canada |
| Dyno Nobel Finance Canada Inc. | Body Corporate | N/A | Canada | 100% | No | Canada |
| Polar Explosives 2000 Inc. | Body Corporate | N/A | Canada | 100% | No | Canada |
| Dene Dyno Nobel (Polar) Inc. | Body Corporate | N/A | Canada | 100% | No | Canada |
| Dyno Nobel Waggaman Inc. | Body Corporate | N/A | Canada | 100% | No | Canada |
| Incitec Pivot Holdings (Hong Kong) Limited | Body Corporate | N/A | Hong Kong | 100% | Yes | Hong Kong |
| Coltivi Insurance Pte Ltd | Body Corporate | N/A | Singapore | 100% | No | Singapore |

# Consolidated Entity Disclosure Statement

| Entity name | Entity type | Trustee, partner of participant in JV | Country of incorporation | % of share capital held | Australian tax resident | Foreign tax jurisdiction (if applicable) |
|---|---|---|---|---|---|---|
| Dyno Nobel Explosivos Chile Limitada | Body Corporate | N/A | Chile | 100% | No | Chile |
| Dyno Nobel Peru S.A. | Body Corporate | N/A | Peru | 100% | No | Peru |
| Dyno Nobel Mexico, S.A. de C.V. | Body Corporate | N/A | Mexico | 99.98% | No | Mexico |
| DNX Papua New Guinea Ltd | Body Corporate | N/A | Papua New Guinea | 100% | No | Papua New Guinea |
| PT DNX Indonesia | Body Corporate | N/A | Indonesia | 100% | No | Indonesia |
| Nitromak Dnx Kimya Sanayii Anonim Sirketi | Body Corporate | N/A | Türkiye | 100% | No | Türkiye |
| RomNitro Explosives SRL | Body Corporate | N/A | Romania | 100% | No | Romania |
| Dyno Nobel Holdings Europe SA | Body Corporate | N/A | Switzerland | 100% | No | Switzerland |
| Dyno Nobel Holdings France Sas | Body Corporate | N/A | France | 100% | No | France |
| Explinvest SASU | Body Corporate | N/A | France | 100% | No | France |
| Titanobel SASU | Body Corporate | N/A | France | 100% | No | France |
| Société d'Explosifs du Centre-Est SA | Body Corporate | N/A | France | 99.9% | No | France |
| Groupement Forestier Minez Clegueric | Body Corporate | N/A | France | 66% | No | France |
| Titanobel-NPGM Equipment SAS | Body Corporate | N/A | France | 51% | No | France |
| Nord-Sud Dynamitage-Sofiter SARL | Body Corporate | N/A | New Caledonia | 51% | No | New Caledonia |
| Titanobel Benin SASU | Body Corporate | N/A | Benin | 100% | No | Benin |
| Titanobel Cameroun SASU | Body Corporate | N/A | Cameroon | 100% | No | Cameroon |
| Afrique Ouest Drilling Sofiter SARL | Body Corporate | N/A | Senegal | 100% | No | Senegal |
| DNX Malaysia Sdn. Bhd. | Body Corporate | N/A | Malaysia | 100% | No | Malaysia |
| Dyno Nobel Ghana Ltd | Body Corporate | N/A | Ghana | 100% | No | Ghana |
| Dyno Nobel Guinee | Body Corporate | N/A | Guinee | 100% | No | Guinee |
| Dyno Nobel Explosives Limited | Body Corporate | N/A | Tanzania | 80% | No | Tanzania |

(1)     After the sale of the fertiliser distribution business to Ridley Corporation Limited on 30 September 2025, the following entities that were included in prior year Statement have been removed:
· Australian Bio Fert Pty Ltd
· Easy Liquids Pty Ltd
· Incitec Pivot Pty Ltd (formerly TOP Australia Pty Limited)
· Incitec Pivot Trading Pty Ltd (formerly Southern Cross International Pty Ltd)
· Incitec Pivot Fertiliser (Singapore) Pte. Ltd
· OZBIOFERT Pty Ltd

Also due to the changes in the following entities during the year, they have not been included in the current year Statement:
· Nitro Industria Kimike Shpk, Albania was sold;
· Société Financière de Terrassement SAS, France merged into Titanobel SASU;
· Titanobel Southern Africa (Pty) Ltd, South Africa was deregistered during the year;
· Voluntary liquidation has commenced in respect of Enviro Blasting Services (Pty) Limited, South Africa during the year.

(2)     The following entities have undergone name change during the year:

| Current name | Previous name |
|---|---|
| Dyno Nobel Limited | Incitec Pivot Limited |
| Project Ceres Pty Ltd | Incitec Fertilisers Operations Pty Ltd |
| Southern Cross Operations Limited | Incitec Pivot Fertilisers Limited |
| Dyno Nobel US Holdings Pty Ltd | Incitec Pivot US Holdings Pty Ltd |
| Dyno Nobel Aust Pty Ltd. | Dyno Nobel Pty Ltd |
| PH Queensland Gas Pty Ltd | Incitec Pivot Queensland Gas Pty Ltd |

(3)     The entity is treated as "flow-through" for US federal income tax purposes and therefore, is not considered a tax resident of the US. However, it is treated as part of a US tax resident entity. For Australian tax purposes, the entity is treated as a partnership with Australian resident partners that are part of the Australian tax consolidated group.

(4)     This entity is treated as "flow-through" for US federal income tax purposes and therefore, not considered a tax resident of the US. For Australian tax purposes, the entity is treated as a partnership with Australian resident partners that are part of the Australian tax consolidated group.

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.175    Page 95 of 100

95    DYNO NOBEL    Directors' Report | Operating and Financial Review | Remuneration Report | **Financial Report** | **Independent Auditor's Report**

# Directors' Declaration

## on the Consolidated Financial Statements set out on pages 49 to 94

In accordance with a resolution of the directors of Dyno Nobel Limited (the Company), we state that:

1.    In the opinion of the directors:

   (a) the consolidated financial statements and notes, set out on pages 49 to 94, are in accordance with the *Corporations Act 2001*, including:

   (i)    giving a true and fair view of the financial position of the Company and the Group as at 30 September 2025 and of their performance for the year ended on that date; and

   (ii)   complying with Accounting Standards in Australia (including the Australian Accounting Interpretations) and the Corporations Regulations 2001;

   (b) the financial report also complies with International Financial Reporting Standards as disclosed on page 57; and

   (c) there are reasonable grounds to believe the Company and the Group will be able to pay their debts as and when they become due and payable.

2.    There are reasonable grounds to believe that the Company and the controlled entities identified in note 16 will be able to meet any obligations or liabilities to which they are or may become subject by virtue of the Deed of Cross Guarantee between the Company and those subsidiaries pursuant to ASIC Corporations (Wholly-owned Companies) Instrument 2016/785.

3.    The directors have been given the declaration by the Chief Executive Officer and the Chief Financial Officer as required by section 295A of the *Corporations Act 2001* for the financial year ended 30 September 2025.

4.    The consolidated entity disclosure statement set out on pages 93 to 94 required by section 295(3A) of the *Corporations Act 2001* is true and correct.

**Greg Robinson**
Chair

10 November 2025

**Mauro Neves**
CEO & Managing Director

10 November 2025



Deloitte Touche Tohmatsu
A.B.N. 74 490 121 060

477 Collins Street
Melbourne VIC 3000

Tel: +61 3 9671 7000
www.deloitte.com.au

# Independent Auditor's Report
## to the members of Dyno Nobel Limited

**Report on the Audit of the Financial Report**

*Opinion*

We have audited the financial report of Dyno Nobel Limited (the "Company") and its subsidiaries (the "Group"), which comprises the consolidated statement of financial position as at 30 September 2025, the consolidated statement of profit or loss and other comprehensive income, the consolidated statement of changes in equity and the consolidated statement of cash flows for the year then ended, and notes to the financial statements, including material accounting policy information and other explanatory information, the consolidated entity disclosure statement and the directors' declaration.

In our opinion, the accompanying financial report of the Group is in accordance with the *Corporations Act 2001*, including:

- Giving a true and fair view of the Group's financial position as at 30 September 2025 and of its financial performance for the year then ended; and

- Complying with Australian Accounting Standards and the *Corporations Regulations 2001*.

*Basis for Opinion*

We conducted our audit in accordance with Australian Auditing Standards. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Report section of our report. We are independent of the Group in accordance with the auditor independence requirements of the *Corporations Act 2001* and the ethical requirements of the APES 110 *Code of Ethics for Professional Accountants (including Independence Standards)* issued by the Accounting Professional & Ethical Standards Board Limited (the Code) that are relevant to audits of the financial report of public interest entities in Australia. We have also fulfilled our other ethical responsibilities in accordance with the Code.

We confirm that the independence declaration required by the *Corporations Act 2001*, which has been given to the directors of the Company, would be in the same terms if given to the directors as at the time of this auditor's report.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

*Key Audit Matters*

The key audit matters are those matters that, in our professional judgement, were of most significance in our audit of the financial report for the current period. These matters were addressed in the context of our audit of the financial report as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters.

Liability limited by a scheme approved under Professional Standards Legislation
Member of Deloitte Asia Pacific and the Deloitte organisation

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.177    Page 97 of
100

97    DYNO
NOBEL

Directors'
Report

Operating and
Financial Review

Remuneration
Report

Financial
Report

**Independent
Auditor's Report**

# Deloitte.

| Key Audit Matter | How the scope of our audit responded to the Key Audit Matter |
|---|---|
| **Incitec Pivot Fertilisers ('IPF') Distribution business divestment**<br><br>*Refer to Note 2 Revenue and expenses, Note 14 Discontinued operations and Note 17 Provisions and contingencies.*<br><br>As at 30 September 2025, Dyno Nobel recognised the sale of the IPF Distribution assets to Ridley Corporation Limited which resulted in a net loss on sale of $145.4 million. The earnings attributable to IPF Distribution for the twelve months ended 30 September 2025 have been presented as discontinued operations.<br><br>As at 30 September 2025, Dyno Nobel also recognised the sale of the Gibson Island land to Goodman Group. This resulted in the recognition of the provision for remediation of the Gibson Island land of $157.0 million.<br><br>The divestment accounting is subject to a high level of judgement including but not limited to the recognition of deferred consideration, working capital and net debt adjustments, tax considerations and recognising and measuring the resulting net loss on sale<br><br>Management's estimate for the cost to remediate the Gibson Island land is subject to a high level of estimation uncertainty and is based on third party specialist cost estimates.<br><br>Given the size of the transaction, the nature of the contracts entered into, the complexity of the accounting requirements and the level of management judgment involved, we consider this to be a Key Audit Matter. | Our procedures to assess the divestment accounting included, but were not limited to:<br><br>• Understanding the relevant controls and processes that management has undertaken to assess the divestment and discontinued operations accounting;<br><br>• Reading the executed agreements to understand key terms and conditions;<br><br>• Assessing the revenues and expenses recorded for the discontinued operations for the period ended 30 September 2025 in accordance with the accounting standards;<br><br>• Assessing the timing of de-recognition of net assets disposed as of 30 September 2025 in line with the executed agreements;<br><br>• Agreeing cash consideration received to bank statements;<br><br>• Assessing the recognition and measurement of deferred consideration;<br><br>• Testing transaction costs on a sample basis to supporting documentation;<br><br>• Agreeing the working capital adjustment and net assets disposed amounts to underlying asset and liability values in the general ledger at 30 September 2025;<br><br>• In conjunction with our tax specialists, assessing the CGT and tax treatments associated with each sale; and<br><br>• Assessing the completeness and accuracy of the costs included and judgements applied to develop the estimates for remediation provisions, including:<br><br>  ○ Enquiring with management to understand the process undertaken to develop the estimate;<br><br>  ○ Reading and assessing the reasonableness of the external reports provided by third party specialists; and<br><br>  ○ Agreeing a sample of forecast costs to underlying budgets and supporting documentation, where applicable.<br><br>We have also assessed the adequacy of the disclosures included in Notes 2, 14 and 17 in the financial statements. |

# Deloitte.

| **Carrying value of goodwill and non-current assets** | Our procedures to assess the recoverable amounts of the CGUs included, but were not limited to: |
|---|---|
| *Refer to Note 9 Property, plant and equipment, Note 10 Leases, Note 11 Intangibles and Note 12 Impairment of goodwill and non-current assets in the financial statements.* <br><br> As at 30 September 2025, the Group held goodwill of $1,778.5 million, intangible assets of $847.7 million, property, plant and equipment of $2,203.7 million and right-of-use lease assets of $149.2 million, which are allocated to the Group's cash generating units (CGUs). <br><br> As disclosed in Note 12, an impairment charge of $245.4 million was recognised against property, plant and equipment, right-of-use lease assets and inventories. <br><br> Goodwill is monitored and tested annually for impairment. An assessment is made for indicators of impairment for each CGU, including the individual operating asset CGUs. <br><br> The assessment of the recoverable amount is subject to a high level of judgement and is based on management's view of key variables and market conditions. The Group has prepared a value-in-use model to determine the recoverable amount of each CGU with goodwill or where an indicator of impairment was identified. <br><br> The Group's Phosphate Hill model is sensitive to changes in key assumptions, including natural gas prices, commodity prices and discount rate. <br><br> The Group's Dyno Nobel Asia Pacific ('DNAP') model is sensitive to changes in terminal value assumptions, including natural gas prices, growth rate and discount rate. <br><br> The Group's Dyno Nobel Americas ('DNA') model is sensitive to changes in terminal value assumptions, including growth rate and discount rate. <br><br> Given the sensitivities of the assumptions in the Phosphate Hill, DNAP and DNA models, we consider the carrying value of goodwill and non-current assets to be a Key Audit Matter. | • Understanding the relevant controls and processes that management has undertaken to assess the recoverable amounts; <br><br> • In conjunction with our valuation specialists: <br>   ○ Evaluating the appropriateness of the models used and the valuation techniques applied by management; <br>   ○ Testing the mechanics of the models; and <br>   ○ Comparing the discount rates applied with an independently developed rate. <br><br> • Assessing and challenging the key assumptions in the models and terminal values by: <br>   ○ Corroborating the key independent market based assumptions to external analysts' reports, published industry growth rates and industry reports; <br>   ○ Corroborating the key non-market based assumptions by comparing Board approved forecasts to historical performance to test the accuracy of management's forecasts; <br>   ○ Agreeing contracted volumes and pricing assumptions in the models to the Board approved forecasts; and <br>   ○ Performing a range of sensitivity analyses on the key assumptions including discount rates, growth rates, natural gas prices and commodity prices used in the cash flow forecasts. <br><br> We have also assessed the adequacy of the disclosures included in Notes 9, 10, 11, and 12 in the financial statements. |

*Other Information*

The directors are responsible for the other information. The other information comprises the Directors' Report, which we obtained prior to the date of the auditor's report, and also includes the following information which will be included in the Group's annual report (but does not include the financial report and our auditor's report thereon): About Us, Performance and Outlook, Being a Sustainability Business, Governance, and Additional Information, which is expected to be made available to us after that date.

Our opinion on the financial report does not cover the other information and we do not express any form of assurance conclusion thereon.

Case 2:25-cv-00789-DBP    Document 21-1    Filed 11/14/25    PageID.179    Page 99 of

99    DYNO    100
     NOBEL

Directors'      Operating and       Remuneration     Financial      **Independent**
Report          Financial Review    Report           Report         **Auditor's Report**

# Deloitte.

In connection with our audit of the financial report, our responsibility is to read the other information identified above and, in doing so, consider whether the other information is materially inconsistent with the financial report or our knowledge obtained in the audit, or otherwise appears to be materially misstated. If, based on the work we have performed, we conclude that there is a material misstatement of this other information, we are required to report that fact. We have nothing to report in this regard.

When we read the About Us, Performance and Outlook, Being a Sustainability Business, Governance, and Additional Information, if we conclude that there is a material misstatement therein, we are required to communicate the matter to the directors and use our professional judgement to determine the appropriate action.

*Responsibilities of the Directors for the Financial Report*

The directors are responsible:

- For the preparation of the financial report in accordance with the *Corporations Act 2001*, including giving a true and fair view of the financial position and performance of the Group in accordance with Australian Accounting Standards; and

- For such internal control as the directors determine is necessary to enable the preparation of the financial report in accordance with the *Corporations Act 2001*, including giving a true and fair view of the financial position and performance of the Group, and is free from material misstatement, whether due to fraud or error.

In preparing the financial report, the directors are responsible for assessing the ability of the Group to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the directors either intend to liquidate the Group or to cease operations, or have no realistic alternative but to do so.

*Auditor's Responsibilities for the Audit of the Financial Report*

Our objectives are to obtain reasonable assurance about whether the financial report as a whole is free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with the Australian Auditing Standards will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of this financial report.

As part of an audit in accordance with the Australian Auditing Standards, we exercise professional judgement and maintain professional scepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the financial report, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control.

- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by the directors.

- Conclude on the appropriateness of the directors' use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Group's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditor's report to the related disclosures in the financial report or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditor's report. However, future events or conditions may cause the Group to cease to continue as a going concern.

# Deloitte.

- Evaluate the overall presentation, structure and content of the financial report, including the disclosures, and whether the financial report represents the underlying transactions and events in a manner that achieves fair presentation.

- Plan and perform the group audit to obtain sufficient appropriate audit evidence regarding the financial information of the entities or business activities within the Group as a basis for forming an opinion on the Group financial report. We are responsible for the direction, supervision and review of the audit work performed for the purposes of the group audit. We remain solely responsible for our audit opinion.

We communicate with the directors regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

We also provide the directors with a statement that we have complied with relevant ethical requirements regarding independence, and to communicate with them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, actions taken to eliminate threats or safeguards applied.

From the matters communicated with the directors, we determine those matters that were of most significance in the audit of the financial report of the current period and are therefore the key audit matters. We describe these matters in our auditor's report unless law or regulation precludes public disclosure about the matter or when, in extremely rare circumstances, we determine that a matter should not be communicated in our report because the adverse consequences of doing so would reasonably be expected to outweigh the public interest benefits of such communication.

**Report on the Remuneration Report**

*Opinion on the Remuneration Report*

We have audited the Remuneration Report included in pages 28 to 47 of the Directors' Report for the year ended 30 September 2025.

In our opinion, the Remuneration Report of Dyno Nobel Limited, for the year ended 30 September 2025, complies with section 300A of the *Corporations Act 2001*.

*Responsibilities*

The directors of the Company are responsible for the preparation and presentation of the Remuneration Report in accordance with section 300A of the *Corporations Act 2001*. Our responsibility is to express an opinion on the Remuneration Report, based on our audit conducted in accordance with Australian Auditing Standards.

DELOITTE TOUCHE TOHMATSU

Suzana Vlahovic
Partner
Chartered Accountants
Melbourne, 10 November 2025